**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

COUNTY OF SUFFOLK,

*Plaintiff*,

v.

ACTAVIS HOLDCO US, INC.; ACTAVIS
ELIZABETH LLC; ACTAVIS PHARMA,
INC.; AMNEAL PHARMACEUTICALS,
INC.; AMNEAL PHARMACEUTICALS
LLC; APOTEX CORP.; ASCEND
LABORATORIES, LLC; AUROBINDO
PHARMA USA, INC.; BARR
PHARMACEUTICALS, LLC; BAUSCH
HEALTH AMERICAS, INC.; BAUSCH
HEALTH US, LLC; BRECKENRIDGE
PHARMACEUTICAL, INC.; CITRON
PHARMA LLC; DAVA
PHARMACEUTICALS, LLC; DR
REDDY'S LABORATORIES, INC.;
ENDO INTERNATIONAL PLC;
FOUGERA PHARMACEUTICALS INC.;
GENERICS BIDCO I, LLC; GLENMARK
PHARMACEUTICALS, INC.;
GREENSTONE LLC; G&W
LABORATORIES, INC.; HERITAGE
PHARMACEUTICALS, INC.; LANNETT
COMPANY, INC.; LUPIN
PHARMACEUTICALS, INC.; MAYNE
PHARMA USA INC.; MALLINCKRODT
INC.; MALLINCKRODT LLC;
MALLINCKRODT PLC; MUTUAL
PHARMACEUTICAL COMPANY, INC.;
MYLAN INC.; MYLAN
PHARMACEUTICALS, INC.; PAR
PHARMACEUTICAL, INC.; PERRIGO
NEW YORK, INC.; PFIZER, INC.;
SANDOZ, INC.; PLIVA, INC.; SUN
PHARMACEUTICAL INDUSTRIES,
INC.; RISING PHARMACEUTICALS,
INC.; RISING PHARMA HOLDINGS,
INC.; TARO PHARMACEUTICALS
USA, INC.; TELIGENT, INC.; TEVA

Index No.


**VERIFIED COMPLAINT**


**JURY TRIAL DEMANDED**

PHARMACEUTICALS USA, INC.;
UPSHER-SMITH LABORATORIES,
LLC; WEST-WARD
PHARMACEUTICALS CORP.;
WOCKHARDT USA LLC; ZYDUS
PHARMACEUTICALS (USA), INC.

*Defendants.*

## TABLE OF CONTENTS

*INTRODUCTION* ................................................................................................... 6

*PARTIES* ................................................................................................................. 8

   **Plaintiff** ............................................................................................................. 8

   **Defendants** ....................................................................................................... 9

      **Actavis** ............................................................................................................ 9

      **Amneal** .......................................................................................................... 10

      **Apotex** ........................................................................................................... 11

      **Ascend** ........................................................................................................... 11

      **Aurobindo** ..................................................................................................... 11

      **Teva, Barr and PLIVA** .................................................................................. 11

      **Bausch** ........................................................................................................... 12

      **Breckenridge** ................................................................................................. 12

      **Citron** ............................................................................................................ 12

      **Par, Generics Bidco, Endo and DAVA** .......................................................... 12

      **Dr. Reddy's** ................................................................................................... 13

      **Sandoz and Fougera** ...................................................................................... 13

      **Glenmark** ...................................................................................................... 14

      **G&W** ............................................................................................................. 14

      **Greenstone and Pfizer** ................................................................................... 14

      **Heritage** ......................................................................................................... 15

      **Lannett** .......................................................................................................... 15

      **Lupin** ............................................................................................................. 15

      **Mayne** ........................................................................................................... 15

      **Mylan** ............................................................................................................ 16

      **Mallinckrodt** ................................................................................................. 16

      **Sun, Mutual and Taro** .................................................................................. 17

      **Perrigo** ........................................................................................................... 18

      **Upsher-Smith** ................................................................................................ 18

      **West-Ward** ..................................................................................................... 18

      **Wockhardt** .................................................................................................... 18

      **Zydus** ............................................................................................................. 19

      **Rising** ............................................................................................................. 19

      **Teligent** ......................................................................................................... 19

      **Unknown co-conspirators** ............................................................................. 19

*JURISDICTION* ................................................................................................... 19

*GENERIC DRUGS AND THE PHARAMCEUTICAL INDUSTRY* ..................... 21

   **Generic Drugs** .................................................................................................. 21

   **Generic Drugs are Cheaper than Brand-Name Drugs** ...................................... 22

   **Competition Lowers Generic Drug Prices** ........................................................ 25

   **The Generic Pharmaceutical Industry is Susceptible to Anti-Competitive Conduct** ........ 27

*PRICING IN THE PHARMACEUTICAL INDUSTRY* ...................................... 29

*STATE AND FEDERAL INVESTIGATIONS* ..................................................... 32

   **State Investigations** .......................................................................................... 32

Department of Justice Investigation ..............................................................35

*PAYMENTS MADE BY SUFFOLK COUNTY FOR PHARMACEUTICAL COSTS, INCLUDING GENERIC DRUGS*..............................................................41

*THE PRICE-FIXING CONSPIRACY* ..............................................................43

*DEFENDANT SPECIFIC AND DRUG SPECIFIC ALLEGATIONS* ..........................47

Movement of Defendants' Employees Within the Industry ..............................51

Frequent Telephone Calls and Text Messages Between Defendants....................52

Communications Through Intermediaries ......................................................64

Defendants Deliberately Decided not to Bid for Customers or Market Certain Drugs....66

*DRUG-SPECIFIC ALLEGATIONS*..............................................................67

Nystatin ..............................................................68
   Nystatin Cream..............................................................68
   Nystatin External Ointment..............................................................72
   Nystatin Tablets..............................................................74

Clonidine TTS Patch and Doxazosin Mesylate ..............................................82

Irbesartan ..............................................................90

Nimodipine ..............................................................91

Valsartan HCTZ ..............................................................97

Doxycycline Hyclate ..............................................................101
   Doxy RR..............................................................101
   Doxy DR..............................................................102

Doxycycline Monohydrate ..............................................................110

Zoledronic Acid ..............................................................117

Tizanidine ..............................................................122

Meprobamate..............................................................124

Nabumetone, Pravastatin, Ranitidine, Adapalene Gel..............................128

Acetazolamide..............................................................132
   Acetazolamide tablets..............................................................133
   Acetazolamide capsules..............................................................136

Temozolomide..............................................................139

Azithromycin Suspension..............................................................142

Tolterodine Extended Release..............................................................145

Tolterodine Tartrate ..............................................................150

Dexmethylphenidate HCL Extended Release..............................................157

Piroxicam..............................................................160

Niacin ER..............................................................163

Baclofen..............................................................165

**Glipizide-Metformin HCI** ........................................................................ **169**

**Glyburide** ................................................................................................ **172**

**Glyburide-Metformin** ............................................................................... **177**

**Leflunomide** ............................................................................................ **181**

**Paromomycin** .......................................................................................... **184**

**Theophylline Extended Release** ............................................................... **186**

**Verapamil HCL** ....................................................................................... **189**

**Fenofibrate** ............................................................................................. **193**

**Diflunisal** ................................................................................................ **200**

**Ketoconazole** .......................................................................................... **202**

**Fluocinonide** ........................................................................................... **205**

**Warfarin, Carbamazepine, and Clotrimazole** ........................................... **208**

**Tobramycin** ............................................................................................. **212**

**Glimepiride** ............................................................................................. **214**

**Griseofulvin** ............................................................................................ **215**

**Gabapentin** ............................................................................................. **217**

**Celecoxib** ................................................................................................ **218**

**Cabergoline** ............................................................................................ **219**

***THE EFFECT OF THE PRICE-FIXING CONSPIRACY*** ................................ ***221***

***THE PRICE-FIXING CONSPIRACY CONSTITUTES VIOLATIONS OF FEDERAL AND STATE ANTITRUST LAW*** ................................................................. ***222***

***THE PRICE-FIXING CONSPIRACY AFFECTED AND AFFECTS INTERSTATE AND INTRASTATE TRADE AND COMMERCE*** .......................................... ***224***

***FACTS RELATING TO STATUTES OF LIMITATION*** ................................ ***225***

**Defendants' Violations Continue to the Present Date** ................................ **225**

**Plaintiff Had No Knowledge of the Price-Fixing Conspiracy Until at Least May 2019.** **225**

**Defendants Concealed their Unlawful Conduct** ......................................... **225**

***CAUSES OF ACTION AGAINST ALL DEFENDANTS*** ................................ ***230***

**FIRST CAUSE OF ACTION** ....................................................................... **230**

**SECOND CAUSE OF ACTION** ................................................................... **233**

**THIRD CAUSE OF ACTION** ..................................................................... **235**

**FOURTH CAUSE OF ACTION** .................................................................. **238**

***PRAYER FOR RELIEF*** ........................................................................... ***240***

***DEMAND FOR TRIAL BY JURY*** .............................................................. ***241***

## INTRODUCTION

1.      This is an action brought by the County of Suffolk ("Plaintiff") against the above-captioned defendants ("Defendants") in relation to Defendants' conduct, which entailed, in particular, participation in an unlawful agreement and overarching conspiracy (the "Price-Fixing Conspiracy") to allocate customers, minimize competition, rig bids and fix, raise, maintain, and/or stabilize the prices of all of their generic pharmaceuticals. Defendants' conduct was intended to, and did, maintain artificially inflated prices for drugs and avoid competition between the Defendants. This conduct occurred between 2011 and the present date (the "Relevant Period").

2.      The Price-Fixing Conspiracy encompassed an agreement among all Defendants, which covered generic drugs manufactured and/or sold by Defendants during the Relevant Period. The Price-Fixing Conspiracy included multiple subsidiary agreements among certain Defendants relating to one or more generic drugs they manufactured. Each Defendant benefited from the unlawful agreement and overarching conspiracy, including all subsidiary agreements, as a whole.

3.      The pricing of generic drugs during the Relevant Period, which experienced a substantial increase, cannot be explained by changes in supply, the costs of production or any other competitive market feature. The only explanation is the Price-Fixing Conspiracy.

4.      Plaintiff is both a Direct Purchaser of, and End-Payor for, certain generic drugs manufactured by Defendants. Plaintiff paid for the generic drugs manufactured by Defendants listed in the table attached to this Complaint as Exhibit A ("Drugs at Issue"). As a result of Defendants' conduct, Plaintiff paid more than it should have for the Drugs at Issue between 2011 and the present date (the "Relevant Period"). Plaintiff reserves the

right to amend this Complaint to include additional names of generic drugs it purchased which were affected by the Price-Fixing Conspiracy.

5.      The accusations made in this Complaint in relation to the operation of the Price-Fixing Conspiracy, and in particular the details of Defendants' communications and agreements during the course of the Price-Fixing Conspiracy, are made on information and belief.  They are based primarily on allegations which have been made by state Attorneys General and the Department of Justice ("DOJ") as a result of their investigations into generic drug manufacturers including at least some of the Defendants.  Through the course of these investigations, evidence was uncovered which, ordinarily, entities without the investigative powers of the DOJ or the offices of state Attorney Generals cannot have uncovered and cannot access.

6.      For example, one of the Complaints filed in litigation brought by a number of state Attorneys General against a number of generic drug manufacturers explains that the allegations in the Complaint are based on "(1) the review of many thousands of documents produced by dozens of companies and individuals throughout the generic pharmaceutical to fix, (2) an industry-wide telephone call database consisting of more than 11 million telephone call records from hundreds of individuals at various levels of the Defendant companies and other generic manufacturers, and (3) information provided by several as-of-yet unidentified cooperating witnesses who were directly involved in the conduct."[1]  This is information which is currently unavailable to Plaintiff.  However, Plaintiff has a reasonable basis for believing the truth of the allegations made by state

---

[1] *The State of Connecticut, et. al. v. Teva Pharmaceuticals USA, Inc.* Case No. 3:19-cv-00710 (D. Conn.): Case No. 2:19-cv-02407 (E.D. Pa.), Complaint ¶ 4.

Attorneys General in three lawsuits concerning the Price-Fixing Conspiracy and relies on the content of the most recent amended Complaints filed in those lawsuits.  Plaintiff also relies on the content of the Complaints filed in other lawsuits relating to the Price-Fixing Conspiracy which are based on the findings of the state Attorneys General investigation.

## PARTIES

**Plaintiff**

7.      Plaintiff County of Suffolk ("Suffolk County") is a County of the State of New York, located on the central and eastern part of Long Island.  It covers 2,373 square miles and has a population of 1,481,093 as of 2018.[2]

8.      Suffolk County employs over 8,500 employees.  Employees of Suffolk County include those working in areas including, but not limited to, public works, social services, public health, consumer protection, law enforcement, jail maintenance and operations and environmental protection.

9.      Suffolk County is a governmental entity which self-insures the vast majority of its healthcare costs.  It pays healthcare costs for (i) those employees and retirees of Suffolk County, and their dependents, who are not covered by Medicare; (ii) certain former employees of Suffolk County and their dependents, who not covered by Medicare, for a limited period of time under the Consolidated Omnibus Budget Reconciliation Act; (iii) inmates of the Suffolk County operated jail system; (iv) children born to female inmates of the Suffolk County operated jail system, for the period the child resides within the jail system; (v) Medicaid beneficiaries who reside within Suffolk County and/or for whom

---

[2] New York State Website, "Suffolk," https://www.ny.gov/counties/suffolk.

Suffolk County has been determined to be the district of fiscal responsibility; and (vi) Medicare beneficiaries, which include certain employees, retirees and former employees of Suffolk County and their dependents.

**Defendants**

10.    Each of the Defendants named in this Complaint is defined to include its managers, officers, employees and/or agents.  Defendants and other entities referred to in this Complaint are set out in Exhibit C.

11.    During the Relevant Period, each of the Defendants named in this Complaint manufactured, produced, marketed and/or sold one or more generic drugs, including one or more of the Drugs at Issue, in Suffolk County, which is within the Eastern District of New York.  In addition, during the Relevant Period, each Defendant directly participated in the Price-Fixing Conspiracy, manufactured, produced, marketed and/or sold one or more generic drugs, including one of more of the Drugs at Issue, at anti-competitive prices influenced by the Price-Fixing Conspiracy in Suffolk County, which is in this District, and throughout the United States, and knowingly received proceeds as a result of the Price-Fixing Conspiracy.

**Actavis**

12.    Defendant Actavis Holdco US, Inc. ("Actavis Holdco") is a Delaware corporation with its principal place of business in Parsippany, New Jersey.

13.    In August 2016, Defendant Teva Pharmaceuticals USA, Inc. acquired the Actavis generics business of Allergan plc, including Actavis, Inc.  Upon the acquisition, Actavis, Inc. – the acquired Allergan plc generics operating company (formerly known as Watson Pharmaceuticals) – was renamed Allergan Finance, LLC, which in turn assigned

all of the assets and liabilities of the former Allergan plc generics business to the newly formed Actavis Holdco, including subsidiaries Defendant Actavis Pharma, Inc. and Defendant Actavis Elizabeth LLC (a research and development and manufacturing entity for Actavis's generic operations), among others.  Actavis Holdco is a wholly owned subsidiary of Defendant Teva Pharmaceuticals USA, Inc.

14.     Defendant Actavis Pharma, Inc. is a Delaware corporation with its principal place of business in Parsippany, New Jersey.  It is a wholly owned subsidiary of Actavis Holdco and is a principal operating company in the U.S. for generic products acquired from Allergan plc. It manufactures, markets, and/or distributes generic pharmaceuticals.

15.     Actavis Elizabeth LLC ("Actavis Elizabeth") is a Delaware company with its principal place of business in Elizabeth, New Jersey.  It is a wholly owned subsidiary of Actavis Holdco and is a research, development, and manufacturing entity for Actavis generic operations.

16.     Unless addressed individually, Actavis Holdco, Actavis Pharma, and Actavis Elizabeth are collectively referred to herein as "Actavis."

**Amneal**

17.     Defendant Amneal Pharmaceuticals, Inc. ("Amneal Inc.") is a Delaware corporation with a principal place of business in Bridgewater, New Jersey.  It is the parent company of Defendant Amneal Pharmaceuticals, LLC.

18.     Defendant Amneal Pharmaceuticals, LLC ("Amneal LLC") is a Delaware limited liability company with its principal place of business in Bridgewater, New Jersey.

19.     Unless addressed individually, Amneal Inc. and Amneal LLC are collectively referred to herein as "Amneal."

**Apotex**

20.     Defendant Apotex Corp. ("Apotex") is a Delaware Corporation.   Its principal place of business is in Weston, Florida.

**Ascend**

21.     Defendant Ascend Laboratories, LLC ("Ascend") is a New Jersey corporation, with a principal place of business in Parsippany, New Jersey.

**Aurobindo**

22.     Defendant Aurobindo Pharma U.S.A., Inc. ("Aurobindo") is a Delaware corporation with its principal place of business in Dayton, New Jersey.

**Teva, Barr and PLIVA**

23.     Defendant Teva Pharmaceuticals USA, Inc. ("Teva USA") is a Delaware corporation with its principal place of business in North Wales, Pennsylvania.  It is a subsidiary of Teva Pharmaceutical Industries Ltd., an Israeli entity.

24.     Defendant Barr Pharmaceuticals, LLC ("Barr") is a Delaware limited liability company with its principal place of business in North Wales, Pennsylvania. Barr is a wholly owned subsidiary of Teva USA, which acquired Barr (then called Barr Pharmaceuticals, Inc.) in 2008.

25.     Defendant PLIVA, Inc. ("PLIVA") is a New Jersey corporation with its principal place of business in East Hanover, New Jersey. PLIVA is a wholly owned subsidiary of Teva USA, which acquired the PLIVA assets as part of the Barr acquisition.

26.     Unless referred to individually, Teva USA, Barr, and PLIVA are collectively referred to herein as "Teva."

27.     In addition, as explained above, Defendant Actavis Holdco is a wholly owned subsidiary of Defendant Teva Pharmaceuticals USA, Inc.

**Bausch**

28.     Defendant Bausch Health Americas, Inc. (formerly known as Valeant Pharmaceuticals International, Inc.) is a Delaware corporation with its U.S. headquarters located in Bridgewater, New Jersey.

29.     Bausch Health US, LLC (formerly known as Valeant Pharmaceuticals North America LLC) is a Delaware limited liability company with its principal place of business in Bridgewater, New Jersey.  Bausch Health US, LLC is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

30.     Unless addressed individually, Bausch Health Americas, Inc. and Bausch Health US, LLC are collectively referred to herein as "Valeant."

**Breckenridge**

31.     Defendant Breckenridge Pharmaceutical, Inc. ("Breckenridge") is a Delaware corporation with its principal place of business in Fairfield, New Jersey. Breckenridge is wholly owned by Pensa Pharma S.A.

**Citron**

32.     Defendant Citron Pharma, LLC ("Citron") is a Delaware limited liability company with its principal place of business in East Brunswick, New Jersey.

**Par, Generics Bidco, Endo and DAVA**

33.     Defendant Par Pharmaceutical, Inc. ("PPI") is a New York corporation with its principal place of business in Chestnut Ridge, New York.

34.     Defendant Generics Bidco I, LLC ("Generics Bidco") is a Delaware company with its principal place of business in Huntsville, Alabama.  Generics Bidco formerly conducted business as Qualitest Pharmaceuticals ("Qualitest").

35.     Defendant DAVA Pharmaceuticals, LLC ("DAVA") is a Delaware corporation with its principal place of business in New Jersey.  DAVA's principal place of business is in Fort Lee.

36.     PPI, Generics Bidco and DAVA are wholly owned subsidiaries of Defendant Endo International plc ("Endo"), an Irish corporation with its principal place of business located in Dublin, Ireland, and its U.S. headquarters located in Malvern, Pennsylvania.

37.     PPI, Generics Bidco and DAVA collectively do business as Par Pharmaceutical.  Unless addressed individually, Endo, PPI, Generics Bidco, DAVA and Qualitest are collectively referred to herein as "Par."

**Dr. Reddy's**

38.     Defendant Dr. Reddy's Laboratories, Inc. ("Dr. Reddy's") is a Delaware corporation with its principal place of business in Princeton, New Jersey.

**Sandoz and Fougera**

39.     Defendant Sandoz, Inc. ("Sandoz") is a Colorado corporation, with its principal place of business in Princeton, New Jersey.  Sandoz is a subsidiary of Novartis AG, a global pharmaceutical company based in Basel, Switzerland.  Sandoz is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

40.     Defendant Fougera Pharmaceuticals Inc. ("Fougera") is a New York corporation with its principal place of business in Melville, New York.  Fougera is a wholly owned subsidiary of Defendant Sandoz, Inc.  In 2012, Sandoz acquired and integrated Fougera into its U.S.-based generic pharmaceutical business.

41.     Unless addressed individually, Fougera and Sandoz are collectively referred to herein as "Sandoz."

**Glenmark**

42.     Defendant Glenmark Pharmaceuticals Inc., USA ("Glenmark") is a Delaware corporation with a principal place of business in Mahwah, New Jersey.

**G&W**

43.     Defendant G&W Laboratories, Inc. ("G&W") is a New Jersey corporation with its principal place of business in South Plainfield, New Jersey.

**Greenstone and Pfizer**

44.     Defendant Greenstone LLC ("Greenstone") is a New Jersey limited liability company with its principal place of business in North Peapack, New Jersey.

45.     Greenstone is a wholly owned subsidiary of Defendant Pfizer Inc. ("Pfizer"), a global pharmaceutical company headquartered in New York, New York, and has at all relevant times operated as the generic drug division of Pfizer.  Greenstone operates out of Pfizer's Peapack, New Jersey campus, and a majority of Greenstone's employees are also employees of Pfizer's Essential Health Division, including Greenstone's President.  Greenstone employees also use Pfizer for financial analysis, human resources, and employee benefit purposes, making the two companies essentially indistinguishable.

46.     Defendant Pfizer is a Delaware corporation, with its principal place of business in New York, New York.  Pfizer is a global biopharmaceutical company and is the corporate parent of Defendant Greenstone.

47.     Unless addressed individually, Greenstone and Pfizer are collectively referred to herein as "Greenstone."

**Heritage**

48.     Defendant Heritage Pharmaceuticals, Inc. ("Heritage") is a Delaware corporation with its principal place of business in Mahwah, New Jersey.  In April 2011, Emcure (a pharmaceutical company based in India) acquired Heritage.

**Lannett**

49.     Defendant Lannett Company, Inc. ("Lannett") is a Delaware corporation with its principal place of business in Philadelphia, Pennsylvania.

**Lupin**

50.     Defendant Lupin Pharmaceuticals, Inc. ("Lupin") is a Delaware corporation with its principal place of business in Baltimore, Maryland.  Lupin is a wholly owned subsidiary of Lupin Ltd., an Indian company with its principal place of business in Mumbai, India.

**Mayne**

51.     Defendant Mayne Pharma USA, Inc. ("Mayne") is a Delaware corporation with its principal place of business in New Jersey.  Mayne's principal place of business is in Paramus, New Jersey.

**Mylan**

52.     Defendant Mylan Inc. is a Pennsylvania corporation with its principal place of business in Canonsburg, Pennsylvania.

53.     Defendant Mylan Pharmaceuticals Inc. ("Mylan Pharma") is a West Virginia corporation with its principal place of business in Morgantown, West Virginia.  It is a subsidiary of Mylan Inc.  Mylan Pharma is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

54.     Unless addressed individually, Mylan Inc. and Mylan Pharma are collectively referred to herein as "Mylan."

**Mallinckrodt**

55.     Defendant Mallinckrodt Inc. is a Delaware corporation with its principal place of business in Webster Groves, Missouri.  As a result of a tax inversion acquisition, as of 2013 it is a wholly owned subsidiary of Mallinckrodt plc, which is based in the United Kingdom.  Mallinckrodt Inc. is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

56.     Defendant Mallinckrodt plc is an Irish public limited company with its principal place of business in Staines-Upon-Thames, Surrey, United Kingdom. Mallinckrodt plc was incorporated in January 2013 for the purpose of holding the pharmaceuticals business of Covidien plc, which was fully transferred to Mallinckrodt plc in June 2013.  Mallinckrodt plc also operates under the registered business name Mallinckrodt Pharmaceuticals, with its U.S. headquarters in Hazelwood, Missouri.

57.     Defendant Mallinckrodt LLC is a Delaware limited liability corporation headquartered in Hazelwood, Missouri.

58.     Unless addressed individually, Mallinckrodt Inc., Mallinckrodt plc, and Mallinckrodt LLC are collectively referred to herein as "Mallinckrodt."

**Sun, Mutual and Taro**

59.     Defendant Sun Pharmaceutical Industries, Inc. ("SPII") is a Michigan corporation with its principal place of business in Cranbury, New Jersey.  SPII is a wholly owned subsidiary of Sun Pharmaceutical Industries Ltd. ("Sun Pharma"), an Indian corporation, which also owns a majority stake in Taro Pharmaceutical Industries, Ltd., and Taro's U.S. subsidiary, Defendant Taro Pharmaceutical USA, Inc.

60.     Beginning in 1997, Sun Pharma began a series of investments in Caraco Pharmaceutical Laboratories Ltd. ("Caraco") and in 2013 acquired 100 percent of Caraco and merged it into SPII to become Sun Pharma's US operations for generic pharmaceutical products.

61.     In 2012, SPII acquired URL Pharma, Inc. ("URL") and its subsidiary, Mutual Pharmaceutical Company, Inc. ("Mutual"), both of which have their principal place of business in Philadelphia.    Until at least June 2016, URL and Mutual operated a pharmaceutical manufacturing facility in Philadelphia, Pennsylvania.  On or about April 28, 2015, URL was merged with Mutual.

62.     Defendant Mutual is a Delaware corporation with its principal place of business located in Philadelphia, Pennsylvania.  It is a wholly owned subsidiary of SPII. Many of the pharmaceutical products sold and distributed throughout the U.S. during the

Relevant Period by SPII, URL and Mutual were marked with the trade name "MUTUAL" on the pill or capsule.

63.    Defendant Taro Pharmaceuticals U.S.A., Inc. ("Taro") is a New York corporation with its principal place of business in Hawthorne, New York.  Taro is a wholly owned subsidiary of Taro Pharmaceutical Industries, Ltd., an Israeli entity, which in turn is majority-owned by Sun Pharma.  Unless referred to individually, Taro, SPII, URL, and Mutual are collectively referred to herein as "Sun."

**Perrigo**

64.    Defendant Perrigo New York, Inc. ("Perrigo") is a Delaware corporation with its executive offices in Allegan, Michigan and its primary business location in Bronx, New York.  It is a subsidiary of Perrigo Company, plc, an Irish company with its principal place of business in Dublin, Ireland.

**Upsher-Smith**

65.    Defendant Upsher-Smith Laboratories, LLC (formerly known as Upsher-Smith Laboratories, Inc.) ("Upsher-Smith"), is a Minnesota limited liability company with its principal place of business located in Maple Grove, Minnesota.  Upsher-Smith is a subsidiary of Sawaii Pharmaceutical Co., Ltd., a large generics company in Japan.

**West-Ward**

66.    Defendant West-Ward Pharmaceuticals Corp. ("West-Ward") is a Delaware corporation with its principal place of business in Eatontown, New Jersey.

**Wockhardt**

67.    Defendant Wockhardt USA LLC ("Wockhardt") is a Delaware limited liability company located in Parsippany, New Jersey.

**Zydus**

68.     Defendant Zydus Pharmaceuticals (USA), Inc. ("Zydus") is a New Jersey corporation with its principal place of business in Pennington, New Jersey.

**Rising**

69.     Rising Pharma Holdings, Inc., f/k/a/ Shore Suven Pharma, is a New Jersey corporation with its principal place of business in East Brunswick, New Jersey.  In April 2019, Rising Pharma Holdings, Inc. acquired the assets of Rising Pharmaceuticals, Inc. and its subsidiaries.  Rising Pharmaceuticals, Inc. is a New Jersey company with its principal place of business in Allendale, New Jersey.  Unless separately referred to, Rising Pharma Holdings, Inc. and Rising Pharmaceuticals, Inc. are collectively referred to herein as "Rising."

**Teligent**

70.     Teligent, Inc. ("Teligent") is a Delaware corporation with its principal place of business in Buena, New Jersey.

**Unknown co-conspirators**

71.     Various individuals and entities who are not currently named as defendants conspired with Defendants in furtherance of, and participated in, the Price-Fixing Conspiracy.  Plaintiff reserves its right to amend this Complaint to name additional defendant co-conspirators and add additional allegations related to the Price-Fixing Conspiracy.

## JURISDICTION

72.     The Court has subject matter jurisdiction because Plaintiff brings this action under §§1 and 3 of the Sherman Act, 15 U.S.C. §1, and under §§4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a).

73.     Plaintiff also brings this action under New York state statutes, including the Donnelly Act, General Business Law § 340, *et seq*., New York Social Services Law § 145-b, as well as under the common law of New York.  All claims under federal and state law are based on a common nucleus of operative fact, and the entire action commenced by this Complaint constitutes a single case that would ordinarily be tried in one judicial proceeding.  The Court has jurisdiction over the non-federal claims under 18 U.S.C. § 1367(a), as well as under principles of pendent jurisdiction.  Pendent jurisdiction will avoid unnecessary duplication and multiplicity of actions and should be exercised in the interests of judicial economy, convenience, and fairness.

74.     This Court has personal jurisdiction over Defendants because, *inter alia*, each Defendant: (a) transacted business throughout the U.S., including in Suffolk County; (b) sold generic drugs throughout the U.S., including in Suffolk County; (c) had substantial contacts with the U.S., including in Suffolk County, because Defendants resided, transacted business and/or had agents in New York State and Suffolk County; (d) was engaged in the Price-Fixing Conspiracy, which was directed at, and had the intended effect of causing injury to, persons residing in, located in, or doing business throughout the U.S., including in Suffolk County; (e) took overt action in furtherance of the Price-Fixing Conspiracy in Suffolk County or conspired with someone who did, and by doing so could reasonably have been expected to be sued in the Eastern District of New York; and/or (f) is subject to nationwide personal jurisdiction under the Clayton Act.

75.     Venue is proper in this Court because Suffolk County is within the Eastern District of New York and a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in Suffolk County, a substantial portion of the affected interstate trade and commerce described below was, and is, carried out in Suffolk County, and the resultant harm and damages were suffered in Suffolk County.

## **GENERIC DRUGS AND THE PHARAMCEUTICAL INDUSTRY**

### **Generic Drugs**

76.     A generic drug is a medication which is pharmaceutically equivalent to an existing brand-name drug, containing the same molecularly identical active pharmaceutical ingredient ("API") and identical to a brand-name drug in dosage form, safety, strength, effectiveness, quality and manner of administration.[3]  In short, a generic drug works the same way as an equivalent brand-name drug, and all generic versions of a certain brand-name drug are interchangeable.

77.     Under federal law, prescription generic drugs, like other prescription drugs, may generally only be marketed in the U.S. if approved by the U.S. Food and Drug Administration (FDA).  In order to gain approval by the FDA, generic drug manufacturers like Defendants must submit an Abbreviated New Drug Application ("ANDA") that shows a generic drug is the same as the brand-name version in the following ways:

(a)     The active ingredient in the generic drug is the same as in the brand-name drug;

---

[3] FDA Website, "Generic Drugs: Questions and Answers," https://www.fda.gov/drugs/questions-answers/generic-drugs-questions-answers.

(b)     The generic drug has the same strength, use indications, form (such as a tablet or an injectable), and route of administration (such as oral or topical);

(c)     The inactive ingredients of the generic drug are acceptable to the FDA;

(d)     The generic drug is manufactured under the same standards as the brand-name medicine; and

(e)     The container in which the generic drug will be shipped and sold is appropriate, and the label is the same as the brand-name drug's label.[4]

78.     Generic drugs are usually manufactured and distributed when the manufacturer of the equivalent brand-name drug loses patent rights or other exclusivity rights concerning that drug.[5]

**Generic Drugs are Cheaper than Brand-Name Drugs**

79.     Generic drugs are sold for a lower price than the equivalent brand name drug, offering greater access to healthcare to individuals.  An individual with a prescription for a brand name drug can fill that prescription for a lower-priced, generic version of that drug.  Generic drugs can be sold at a cheaper price than their brand name equivalents because of the streamlined process for gaining FDA approval for generic drugs, meaning

---

[4] U.S. Food and Drug Administration, "Generic Drug Facts" https://www.fda.gov/drugs/generic-drugs/generic-drug-facts.

[5] Congressional Budget Office, *Effects of Using Generic Drugs on Medicare's Prescription Drug Spending* (Sept. 2010), VII, available at: https://www.cbo.gov/sites/default/files/111th-congress-2009-2010/reports/09-15-prescriptiondrugs.pdf.

drug manufacturers can manufacture and distribute generic drugs much more cheaply than brand-name drugs.

80.     Recognizing the significant savings to the U.S. healthcare system attributable to generic drug sales, and the potential for those savings to be even greater, Congress enacted the Drug Price Competition and Patent Term Restoration Act of 1984 (the "Hatch-Waxman Act"), Pub. L. No. 98-417, Stat, 1585.  The Hatch-Waxman Act streamlined the regulatory process for generic drug manufacturers to gain approval to sell and otherwise distribute generic drugs.  Currently, "[m]anufacturers of generic drugs are not required to duplicate all of the costly clinical trials conducted by manufacturers of the brand name drug; instead, to gain approval from the Food and Drug Administration (FDA), they must demonstrate only that the generic version contains the same active ingredient as the brand-name version…and provides very similar concentrations of the drug in the blood."[6]

81.     The Congressional Budget Office ("CBO") stated in 2010 that generic drugs are, on average, seventy-five percent cheaper than the equivalent brand-name drug.[7]  Also in 2010, the Federal Trade Commission ("FTC") stated that in a mature market (the market for a specific generic drug "matures" around one year after the first manufacturer of that generic drug enters the market), "generic prices are, on average, eighty-five percent lower than the pre-entry branded drug price."[8]

---

[6] *Id.* at 8.

[7] *Federal* Trade Commission, *Pay-for-Delay: How Drug Company Pay-Offs Cost Consumers Billions* (Jan. 2010), 8, available at: https://www.ftc.gov/sites/default/files/documents/reports/pay-delay-how-drug-company-pay-offs-cost-consumers-billions-federal-trade-commission-staff-study/100112payfordelayrpt.pdf.

[8] *Federal* Trade Commission, *Pay-for-Delay: How Drug Company Pay-Offs Cost Consumers Billions* (Jan. 2010), 8, available at: https://www.ftc.gov/sites/default/files/documents/reports/pay-

82.     Since generic drugs are cheaper than their brand-name equivalents, they make up the majority of prescriptions filled in the U.S.  Nine out of ten prescriptions filled in the U.S. are for generic drugs.[9]  In fact, since the passage of the Hatch-Waxman Act, every state in the U.S. has enacted laws requiring or permitting pharmacies to substitute generic drug equivalents for branded drugs, unless the prescribing physician orders otherwise on the prescription.  In New York State, all drug prescriptions contain wording that allows for substitution of a brand name drug with a generic drug unless the prescriber indicates otherwise.[10]

83.     Since they are significantly cheaper than brand-name drugs, generic drugs can save (and have saved) consumers, other purchasers of drugs (including Plaintiff) and taxpayers tens of billions of dollars annually.  In a 2010 report, the CBO estimated that dispensing generic drugs rather than their brand name counterparts to certain Medicare beneficiaries reduced total prescription drug costs in 2007 by some $33 billion.[11]  The FTC, in 2010, calculated that "the average consumer savings from a mature generic market relative to pre-generic levels are approximately seventy-seven percent (eighty-five percent savings multiplied by ninety percent of market demand)."[12]

84.     The FDA explains the savings generic drugs enable in the following terms:

---

delay-how-drug-company-pay-offs-cost-consumers-billions-federal-trade-commission-staff-study/100112payfordelayrpt.pdf.

[9] U.S. Food & Drug Administration, "Generic Drugs" (Nov 11, 2019), https://www.fda.gov/drugs/buying-using-medicine-safely/generic-drugs.

[10] NY CLS Educ § 6810(6)(e); *see also* NY CLS Pub Health § 206(1)(o).

[11] Congressional Budget Office, *Effects of Using Generic Drugs on Medicare's Prescription Drug Spending* (Sept. 2010), VII, available at: https://www.cbo.gov/sites/default/files/111th-congress-2009-2010/reports/09-15-prescriptiondrugs.pdf.

[12] Federal Trade Commission, *Pay-for-Delay: How Drug Company Pay-Offs Cost Consumers Billions* (Jan. 2010), 8, available at: https://www.ftc.gov/sites/default/files/documents/reports/pay-delay-how-drug-company-pay-offs-cost-consumers-billions-federal-trade-commission-staff-study/100112payfordelayrpt.pdf.

**Generic medicines cost less than brand-name medicines**

Generic medicines tend to cost less than their brand-name counterparts because they do not have to repeat animal and clinical (human) studies that were required of the brand-name medicines to demonstrate safety and effectiveness.  In addition, multiple applications for generic drugs are often approved to market a single product; this creates competition in the marketplace, typically resulting in lower prices.

The reduction in upfront research costs means that, although generic medicines have the same therapeutic effect as their branded counterparts, they are typically sold at substantially lower costs.  When multiple generic companies market a single approved product, market competition typically results in prices about 85% less than the brand-name.  According to the IMS Health Institute, generic drugs saved the U.S. health care system $1.67 trillion from 2007 to 2016.[13]

85.     Generic drugs are, as explained above, a lower cost option to brand name drugs, and collectively save consumers and the U.S. health industry billions of dollars each year.  However, in a truly competitive marketplace, generic drug savings would have been even higher than they have been, because the prices of generic drugs manufactured by Defendants should have been lower than they have been and currently are.  In other words, the Price-Fixing Conspiracy limited the savings to the U.S. healthcare system that generic drugs could generate – savings which federal and state law explicitly encourage and intended to maximize through the passage of the Hatch-Waxman Act and state law encouraging the substitution of generic drugs for prescribed brand-name drugs.

**Competition Lowers Generic Drug Prices**

86.     It is well-established that the greater the competition between generic drug manufacturers, the lower the price of generic drugs.  In the pharmaceutical industry, the manufacturer of a brand-name drug initially has a monopoly and 100 percent of sales for

---

[13]   U.S. Food and Drug Administration, "Generic Drug Facts," available at https://www.fda.gov/drugs/generic-drugs/generic-drug-facts.

that drug.  Once equivalent generic drugs enter the market, the brand name drug loses market share as consumers purchase the lower priced generic version of the drug.  In a competitive market, as more manufacturers that manufacture a certain generic drug enter the market, they compete for market share, driving down the prices of that particular generic drug.[14]

87.    In a truly competitive market, generic drug manufacturers each price drugs competitively, relative to other manufacturers – so if one generic drug manufacturer raises the price for a particular generic drug, it risks losing sales to competitors who manufacture and distribute equivalent generic drugs.  Likewise, a generic drug manufacturer may choose to lower prices for its generic drugs so as to gain a larger market share for its generic drugs than competitors who manufacturer equivalent generic drugs.  In fact, when introducing their version of an established generic drug to the market, manufacturers typically price that drug lower than equivalent generic drugs on the market in order to obtain a market share.[15]  Other manufacturers then lower their prices for that generic drug in order to compete, resulting in a fall in price for a generic drug of around twenty percent each time a new manufacturer enters the market for that generic drug, and prices for that drug remain low until manufacturers begin to exit the market.

88.    By engaging in the Price-Fixing Conspiracy, Defendants reduced and/or eliminated competition between generic drug manufacturers and artificially inflated the prices of generic drugs, reducing the savings that consumers, other purchasers such as

---

[14] Congressional Budget Office, *Effects of Using Generic Drugs on Medicare's Prescription Drug Spending* (Sept. 2010), 10, available at: https://www.cbo.gov/sites/default/files/111th-congress-2009-2010/reports/09-15-prescriptiondrugs.pdf.

[15] U.S. Government Accountability Office, *Generic Drugs Under* Medicare (Aug. 2016), 23, available at: https://www.gao.gov/assets/680/679022.pdf.

Plaintiff, taxpayers and the U.S. health care system in general would have benefited from if the generic drugs had been sold in a competitive marketplace.

**The Generic Pharmaceutical Industry is Susceptible to Anti-Competitive Conduct**

89.     The generic pharmaceutical industry has a number of features which make it highly susceptible to collusion between manufacturers.   These features include the following:

(a)    The pharmaceutical market across the U.S., and in New York State in particular, is controlled by Defendants;

(b)    The pharmaceutical market in the U.S. is subject to high barriers to entry.   These barriers include substantial manufacturing costs and regulatory requirements which must be met by any potential drug manufacturer before entering the market, preventing generic drug manufacturers from entering the market in greater numbers on a regular basis and thereby increasing competition;

(c)    Generic drugs are products for which demand is highly inelastic because under federal law, each generic drug must contain the same type and amount of active pharmaceutical ingredient and be pharmaceutically equivalent to other generic drugs which are generic versions of the same brand-name drug;

(d)    All generic drugs which are generic versions of the same brand-name drug are pharmaceutically equivalent, and therefore interchangeable. Manufacturers and distributers of generic drugs can therefore easily

detect deviations from (unlawful) price-fixing or market allocation agreements like the Price-Fixing Conspiracy;

(e) All generic drugs which are generic versions of the same brand-name drug, being pharmaceutically equivalent, are identical from the perspective of consumers.  This means that if a particular generic drug is sold at a higher price than equivalent generic drugs, the manufacturer of that generic drug will generally lose sales in favor of equivalent generic drugs.   This encourages manufacturers and distributors of generic drugs to ensure its competitors will maintain the same prices for equivalent drugs;

(f) Similarly, because all generic drugs which correspond to a particular brand-name drug are essentially interchangeable, the primary mechanism through which their manufacturers compete is price;

(g) Due to the regulated nature of the pharmaceutical industry, generic drug manufacturers usually know in advance which manufacturers are entering the market for a particular generic drug (the FDA provides public notice of approved ANDAs), making it easier for manufacturers like Defendants to contact competitors and enter into collusive agreements with them or recruit them into anti-competitive schemes, like the Price-Fixing Conspiracy; and

(h) In previous years, a large number of trade association meetings, conferences and workshops were held for members of the pharmaceutical industry each year.  This created opportunities for

representatives of drug manufacturers to meet and agree on drug prices and allocate markets and customers.

90.     As described herein, Defendants took full advantage of the above features to institute and engage in the Price Fixing Conspiracy throughout the Relevant Period.

## PRICING IN THE PHARMACEUTICAL INDUSTRY

91.     Generic drugs are sold in the U.S. in a supply chain which includes manufacturers, wholesalers and direct and indirect purchasers.  In general, the supply chain operates in the following way.

92.     First, manufactures sell drugs to wholesalers.  Wholesalers then sell drugs to pharmacies and other entities (including government entities such as counties like Suffolk County), who then dispense the drugs directly to individuals and to other entities who, in turn, dispense the drugs to individuals (including counties like Suffolk County). When generic drugs are dispensed to individuals by pharmacies, in some instances the cost the individual pays for a drug is reimbursed in whole or in part by the county in which they reside (such as Suffolk County).  Plaintiff is thus both a direct and indirect purchaser of generic drugs – Plaintiff both purchases some drugs directly from wholesalers and dispenses them to individuals whose healthcare costs it covers, and reimburses the prescription costs of some drugs for Medicaid and Medicare beneficiaries.  In relation to employees and retirees of Plaintiff, payments made by Plaintiff are administered through a Pharmacy Benefit Manager, WellDyneRx, LLC.

93.     The prices paid for generic drugs differ at different levels of the supply chain, and most transactions involving the sale and purchase of generic drugs occur

between private parties under terms which are not publicly disclosed.  Accordingly, the price of a particular generic drug is not always obvious.

94.     One method of determining the market-wide pricing of a particular generic drug is by looking at the Centers for Medicare & Medicaid Services ("CMS") survey of National Average Drug Acquisition Cost ("NADAC").  CMS frequently collects data of prices of Medicare & Medicaid covered drugs to produce NADAC surveys, which are "designed to create a national benchmark that is reflective of the prices paid by retail community pharmacies to acquire prescription and over-the-counter covered outpatient drugs" and provide an average of the drug acquisition costs submitted to CMS by retail community pharmacies.[16]

95.     Another method of determining market-wide pricing of particular generic drugs is by looking at data provided by generic drug manufacturers – although the accuracy of such data is questionable.  In particular, drug manufacturers report supposed benchmarks, such as Wholesale Acquisition Cost ("WAC") and Actual Wholesale Price ("AWP") for their drugs, which are referred to by participants in the pharmaceutical industry.  The AWP is intended to represent the average price at which wholesalers sell drugs to consumers, and is often used as a benchmark for the prices at which drugs are sold at.[17]  However, AWPs are not accurate reflections of actual market prices, because they are self-reported by manufacturers who consider them a nominal price for drugs, and

---

[16] Centers for Medicaid & Medicare Services, *Methodology for Calculating the National Average Drug Acquisition Cost (NADAC) for Medicaid Covered Outpatient Drugs* (Nov. 2013), 5, 15 available at https://data.medicaid.gov/Drug-Pricing-and-Payment/NADAC-National-Average-Drug-Acquisition-Cost-/a4y5-998d.
[17] Dawn M. Gencarelli, *Average Wholesale Price for Prescription Drugs: Is There a More Appropriate Pricing Mechanism?*, National Health Policy Forum ("NHPF") Issue Brief No. 775 (June 7, 2002), 2-3, available at https://www.nhpf.org/library/issue-briefs/IB775_AWP_6-7-02.pdf.

AWPs do not take into account discounts to, for example, federal agencies and large purchasers.[18]  The WAC is intended to represent the amount wholesalers pay to acquire a drug, but is also a self-reported figure which does not take into account rebates and discounts and therefore may also be inaccurate.[19]  The WAC and AWP are thus imperfect measures of the actual cost of the drugs.  Regardless, the amount paid for drugs by an end-payor is typically the list price, such as the WAC, plus a mark-up or dispensing fee.

96.    Third-party payors and Pharmacy Benefit Managers ("PBMs") have become aware, over time, that list prices based on WACs and AWPs can be substantially higher than the actual economic cost incurred to acquire the drugs, meaning that end-payors like Plaintiff often pay more than simply the actual cost to acquire a drug plus a small mark-up or dispensing fee.  To address this issue, some third-party payors and PBMs have created their own benchmark prices – the Maximum Allowable Cost ("MAC") - that set the maximum amount they will pay for generic drugs, regardless of the pharmacy's acquisition costs.[20]  The MAC for a generic drug is set at the lowest possible price, so it encourages pharmacies to purchase that generic drug at the lowest possible price.[21]  In other words, pharmacies are likely to shop around and purchase a generic drug from the manufacturer who sells that generic drug for the lowest price, because if a pharmacy were to purchase a generic drug at a higher price, the pharmacy might lose money when on-selling that generic drug to a third-party payor or PBM who will only pay the MAC price for that drug.

---

[18] *Id* at 3.

[19] *Id* at 15.

[20] Academy of Managed Care Pharmacy, "Maximum Allowable Cost (MAC) Pricing" (May 20, 2019),     https://www.amcp.org/policy-advocacy/policy-advocacy-focus-areas/where-we-stand-position-statements/maximum-allowable-cost-mac-pricing.

[21] *Id.*

97.     In a competitive marketplace, the existence of MACs and their effects on the prices pharmacies and other purchasers are willing to pay for generic drugs encourages generic drug manufacturers to keep their prices as low as possible.  It would make no economic sense for a generic drug manufacturer to raise the prices of a certain generic drug when its competitors are selling their versions of that same drug at a lower price – the manufacturer with the highest price would lose market share.  It *only* makes sense for a manufacturer to increase the price of a generic drug when the manufacturer knows its competitors will do the same – which is precisely what occurred as part of the Price-Fixing Conspiracy.

## STATE AND FEDERAL INVESTIGATIONS

98.     The Price-Fixing Conspiracy has been the subject of investigations at both federal and state level which have resulted in lawsuits and criminal investigations and charges.

**State Investigations**

99.     The Office of the Attorney General for the State of Connecticut ("Connecticut AG") commenced a non-public investigation in July 2014 into the dramatic price increases of generic drugs.  The Connecticut AG has stated that "there is compelling evidence of collusion and anti-competitive conduct across many companies that manufacture and market generic drugs in the United States…[and] evidence of widespread participation in illegal conspiracies across the generic drug industry."[22]

---

[22] The Office of Attorney General William Tong, "Connecticut Leads 20 State Coalition Filing Federal Antitrust Lawsuit against Heritage Pharmaceuticals, other Generic Drug Companies" (Dec. 15, 2016), https://portal.ct.gov/AG/Press-Releases-Archived/2016-Press-Releases/Connecticut-Leads-20-State-Coalition-Filing-Federal-Antitrust-Lawsuit-against-Heritage-Pharmaceutica.

100.     The Connecticut AG's investigation resulted in multiple complaints t being filed based on evidence uncovered during the investigation of unlawful anti-competitive behavior by generic drug manufacturers.  The first lawsuit ("First State Lawsuit") was initially filed in the United States District Court for the District of Connecticut on December 12, 2016 by the State of Connecticut and nineteen other states, including New York State, against six generic drug manufacturers.[23]

101.     On June 15, 2018, the Consolidated Amended Complaint was filed in the First State Lawsuit ("First State Lawsuit Complaint"), which named the State of Connecticut, New York State, forty-five other states, the District of Columbia and Puerto Rico as plaintiffs.  The defendants named in the First State Lawsuit Complaint include Defendants Actavis, Ascend, Apotex, Aurobindo, Citron, Dr. Reddy's, Glenmark, Heritage, Lannett, Mayne, Mylan, Par, Sandoz, Sun, Teva and Zydus.  The First State Lawsuit Complaint alleges that the defendants "participated in an overarching conspiracy, the effect of which was to minimize if not thwart competition across the generic drug industry" and that the defendants' "illegal agreements have raised prices, maintained artificially inflated prices and frustrated the potential of the industry to deliver great value to Plaintiff States and those they represent."[24]

102.     On May 10, 2019, the State of Connecticut, New York State, forty-one other states and Puerto Rico filed a second lawsuit ("Second State Lawsuit"), based on further

---

[23] *The State of Connecticut, et. al. v. Aurobindo Pharma USA, Inc.* Case No. 3:16-cv-02056 VLB (D. Conn.); transferred to the Multidistrict Litigation in the Eastern District of Pennsylvania on August 23, 2017: Case No. 2:17-cv-03768 (E.D. Pa.).
[24] First State Lawsuit Complaint, ¶¶ 2, 4.

evidence uncovered during the Connecticut AG's investigation.[25]   The unredacted version

of the May 2019 complaint was unsealed on June 21, 2019.  An Amended Complaint was

filed on November 1, 2019 ("Second State Lawsuit Complaint"), now naming as Plaintiffs

the Connecticut AG, the New York AG and the Attorneys General of forty-six other states,

the District of Columbia, Guam, the Northern Mariana Islands, Puerto Rico and American

Samoa.   The Second State Lawsuit Complaint names as Defendants Teva, Actavis,

Amneal, Apotex, Aurobindo, Breckenridge, Dr. Reddy's, Glenmark, Greenstone, Lannett,

Lupin, Mylan, Par, Pfizer, Sandoz, Taro, Upsher-Smith, Wockhardt and Zydus.

103.   The Second State Lawsuit Complaint alleges that:

> For many years, the generic pharmaceutical industry has operated pursuant
> to an understanding among generic manufacturers not to compete with each
> other and to instead settle for what these competitors refer to as "fair share."
> This understanding has permeated every segment of the industry, and the
> purpose of the agreement was to avoid competition among generic
> manufacturers that would normally result in significant price erosion and
> great savings to the ultimate consumer. Rather than enter a particular
> generic drug market by competing on price in order to gain market share,
> competitors in the generic drug industry would systematically and routinely
> communicate with one another directly, divvy up customers to create an
> artificial equilibrium in the market, and then maintain anti-competitively
> high prices. This "fair share" understanding was not the result of
> independent decision making by individual companies to avoid competing
> with one another. Rather, it was a direct result of specific discussion,
> negotiation and collusion among industry participants over the course of
> many years.[26]

104.   The Second State Complaint Lawsuit calls the collusive conduct of generic

drug manufacturers, uncovered as a result of the Connecticut AG's investigation, "one of

---

[25] *The State of Connecticut, et. al. v. Teva Pharmaceuticals USA, Inc.* Case No. 3:19-cv-00710 (D. Conn.); transferred to the Multidistrict Litigation in the Eastern District of Pennsylvania on May 30, 2019: Case No. 2:19-cv-02407 (E.D. Pa.).
[26] Second State Lawsuit Complaint ¶ 1.

the most egregious and damaging price-fixing conspiracies in the history of the United States."[27]

105.    The Connecticut State AG's investigation uncovered yet more evidence of unlawful anti-competitive conduct after the filing of the two lawsuits described above.  On June 10, 2020, the State of Connecticut, New York State, forty-four other states, the U.S. Virgin Islands, Puerto Rico, the Northern Mariana Islands, Guam and the District of Columbia filed another lawsuit ("Third State Lawsuit").[28]  The defendants named in the Third State Lawsuit include Defendants Sandoz, Actavis, Amneal, Aurobindo, Bausch, Fougera, Glenmark, Greenstone, G&W Laboratories, Lannett, Lupin, Mallinckrodt, Mylan, Perrigo, Pfizer, Sun, Taro, Teligent and Wockhardt.

106.    The Third State Lawsuit focuses in particular on unlawful anti-competitive conduct in relation to generic topical products, and also alleges a widespread conspiracy across the generic drug pharmaceutical industry to fix prices and allocate market share.

**Department of Justice Investigation**

107.    Upon information and belief, in or around late 2014 the DOJ instituted an investigation into allegations of unlawful anti-competitive conduct in the generic drug industry.

108.    In or around November 12, 2014, Defendant Lannett and Impax Laboratories Inc., both generic drug manufacturers, were served criminal grand jury subpoenas by the DOJ, requiring production of communications discussing generic

---

[27] *Id.* ¶ 2.
[28] *The State of Connecticut, et. al. v. Sandoz, Inc.* Case No. 3:20-cv-00802 (D. Conn.); transferred to the Multidistrict Litigation in the Eastern District of Pennsylvania on July 20, 2020: Case No. 2:20-cv-03539 (E.D. Pa.).

pharmaceutical pricing and sales with competitors.[29]   Other Defendants have also been subpoenaed as part of the DOJ investigation, including Actavis,[30] Mylan,[31] Sun,[32] Endo,[33] Par,[34] Taro,[35] Dr. Reddy's,[36] and Aurobundo.[37]

109.    Upon information and belief, the DOJ convened a grand jury to investigate a number of the Defendants. In order to empanel a grand jury, the DOJ's Guidelines require senior executives in the Antitrust Division to conclude that sufficient credible evidence of collusion exists.

110.    The DOJ has also executed search warrants in relation to the corporate offices of some of the Defendants, which indicates the DOJ was able to establish to a federal judge that there was probable cause to suspect that antitrust violations had occurred,

---

[29] Marl Rosman and Seth Silber, "DOJ's Investigation Into Generic Pharma Pricing is Unusual," Law360 (Nov. 12, 2014), available at https://www.wsgr.com/images/content/2/4/246/rosman-1114.pdf.

[30] Eric Palmer, "Actavis gets subpoena as DOJ probe of generic pricing moves up food chain," Fierce Pharma (Aug. 7, 2015), https://www.fiercepharma.com/regulatory/actavis-gets-subpoena-as-doj-probe-of-generic-pricing-moves-up-food-chain.

[31] Chelsey Dulaney, "Mylan Receives Justice Department Subpoena About Generic Pricing," The Wall Street Journal (Dec. 4, 2015), https://www.wsj.com/articles/mylan-receives-justice-department-subpoena-about-generic-pricing-1449237291.

[32] Thomas Sullivan, "Sun Pharma Receives Grand Jury Summons," Policy & Medicine (May 5, 2018), https://www.policymed.com/2016/06/sun-pharma-receives-grand-jury-summons.html.

[33] Caroline Humer, "DOJ antitrust unit subpoenas Mylan over pricing of doxycycline" Reuters (Dec. 4, 2015), https://www.reuters.com/article/us-mylan-nl-subpoena/doj-antitrust-unit-subpoenas-mylan-over-pricing-of-doxycycline-idUSKBN0TN1FW20151204.

[34] Eric Kroh, "Taro, Execs Receive DOJ Subpoenas Over Generic Drug Prices," Law 360 (Sept. 12, 2016), https://www.law360.com/articles/838753/taro-execs-receive-doj-subpoenas-over-generic-drug-prices.

[35] Id.

[36] "India's Sun Pharma gets U.S. subpoena over generic drugs pricing," Reuters (May 28, 2016), https://www.reuters.com/article/sun-pharm-usa-idCNL4N18P00X.

[37] "India's Aurobindo shares hit nine-month low on US price-fixing lawsuit," Reuters (Dec. 16, 2016), https://www.reuters.com/article/us-aurobindo-pharm-stocks/indias-aurobindo-shares-hit-nine-month-low-on-u-s-price-fixing-lawsuit-idUSKBN1450DV.

and that evidence of these violations would be found at the corporate offices of some generic drug manufacturers.  For example, Mylan disclosed in September 2016 that the DOJ had executed multiple search warrants at its premises.[38]  In May 2017, a DOJ search warrant was executed at Defendant Perrigo's corporate office.[39]

111.    Over the course of the DOJ investigation, a number of generic drug manufacturers, and individuals associated with these manufacturers, have been charged with unlawful anti-competitive conduct and/or admitted to participating in unlawful, anti-competitive conspiracies.  This includes the following:

(a)    In January 2017, two senior former executives of Defendant Heritage, Jeffery Glazer and Jason Malek, pled guilty to participating in conspiracies to fix prices, rig bids and allocate customers for a generic antibiotic, Doxycycline Hyclate, from as early as April 2013 through at least December 2015, and to conspiring to fix prices and allocate customers for a generic diabetes treatment, Glyburide, from as early as April 2014 until at least December 2015.[40]

(b)    In May 2019, Defendant Heritage was charged by the DOJ for conspiring with its competitors to fix prices, rig bids, and allocate

---

[38] CBS Pittsburgh, "Mylan is Target of 2 Federal Probes" (Nov. 10, 2016), https://pittsburgh.cbslocal.com/2016/11/10/mylan-is-target-of-2-federal-probes/.

[39] Perrigo, "Perrigo Discloses Investigation" (May 2, 2017), https://investor.perrigo.com/2017-05-02-Perrigo-Discloses-Investigation.

[40] DOJ, "Division Update Spring 2017" (March 28, 2017), https://www.justice.gov/atr/division-operations/division-update-spring-2017/division-secures-individual-and-corporate-guilty-pleas-collusion-industries-where-products; and, Reuters, "Heritage Pharmaceuticals to pay $7 million to settle price-fixing allegations" (May 31, 2019), https://www.reuters.com/article/us-usa-emcure-settlement/heritage-pharmaceuticals-to-pay-7-million-to-settle-price-fixing-allegations-idUSKCN1T1285.

customers for the generic drug Glyburide from around April 2014 to December 2015, and entered into a deferred prosecution agreement under which it agreed to pay a $225,000 penalty.[41]

(c)   In December 2019, Rising Pharmaceuticals Inc. was charged by the DOJ with conspiring to fix prices and allocate customers for a generic hypertension drug, Benazepril HCTZ, and entered into a deferred prosecution agreement under which it agreed it owed $1,543,207 in restitution and a $1.5 million monetary penalty (both amounts reduced to account for civil damages already owed to the DOJ and the entity's liquidation).[42]

(d)   In February 2020, Ara Aprahamian, a former sales and marketing executive at Defendant Taro was indicted for participating in two conspiracies to fix prices, rig bids, and allocate customers for generic drugs from at least March 2013 and to at least June 2015.[43]  The generic drugs involved included Clotrimazole Cream, Clotrimazole topical solution one percent, Desonide ointment, Fluocinonide ointment, Lidocaine ointment, Nystatin Triamcinolone cream,

---

[41] DOJ, "Pharmaceutical Company Admits to Price Fixing in Violation of Antitrust Law, Resolves Related False Claims Act Violations" (May 31, 2019), https://www.justice.gov/opa/pr/pharmaceutical-company-admits-price-fixing-violation-antitrust-law-resolves-related-false.
[42] DOJ, "Second Pharmaceutical Company Admits to Price Fixing, Resolves Related False Claims Act Violations" (Dec. 3, 2019), https://www.justice.gov/opa/pr/second-pharmaceutical-company-admits-price-fixing-resolves-related-false-claims-act.
[43] DOJ, "Generic Drug Executive Indicted on Antitrust and False Statement Charges" (Feb. 4, 2020), https://www.justice.gov/opa/pr/generic-drugexecutive-indicted-antitrust-and-false-statement-charges; and, Reuters, "Former executive of Taro Pharmaceutical indicted in U.S. for price-fixing" (Feb. 4, 2020) https://www.reuters.com/article/us-usa-drugs-pricefixing/former-executive-of-taro-pharmaceutical-indicted-in-u-s-for-price-fixing-idUSKBN1ZZ02W.

Nystatin Triamcinolone Ointment, Carbamazepine tablets and chews, Clobetasol, Fluocinonide ointment, Fluocinonide gel, Etodolac immediate release and extended release tablets and warfarin.

(e)    In February 2020, Hector Kellum, a former senior executive at Defendant Sandoz pled guilty to participating in a conspiracy to fix prices, rig bids, and allocate customers for generic drugs from at least March 2013 to at least June 2015.[44]  The generic drugs involved included Clobetasol and Nystatin Triamcinolone cream.

(f)    In March 2020, Defendant Sandoz, which had been charged by the DOJ with four counts of conspiring to allocate customers, rig bids, and fix prices for generic drugs between 2013 and 2015, entered into a deferred prosecution agreement under which it agreed to pay a $195 million criminal penalty and admitted that its sales affected by the charged conspiracies exceeded $500 million.[45]  The drugs involved included Clobetasol (cream, emollient cream, gel, ointment, and solution), Desonide ointment, Nystatin Triamcinolone cream and Tobramycin inhalation solution.

(g)    In May 2020, Defendant Apotex, which was charged by the DOJ with fixing the price of generic drug Pravastatin between May 2013 and

---

[44] DOJ, "Former Generic Pharmaceutical Executive Pleads Guilty for Role in Criminal Antitrust Conspiracy" (Feb. 14, 2020), https://www.justice.gov/opa/pr/former-generic-pharmaceutical-executive-pleads-guilty-role-criminal-antitrust-conspiracy; Riley Griffin and David McLaughlin, "Former Sandoz Executive Pleads Guilty in U.S. Price-Fixing Probe" (Feb. 14, 2020), https://www.bloomberg.com/news/articles/2020-02-14/former-sandoz-executive-pleads-guilty-in-u-s-price-fixing-probe.

[45] DOJ, "Major Generic Pharmaceutical Company Admits to Antitrust Claims" (March 2, 2020), https://www.justice.gov/opa/pr/major-generic-pharmaceutical-company-admits-antitrust-crimes.

December 2015, entered into a deferred prosecution agreement with the DOJ under which it agreed to pay a $24.1 million criminal penalty and admitted that it conspired with other generic drug sellers to artificially raise the price of Pravastatin.[46]

(h)     In June 2020, Defendant Glenmark was charged by the DOJ with conspiring to increase and maintain prices of Pravastatin and other generic drugs between around May 2013 and December 2015.[47]

(i)     In July 2020, Defendant Taro was charged by the DOJ with conspiring to fix prices, allocate customers, and rig bids for a number of generic drugs and entered into a deferred prosecution agreement under which it agreed to pay a $205,653,218 criminal penalty and admitted that its sales affected by the charged conspiracies exceeded $500 million.[48]

112.    The DOJ has recently described its investigation of anti-competitive conduct in the generic drug pharmaceutical industry as follows:

> The Division's ongoing generic drug investigation targets price-fixing, bid-rigging, and customer-allocation conspiracies in one of the most important industries for the health and pocketbooks of American consumers. Indeed, nearly 90% of all prescriptions in the United States are filled with generic drugs. To date, the investigation has resulted in charges against four companies and four executives for schemes affecting critical drugs relied on by vulnerable and elderly American consumers to treat a range of diseases and chronic conditions such as high cholesterol, arthritis, hypertension, seizures, various skin conditions, and blood clots. Four

---

[46] DOJ, "Generic Pharmaceutical Company Admits to Fixing Price of Widely Used Cholesterol Medication" (May 7, 2020), https://www.justice.gov/opa/pr/generic-pharmaceutical-company-admits-fixing-price-widely-used-cholesterol-medication.
[47] DOJ, "Fifth Pharmaceutical Company Charged in Ongoing Criminal Antitrust Investigation" (June 30, 2020), https://www.justice.gov/opa/pr/fifth-pharmaceutical-company-charged-ongoing-criminal-antitrust-investigation.
[48] DOJ, "Sixth Pharmaceutical Company Charged in Ongoing Criminal Antitrust Investigation" (July 23, 2020), https://www.justice.gov/opa/pr/sixth-pharmaceutical-company-charged-ongoing-criminal-antitrust-investigation.

companies have resolved charges by deferred prosecution agreements, which require an admission of guilt, a criminal penalty, and cooperation in the ongoing investigation.  Collectively, the four companies have agreed to pay over $220 million in criminal penalties.[49]

## PAYMENTS MADE BY SUFFOLK COUNTY FOR PHARMACEUTICAL COSTS, INCLUDING GENERIC DRUGS

113.    Plaintiff is a governmental entity which self-insures the vast majority of its healthcare costs.  At all material times, Plaintiff has paid the costs of pharmaceuticals, including generic drugs, for various individuals, as set forth below.

114.    Plaintiff provides medical benefits, including pharmaceutical benefits, for those employees and retirees of Suffolk County, and their dependents, who are not covered by Medicare.  Plaintiff also provides medical benefits, including pharmaceutical benefits, for certain former employees of Suffolk County and their dependents, who are not covered by Medicare, for a limited period of time under the Consolidated Omnibus Budget Reconciliation Act.

115.    Plaintiff provides medical and pharmaceutical benefits to the inmates of the Suffolk County operated jail system.  Plaintiff also provides medical and pharmaceutical benefits for children born to female inmates of the Suffolk County operated jail system, for the period the child resides within the Suffolk County operated jail system.

116.    Plaintiff also pays Medicare and Medicaid costs.  Plaintiff reimburses pharmaceutical costs for Medicare beneficiaries, which include certain employees, retirees and former employees of Suffolk County and their dependents.  Plaintiff reimburses pharmaceutical costs for Medicaid beneficiaries who reside within Suffolk County and/or

---

[49] DOJ, "Generic Drugs Update 2020" (June 23, 2020), https://www.justice.gov/atr/division-operations/antitrust-division-update-2020/generic-drugs.

for whom Suffolk County has been determined to be the district of fiscal responsibility. The federal government pays approximately half of Medicaid's share of prescription drug costs, and the remainder of the costs are allocated to state and local authorities in accordance with state law.[50]  Under New York's statutory regime, New York State pays providers the full amount of costs allocated to state and local authorities, and then collects approximately half of this amount from the county where the individual concerned resides.[51]  Plaintiff therefore pays approximately twenty-five percent of pharmaceutical costs of Medicaid beneficiaries who reside in Suffolk County and/or for whom Suffolk County has been determined the district of fiscal responsibility.

117.    The price Medicaid pays for prescription drugs is determined by (a) the AWP and (b) the Average Manufacturer's Price ("AMP") (the average price paid to the drug manufacturer by wholesalers) and/or the Best Price (the lowest price paid by any purchaser).[52]  The price initially paid by Medicaid to a provider for a drug (*e.g.* a dispensing pharmacy) is determined by New York State law, based on the AWP.[53]  As described above, AWPs are provided by drug manufacturers and likely not be accurate reflections of the real drug cost.  The price paid by Medicaid, based on the AWP, is then affected by a federally mandated rebate which drug manufactures pay to states, which is calculated by reference to the AMP and the Best Price.

118.    Throughout the Relevant Period, Plaintiff made payments as set out above for the Drugs at Issue.

---

[50] 42 U.S.C. § 1396d(b).
[51] N.Y. Soc. Serv. Law § § 367-b, 368-a.
[52] 42 U.S.C. § 1396r-(c)(1)(c) (definition of Best Price); 42 U.S.C. § 1396r-8(k)(1) (definition of AMP).
[53] N.Y. Soc. Serv. Law § 367-a (9).

119.    Due to the Price-Fixing Conspiracy, Plaintiff paid more for the Drugs at Issue than Plaintiff would have if the generic drug market had been truly competitive throughout the Relevant Period.  In relation to Medicaid payments, Plaintiff made payments based on grossly inflated AWPs, AMPs and Best Prices for generic drugs manufactured by Defendants, as a result of the Price-Fixing Conspiracy.  Plaintiff will continue to pay more for the Drugs at Issue than it would have to in the absence of the Price-Fixing Conspiracy until the Court enjoins the Price-Fixing Conspiracy.  Plaintiff has therefore been injured, and continues to be injured, by Defendants' conduct in engaging in the Price-Fixing Conspiracy.

## THE PRICE-FIXING CONSPIRACY

120.    The Price-Fixing Conspiracy consists of various unlawful, collusive agreements, understandings and conduct by Defendants and their co-conspirators, which constituted an overarching conspiracy to allocate customers, minimize competition, rig bids and fix, raise, maintain, and/or stabilize the prices of all of their generic pharmaceuticals.

121.    First and foremost, the Price-Fixing Conspiracy was based on an understanding between all Defendants that they were current or future competitors with each other for numerous generic drugs they manufactured and sold or distributed, and a desire to limit or remove that competition.  Defendants understood that, in order to be most effective, the Price-Fixing Conspiracy needed to include as many generic drug manufacturers and generic drugs as possible – and it did.

122.     A key aspect of the Price-Fixing Conspiracy was the "fair share" concept. This concept, developed and subscribed to by Defendants, was that a "fair share" (although it was anything but fair to consumers) of the market should be allocated to each member of the Price-Fixing Conspiracy, without resorting to, or experiencing, price competition. "Fair shares" were allocated to Defendants within a particular generic drug market based on the number of competitors in the market and the timing of their entry to the market. Generally, the first entrant to the market received the largest share of the market, and each subsequent entrant received a progressively smaller share.

123.     Defendants, as generic drug manufacturers who routinely all enter markets for generic drugs, instituted participation in the "fair share" concept as something that all, or nearly all, manufacturers of generic drugs had to do.  If all, or nearly all, manufacturers of generic drugs did not participate in the Price-Fixing Conspiracy, including the "fair share" concept, the Price-Fixing Conspiracy would not have worked as well as it did.  In fact, the "fair share" agreement became so ingrained that some of Defendants' account managers and sales teams appeared to view discussing matters such as market allocation and price-fixing with their counterparts and competitors as part of the ordinary course of business, and referred to the "fair share" market allocation as following "the rules of the road" and "playing nicely in the sandbox."

124.     Similarly, decisions made by Defendants as to whether to enter or re-enter a market for a particular type of generic drug, whether to leave a market for a particular generic drug and the pricing of generic drugs throughout the Relevant Period were influenced by cooperation between Defendants.  In particular, these decisions were made by Defendants in accordance with what was required to maintain the "fair share" market

allocations they had unlawfully agreed on.  In a competitive market, decisions as to whether to enter, leave or re-enter a particular generic drug market should have been made by each Defendant alone, without cooperation with competitors.

125.    In addition, as part of the Price-Fixing Conspiracy, Defendants did not compete with each other, even when it meant Defendants might lose out on sales for a particular drug.  Sometimes, Defendants did not bid for a particular generic drug customer, or provided a sham bid so high that it that was guaranteed to lose, in order to maintain the "fair share" market allocation.  Instead of each trying to obtain as much of the market share for each generic drug they manufactured as possible (which is what generic drug manufacturers would do in a competitive market), Defendants considered that the maintenance of the Price-Fixing Conspiracy as a whole was more important.

126.    Customers in one generic drug market were also sometimes traded by Defendants and their co-conspirators for customers in another generic drug market to ensure "fair shares" were maintained across the generic drug market as a whole.  Such conduct was clearly collusive and would never occur in a competitive market.

127.    Defendants actively colluded on the prices for the generic drugs they manufactured.  They agreed to substantially raise, and then maintain, fix and/or prevent the decline of, prices of generic drugs.  On some occasions, Defendants would support a price increase for one generic drug with the understanding that their competitors would support a price increase for a different generic drug.  On occasions when customers requested new bids in response to price increases instituted by one or more of the Defendants, Defendants communicated in order to devise a response without undermining their pricing agreements.

Again, such conduct was unlawfully collusive and anti-competitive, and would never occur in a competitive market.

128.    As noted, there are certain features of the generic pharmaceutical industry which make it susceptible to unlawful anti-competitive conduct, of which Defendants took full advantage.  In particular, because the FDA notifies the public of successful ANDA applications for generic drugs, Defendants were able to know which manufacturers had approval to manufacture which generic drugs and approximately when they would enter the market for each generic drug.  This allowed Defendants to recruit generic drug manufacturers into the Price-Fixing Conspiracy, monitor compliance with the Price-Fixing Conspiracy, coordinate generic drug pricing and allocate market shares for each generic drug.  Defendants also actively contacted each other when they were preparing to enter a particular generic market so that they could coordinate in accordance with the Price-Fixing Conspiracy.

129.    The frequency of tradeshows, conferences and industry events in previous years, and the movement of employees and officers within the industry, also assisted Defendants in facilitating and participating in the Price-Fixing Conspiracy.  Defendants took advantage of the personal connections formed by the frequent movement of Defendants' employees, officers and agents through the industry; frequent in person meetings between Defendants' employees, officers and agents at industry conferences, trade shows, happy hours, lunches, dinners and golf outings; frequent in-person communications; and frequent communications through mediums like e-mail, telephone calls and text messages.  In particular, Defendants' National Account Managers ("NAM"), the employees who constituted the Defendants direct sales force and were supposed to be

in competition for the same customers, developed close relationships with each other, frequently meeting in various social settings, which enabled them to exchange information.

130.     Defendants' geographic proximity – primarily based between the New York City and Philadelphia metropolitan areas - meant that their representatives frequently met at industry events.  Defendants' representatives took advantage of these regular meetings to collude and participate in the Price-Fixing Conspiracy.

131.     By 2011 at the latest, each Defendant had implemented anti-competitive agreements to fix prices and allocate the markets of the Drugs in Issue.  Specific details of agreements between Defendants and co-conspirators and each Defendant's conduct in relation to the Price-Fixing Conspiracy is set forth below.  In general, Defendants kept their communications with each other oral, so that there would be no record of what was discussed.   This is reflected by the numerous telephonic communications between Defendants set forth below.

132.     Plaintiff reserves the right to amend this Complaint to include further details of Defendants' role in the Price-Fixing Conspiracy when such further details are revealed through the course of this litigation.

## DEFENDANT SPECIFIC AND DRUG SPECIFIC ALLEGATIONS

133.     The Defendant-specific and drug-specific allegations made below are only examples of aspects or parts of the Price-Fixing Conspiracy.  Upon information and belief, each of the Defendants participated in the Price-Fixing Conspiracy, and the Price-Fixing Conspiracy affected the prices of every generic drug manufactured, distributed and/or sold by Defendants.  Some of the specific individuals involved in the Price-Fixing Conspiracy,

so far as known to Plaintiff, are referred to below and listed in Exhibit B attached to this Complaint.

**Trade Association Conferences, Customer Conferences and Social Events**

134.    As mentioned, the frequent meetings of representatives of Defendants at trade shows, conferences and social events assisted with the creation, implementation and facilitation of the Price-Fixing Conspiracy.

135.    Many customers of the Defendants, including but not limited to (a) large wholesalers or distributors like AmerisourceBergen Corp ("AmerisourceBergen"), Cardinal Health, Inc. ("Cardinal Health"), HD Smith Wholesale Drug Co ("HD Smith"), McKesson Corporation ("McKesson") and Morris & Dickson Co. ("Morris & Dickson"), (b) Group Purchasing Organizations ("GPO") like Premier, Inc. ("Premier") the Minnesota Multistate Contracting Alliance for Pharmacy ("MMCAP") and Econdisc Contracting Solutions, a GPO that includes Express Scripts, the Kroger Company, and Supervalu, Inc ("Econdisc"), and (c) other large drug purchasers like pharmacy or grocery store chains, hold multi-day conferences throughout the year in various locations throughout the U.S. Generic manufacturers from across the U.S. are invited to attend.

136.    Additionally, the Defendants and other generic drug manufacturers also attend various industry trade shows throughout the year, including those hosted by the National Association of Chain Drug Stores ("NACDS"), Healthcare Distribution Management Association ("HDMA") (now the Healthcare Distribution Alliance), the Generic Pharmaceutical Association ("GPhA") and Efficient Collaborative Retail Marketing ("ECRM"), in a variety of locations throughout the U.S.

137.    At these various conferences and trade shows, sales representatives from many generic drug manufacturers, including Defendants, interact with each other and discuss their respective businesses and customers.  Many of these conferences and trade shows include organized recreational and social events such as golf outings, lunches, cocktail parties and dinners that provide additional opportunities to meet with competitors. Defendants used these opportunities to discuss and share competitively sensitive information concerning upcoming bids, specific generic drug markets, pricing strategies and pricing terms in their contracts with customers.

138.    These trade shows and customer conferences provide generic drug manufacturers, including but not limited to the Defendants, with ample opportunity to meet, discuss, devise and implement a host of anti-competitive schemes that unreasonably restrain competition in the U.S. market for generic drugs.

139.    In addition to these frequent conferences and trade shows, senior executives and sales representatives gather in smaller groups, allowing them to further meet face-to-face with their competitors and discuss competitively sensitive information.

140.    Many generic drug manufacturers, including several of the Defendants, are headquartered in close proximity to one another in New Jersey or eastern Pennsylvania, giving them additional opportunities to foster connections and meet and collude.  At least forty-one different generic drug manufacturers are concentrated between New York City and Philadelphia, including, among others, Defendants Actavis, Aurobindo, Breckenridge, Dr. Reddy's, Glenmark, Greenstone, Lannett, Par, Pfizer, Sandoz, Taro, Teva, Wockhardt and Zydus.

141.    High-level executives of many generic drug manufacturers get together periodically for what some of them refer to as "industry dinners," at which one company is usually responsible for paying for all of the attendees.  For example, in January 2014, at a time when the prices of a number of generic drugs were reportedly soaring, at least thirteen high-ranking executives, including CEOs, Presidents and Senior Vice Presidents of various generic drug manufacturers, met at a steakhouse in Bridgewater, New Jersey. Executives from Defendants Actavis, Aurobindo, Breckenridge, Dr. Reddy's and Lannett, among many other generic manufacturers, attended this particular dinner.

142.    Other groups of competitors gather routinely for golf outings, where they have the opportunity to spend several days at a time together without interruption.  One such annual event was organized by a packaging contractor in Kentucky.  From September 17-19, 2014, for example, high-level executives from Defendants Teva, Apotex, Actavis, Amneal, Lannett, Par, Zydus and others were invited to a gathering at a country club in Bowling Green, Kentucky where they would play golf all day and socialize at night.  High-level executives from Defendants Lannett, Amneal, Apotex, Wockhardt and other generic manufacturers.

143.    Some generic pharmaceutical sales representatives also get together regularly for what they refer to as a "Women in the Industry" meeting or dinner.  During these events, the sales representatives meet with their competitors and discuss competitively sensitive information.

144.    Many "Women in the Industry" dinners were organized by A.S., a salesperson from Defendant Heritage who resides in the State of Minnesota.  Other participants in these meetings were employees of generic drug manufacturers located in

Minnesota, or salespeople residing in the area.  However, out-of-town sales representatives were also aware of these dinners and were included when in the area.  Sometimes dinners were also planned around visits of out-of-town competitors.

145.     Several different "Women in the Industry" dinners were held in 2015, including: (1) at the ECRM conference in February (involving Defendants Dr. Reddy's, Greenstone, Lannett, Teva, Upsher- Smith and Zydus, among others – including individual Jill Nailor and Tracy Sullivan); (2) in Baltimore in May (involving Defendants Dr. Reddy's, Lupin and Teva among others); and (3) at the NACDS conference in August (involving Defendant Dr. Reddy's among others).

146.     Industry, business and social events occur with such frequency that there was almost constant ability for Defendants to meet in person and discuss their business plans, and to create and implement the Price-Fixing Conspiracy.  For example, between February 20, 2013 and December 20, 2013 (a forty-one week period), there were at least forty-four different tradeshows or customer conferences where the Defendants had the opportunity to meet in person.  These in-person meetings gave the Defendants the opportunity and cover to have these conversations, and reach these agreements, without fear of detection.

**Movement of Defendants' Employees Within the Industry**

147.     The Price-Fixing Conspiracy was also enabled by the contacts Defendants' employees and former employees had with each other in part due to their movement to different generic drug manufacturers throughout their career.

148.     This familiarity encouraged further collusion.  For example, as discussed below, in the spring and summer of 2014, Heritage's Daniel Lukasiewicz, at the direction

of CEO Glazer, reached out to Aurobindo, his former place of employment, to coordinate pricing on Glyburide, Glyburide-Metformin HCl and Fosinopril-HCTZ.

149.     Similarly, Teva's Director of Strategic Customer Marketing, Nisha Patel ("Patel"), met Heritage's then-Sr. Vice President Malek when she worked at Amerisource Bergen, which was a Heritage customer whom Malek managed. When Patel moved to Defendant Teva in April 2013, she contacted Malek to determine which generic drug products Teva sold that overlapped with generic drugs sold by Heritage so that they could coordinate pricing. As detailed below, Malek and Patel used their relationship to orchestrate a number of price increases throughout the Relevant Period—some led by Teva, others led by Heritage.

150.     Malek and Patel's communications were valued and accepted by Malek's supervisors.  For example, in April 2014, Malek and Glazer met with the CEO (Satish Mehta) and President (Vikas Thapar) of Emcure, Heritage's parent, to discuss potential price increases for several drugs. During that meeting, Heritage's Malek told Emcure's Mehta and Thapar about his contact at Teva, Nisha Patel.  Malek, who already had been discussing price increases for Nystatin with Patel since mid-2013, told them that Patel could be a vehicle for communicating with Teva about price increases and customer allocation. Mehta and Thapar approved of Malek's strategy to coordinate prices and allocate customers with Teva.

**Frequent Telephone Calls and Text Messages Between Defendants**

151.     The Price-Fixing Conspiracy was reinforced through telephone calls and text messages between the Defendants to discuss "fair share" and the desire to maintain or

raise prices with respect to specific drugs. These types of communications occur with great frequency across the industry, including among Defendants.

152. For example, from the period of January 1, 2013 through December 31, 2013, senior sales executives and other individuals responsible for the pricing, marketing and sales of generic drugs at Defendant Teva spoke to representatives of every significant competitor by telephone and/or text message on multiple occasions. For example, in 2013, Defendant Teva engaged in at least 183 telephone calls or text messages with Defendant Actavis, at least ninety-five telephone calls or text messages with Defendant Glenmark, at least fifty-nine telephone calls or text messages with Defendant Greenstone, at least 121 telephone calls or text messages with Defendant Lupin, at least 261 telephone calls or text messages with Defendant Mylan, at least 104 telephone calls or text messages with Defendant Sandoz, at least thirty-five telephone calls or text messages with Defendant Taro and at least 531 telephone calls or text messages with Defendant Zydus.

153. Similarly, from the period of January 1, 2014 through December 31, 2014, senior sales executives and other individuals responsible for the pricing, marketing and sales of generic drugs at Defendant Teva continued to speak to representatives of every significant competitor by telephone and/or text on multiple occasions. In 2014, Defendant Teva engaged in at least 365 telephone calls or text messages with Defendant Actavis, at least seventy telephone calls or text messages with Defendant Glenmark, at least fifty-four telephone calls or text messages with Defendant Greenstone, at least thirty-three telephone calls or text messages with Defendant Lupin, at least fifty-seven telephone calls or text messages with Defendant Mylan, at least eighty-two telephone calls or text messages with

Defendant Sandoz, at least fifty-five telephone calls or text messages with Defendant Taro and at least 225 telephone calls or text messages with Defendant Zydus.

154.    It was not just Teva personnel speaking to their competitors, however. All of these individuals were speaking to each other, when needed, hundreds or even thousands of times to ensure adherence to the overarching conspiracy.

155.    The Price-Fixing Conspiracy involved a web of often overlapping collusive agreements, all aimed at preserving the overarching conspiracy to fix prices and maintain the "fair share" concept.  The specific drug agreements often involve overlapping sets of Defendants in communication with each other, all following their agreed-upon "fair share" code of conduct. For example, to view only a small portion of the interlocking, overlapping web of collusion formed by Defendants: Teva, Taro and Wockhardt discussed amongst themselves the allocation of the Enalapril Maleate market; Teva and Taro communicated with Sandoz concerning the prices for Ketoconazole Cream; Sandoz worked with Mylan to allocate the market for Valsartan HCTZ; and Teva, Mylan and Par all communicated with each other in the spring of 2014 concerning the market for Budesonide DR Capsules. These are not isolated, one-off agreements, but rather demonstrate the ongoing, sprawling nature of the Price-Fixing Conspiracy.

156.    Another example is that while Heritage's Associate Director of National Accounts Neal O'Mara was discussing pricing and market share of Zoledronic Acid with Vice President ("VP") of Sales and Marketing John Adams at Dr.Reddy's, O'Mara and Heritage's Sr. NAM Matthew Edelson were also discussing pricing for Meprobamate with Dr. Reddy's. At the same time, Heritage's Sather was speaking with Director of National Accounts Tracy Sullivan at Lannett about pricing for Doxycycline

Monohydrate. A month later, in April 2013, Sun, Heritage, and Teva then began discussing pricing for Nystatin. Similarly, in May 2013, Malek, with the assistance of Emcure CEO Mehta, began talking about the pricing for Doxycycline DR ("Doxy DR") with Rajiv Malik, President of Mylan.

157.    There are many more examples of the overlapping nature of collusive conduct between different Defendants.  In the spring and summer of 2011, Defendants Taro and Perrigo imposed abrupt, large and nearly identical price increases for Nystatin external cream. Par joined the price increase by late summer. By October 2011, Actavis also joined the price increase. These Defendants maintained elevated prices thereafter. When Sandoz ramped up production two years later, in the summer of 2013, it imposed nearly identical prices for Nystatin cream.

158.    Not long after the price increases for Nystatin cream in the summer of 2011, Actavis, Perrigo and Sandoz began to impose similar increases to Nystatin ointment. The price increases were large, abrupt and nearly identical, but staggered by approximately six month increments.

159.    While the Nystatin cream and ointment increases were occurring, Defendants had the opportunity to meet and discuss pricing at the ECRM Retail Pharmaceutical Conferences and NACDS Annual Meetings in 2011 and 2012. All four of these meetings were attended by Actavis, Par, Perrigo, Sandoz and Taro.

160.    In the spring of 2012, Defendants Taro and Lannett tested the waters with a relatively small price increase for their Acetazolamide tablets. The increases were nearly simultaneous and nearly identical.

161.     In the summer of 2012, Heritage and Sun were discussing price increases for at least two more drugs: Nimodipine and Paromomycin. Heritage and Sun were able to reach agreements through multiple e-mails, text messages and in-person communication at trade events, including at the 2012 ECRM Retail Pharmaceutical Conference and the HDMA Business Leadership Conference.  Actavis and West-Ward also attended 2012 conferences with Sun and Heritage, and in the following months joined Sun in dramatic Doxycycline Hyclate price increases.

162.     Heritage and Sun, as well as Defendants Actavis, Apotex, Aurobindo, Dr. Reddy's, Glenmark, Lannett, Mylan, Par, Perrigo, Sandoz, Taro, Teva, and Zydus, had the opportunity to discuss pricing and market share and otherwise further the conspiracy while attending the October 2012 GPhA meeting.

163.     By late 2012 and into early 2013, Sun increased list prices for Paromomycin consistent with Heritage's pricing, and Sun, Actavis and West-Ward all dramatically increased prices for regular release Doxycycline Hyclate. Mylan increased prices for Verapamil tablets and allowed Heritage, a relative newcomer to the market, to gain market share. By March 1, 2013, Heritage had increased its Nimodipine list prices consistent with its agreement with Sun.

164.     Between January and March 2013, representatives from Heritage and Dr. Reddy's spoke or texted multiple times, and representatives of all U.S. Defendants except Citron had attended at least one trade association meeting where Defendants had the opportunity to meet and discuss pricing and market allocation of multiple generic drugs.  During at least one of those trade association meetings, Dr. Reddy's Adams and Heritage's O'Mara discussed the pricing of at leastZoledronic Acid.

165.     On the heels of these communications and meetings, by April 2013, Defendants had increased the prices of three additional Drugs in Issue: Meprobamate (Dr. Reddy's, Heritage), Nystatin tablets (Heritage, Sun), and Zoledronic Acid (Dr. Reddy's, Heritage).

166.     Sun implemented price increases for Nystatin tablets in order to facilitate Heritage obtaining a "fair share" of the market, just as Mylan had raised prices on Verapamil tablets to allow Heritage to gain share. Defendants also raised prices on an additional Doxycycline Hyclate regular release product (Actavis, Sun, West-Ward).

167.     During this time-frame, Defendants also increased the prices of other drugs as part of their overarching conspiracy, including, for example, Albuterol (Mylan and Sun), Desonide (Actavis, Sandoz, Perrigo, Taro), and Propranolol capsules (Actavis, Breckenridge, and Upsher).

168.     Notably, even if a particular manufacturer was not directly involved in a price increase, it nonetheless monitored the increases carefully. For example, even though Heritage did not increase its price for Nystatin tablets in April 2013, it maintained close contact with Sun in the lead up to and following Sun's price increase. For example, the day after Sun increased its Nystatin prices, representatives for the two companies spoke for nearly forty minutes.

169.     Defendants' pattern of conspiratorial communications continued through April and June 2013 and beyond. During April to June 2013, Heritage spoke with at least Mylan, Teva, Sun, Dr. Reddy's and Lannett.  After a series of communications with Sun, Heritage doubled the price of Nimodipine. Lannett and Par also independently spoke with each other.

170.    Electronic contacts between Defendants increased dramatically starting in July 2013.  Between July and September 2013, Teva and Heritage contacted their competitors via text or telephone calls hundreds of times.

171.    Teva had at least 144 separate contacts with nine Defendants in July 2013; at least ninety-seven contacts with nine Defendants in August 2013; and at least fifty-six different contacts with eight Defendants in September 2013.  These discussions involved at least Doxycycline Hyclate, Doxycycline Monohydrate, and Nystatin tablets.

172.    Further, in addition to their telephone and text contacts, between July and September 2013, representatives from a number of Defendants attended at least a second trade association meeting (besides at least one in the April to June 2013 period) where Defendants had the opportunity to discuss pricing and market allocation.

173.    At least one of these meetings, the NACDS Total Store Expo, was attended by a number of individuals who are directly implicated in anti-competitive communications, including: Heritage's Glazer, Malek, O'Mara, Sather and Edelson; Lannett's Sullivan; Mylan's VP of Sales, James Nesta ("Nesta" or "Jim Nesta") and Michael Aigner (Director, National Accounts); Sun's Susan Knoblauch (Sr. Manager of Sales); Aurobindo's Robert Cunard (CEO); and Apotex's Beth Hamilton (VP of Marketing). Daniel Lukasiewicz, then employed by Zydus (and who would later join Heritage and assist in orchestrating various pricing agreements there), also attended. Sales representatives from Actavis, Dr. Reddy's, Glenmark, Par, Perrigo, Sandoz, Taro, Teva and West-Ward also attended the Expo. As discussed below, at least Heritage's Sather used this meeting as an opportunity to solidify agreements on pricing for multiple drugs.

174.     As was the case in prior months, price increases accompanied these inter-Defendant contacts.  By the end of the summer of 2013, Defendants Actavis and Mylan began to implement price increases for Verpamil capsules.  Defendants Heritage, Lannett, Mylan and Par were in frequent contact with each other and increased their Doxycycline Monohydrate prices.  During the same period, Defendants Heritage and Mylan were frequently communicating in order to work out agreements relating to customers and pricing for Doxycycline Hyclate's delayed release.

175.     During this time frame Defendants also increased the prices of various other drugs: Clomipramine (Mylan, Sandoz, Taro); Divalproex (Dr. Reddy's, Mylan, Par, Zydus); Levothyroxine (Lannett, Mylan, Sandoz); and Pravastatin (Apotex, Glenmark, Sandoz, Teva, Zydus and Lupin). Concurrent with these price increases, Actavis entered the Desonide cream market at the same elevated prices that had already been implemented by Taro and Perrigo. Actavis, Taro and Perrigo maintained their elevated prices of Nystatin cream and ointment during the period as well.

176.     Defendants remained in frequent contact between October and December 2013. In that three-month period, Teva and Heritage exchanged 582 text messages or telephone calls with other Defendants.  Additionally, all but two Defendants attended at least one trade association meeting in the last quarter of 2013 and thus had ample opportunity to further their conspiratorial plans in person, without leaving an electronic footprint.

177.     Following these communications, Defendants implemented another price increase: Acetazolamide tablets (Taro, Lannett). Shortly after meeting at the GPhA Fall Technical Conference at the end of October 2013, Taro and Lannett implemented large,

nearly identical and nearly simultaneous price increases for Acetazolamide tablets. Defendants also raised the prices of two additional drugs: Benazepril (Mylan, Sandoz) and Digoxin (Lannett, Mylan, Par, West-Ward and non-Defendant Impax).

178.    Continuing their conspiracy, Teva and Heritage contacted other Defendants by telephone or text at least 348 times during the first quarter of 2014. Teva was involved in the majority of the contacts.

179.    These communications were accompanied by numerous opportunities for Defendants to meet in person and thereby exchange information without leaving electronic footprints. Representatives from almost every Defendant attended at least one trade association meeting during the first quarter of 2014, including the ECRM Retail Pharmacy Conference, which was attended by a number of Defendants' personnel directly implicated in anti-competitive communications, from Heritage, Sun, and Apotex. Representatives from Defendants Actavis, Citron, Dr. Reddy's, Lannett, Mayne, Par, Perrigo, Sandoz, Taro, Teva, West-Ward and Zydus also attended the conference.

180.    Following the price increases at the end of 2013, in January 2014, at least thirteen high-ranking executives, including CEOs, Presidents, and Senior Vice Presidents of various generic drug manufacturers, met at a steakhouse in Bridgewater, New Jersey. Executives from Defendants Actavis, Aurobindo, Dr. Reddy's, Lannett and Sun, among others, attended.

181.    During this time frame (around the first quarter of 2014), Par also joined the Digoxin price and Sandoz joined the Desonide price increase, while Defendants Lannett, Par, Teva and Upsher-Smith imposed another price increase for Baclofen. Teva

and Par's increases for Baclofen occurred after Teva and Par communicated at least thirty-four times during January and February.

182.    Between April and July 2014, Teva and Heritage had 639 different telephone or text contacts with other Defendants. Teva, Actavis and Zydus were involved in almost half of those interactions, speaking or texting 259 times over the course of four months. And as Citron prepared to enter the market for numerous drugs, its contacts with Heritage greatly increased.   Heritage's communications involved at least fourteen generic drugs: Acetazolamide, Doxycycline Hyclate, Doxycycline Monohydrate, Fosinopril-HCTZ, Glipizide-Metformin HCI, Glyburide, Glyburide-Metformin, Leflunomide, Meprobamate, Nimodipine, Nystatin, Paromomycin, Theophylline, and Verapamil.

183.    Defendants likewise advanced their conspiracy through attendance at four trade association meetings between April and July 2014.  Heritage's Sather used the May 2014, MMCAP National Member Conference as an opportunity to personally confirm agreements on pricing for Drugs at Issue with Aurobindo (Fosinopril/HCTZ, Glyburide and Glyburide/Metformin), Sandoz (Fosinopril-HCTZ), and Lannett (Doxycycline Monohydrate). Also, during this time, Heritage, Mylan and Mayne coordinated Mayne's entry into the market for the delayed release of Doxycycline Hyclate so as not to erode pricing.

184.    On June 1-4, 2014, Heritage's O'Mara and Sather, Teva's Patel, Mylan's Aigner, and Lannett's Sullivan all attended the HDMA Business and Leadership Conference. Nearly every Defendant had representatives attending this conference. On June 3, 2014, while at the conference, Heritage's Sather had dinner and drinks with a

number of Heritage's competitors, including personnel from Sandoz, Par, and Lannett. In advance of the dinner, one of the attendees exchanged text messages with someone at Sandoz, who also was attending the meeting, and invited him to the dinner.

185.    Following these trade association meetings, discussions among competitors picked up. Between June 3 and 10, 2014, an Aurobindo employee had three telephone calls with a Sandoz employee and five telephone calls and multiple text messages with Glenmark, likely to discuss pricing on Fosinopril-HCTZ.

186.    On June 16, 2014, a different Glenmark employee called a different Aurobindo employee and they spoke for approximately 20 minutes.  These discussions involved pricing agreements for generic drugs.

187.    On August 20, 2014, a Heritage employee exchanged text messages with a Sun employee, which described the pricing agreements reached with Actavis for Glyburide-Metformin and Verapamil. Notably, Sun did not market or sell either drug at the time of this communication, thus highlighting the industry-wide nature of Defendants' conspiracy, regardless of whether a given Defendant was actually engaged in the manufacture or sale of a particular drug at issue, in this case, Glyburide-Metformin and Verapamil.  Sun needed to be kept apprised of drug-specific agreements between other Defendant co-conspirators, even for drugs Sun did not sell, because the efforts of all Defendants to inflate the prices of all generic drugs were inter-related.

188.    Days later, the 2014 NACDS Total Store Expo, which was held in Boston from August 23-26, 2014, was attended by representatives from almost all, Defendants. A number of individuals directly implicated in anti-competitive communications attended, including from Heritage (Glazer, Malek, O'Mara, Edelson and Sather), Lannett

(Sullivan), Mylan (Aigner and Nesta), Sun (Knoblauch), Teva (Patel), Apotex (Hamilton), Aurobindo (Cunard) and Mayne (Gloria Peluso-Schmid).

189.    Following these meetings and communications, Heritage began to announce price increases. By July 2014, Heritage had announced increases for Fosinopril- HCTZ, Glyburide, Acetazolamide (capsules), Glipizide-Metformin HCI, Glyburide-Metformin, Leflunomide, Nystatin (tablets), Paromomycin, Theophylline and Verapamil (tablets).

190.    Thereafter, multiple Defendants either led or followed price increases for at least five Drugs at Issue:  Fosinopril-HCTZ (Aurobindo, Citron, Heritage, Glenmark, Sandoz); Leflunomide (Apotex, Heritage, Teva); Nystatin tablets (Heritage, Sun); Paromomycin (Heritage, Sun); and Theophylline (Heritage, Teva). Sandoz re-joined the Nystatin cream market at the elevated prices that already had been imposed by Actavis, Par, Perrigo, and Taro.

191.    Defendants also increased the prices of other Drugs at Issue during this time frame: Amitriptyline (Mylan, Par, Sandoz); Clobetasol (Actavis, Perrigo, Sandoz, Taro and Wockhardt); Econazole (Perrigo, Taro); Fluocinonide (Actavis, Teva, and Taro); Lidocaine-Prilocaine (Sandoz); and Ursodiol (Actavis, Lannett). In addition, Lannett joined the Baclofen price increase during this period.

192.    Defendants' frequent contacts and price increases continued in 2015. Defendants implemented additional price increases for Leflunomide and Verapamil capsules. Defendants also increased the prices of Propranolol tablets. Prices for the Drugs at Issue remained elevated above competitive levels thereafter.

193.     The price increases implemented by Defendants during the Relevant Period were not the result of a free market. Rather, these price increases occurred because Defendants engaged in an overarching conspiracy to fix, raise, maintain, and/or stabilize prices of generic drugs. As a result of Defendants' conspiracy, Plaintiff paid more for the Drugs at Issue than they otherwise would have and were harmed by Defendants' anti-competitive conduct.

**Communications Through Intermediaries**

194.     Because the wholesalers typically had "cost-plus" distribution contracts, they also profited from the Price-Fixing Conspiracy and were therefore incentivized to assist in the Price-Fixing Conspiracy.  Some wholesalers Plaintiff worked with include corporate giants McKesson, Cardinal Health and AmerisourceBergen.

195.     The relationship between price increases for generic drugs and wholesalers' profits is evident, for example, from McKesson's 10-K filing for 2014, in which McKesson reported:

> A significant portion of our distribution arrangements with the manufacturers provides us compensation based on a percentage of our purchases. In addition, we have certain distribution arrangements with pharmaceutical manufacturers that include an inflation-based compensation component whereby we benefit when the manufacturers increase their prices as we sell our existing inventory at the new higher prices. For these manufacturers, a reduction in the frequency and magnitude of price increases, as well as restrictions in the amount of inventory available to us, could have a material adverse impact on our gross profit margin.

196.     In that same filing, McKesson reported that its "practice is to pass on, to customers, published price changes from suppliers."  In other words, McKesson passes on price increases to its customers rather than absorbing any price increases.

197. Similarly, Cardinal Health's 2014 10-K filing stated that manufacturers' price increases for generic drugs positively impacted its margins:

> Gross margin in our Pharmaceutical segment is impacted by generic and branded pharmaceutical price appreciation and the number and value of generic pharmaceutical launches. In past years, these items have been substantial drivers of Pharmaceutical segment profit. Prices for generic pharmaceuticals generally decline over time. But at times, some generic products experience price appreciation, which positively impacts our margins.

198. AmerisourceBergen's Annual Summary 2014 and Annual Report 2014 make very similar statements: "Our results of operations continue to be subject to the risks and uncertainties of inflation in branded and generic pharmaceutical prices and deflation in generic pharmaceutical prices."

> Certain distribution service agreements that we have entered into with branded and generic pharmaceutical manufacturers continue to have an inflation-based compensation component to them. Arrangements with a small number of branded manufacturers continue to be solely inflation- based. As a result, our gross profit from brand-name and generic manufacturers continues to be subject to fluctuation based upon the timing and extent of manufacturer price increases. If the frequency or rate of branded and generic pharmaceutical price increases slows, our results of operations could be adversely affected.  In addition, generic pharmaceuticals are also subject to price deflation. If the frequency or rate of generic pharmaceutical price deflation accelerates, our results of operations could be adversely affected.

199. The fact that slowing and lesser rates of price increases and lowering in generic prices is a risk for AmerisourceBergen emphasizes that, as with McKesson and Cardinal Health, the higher and more often that Defendants' cartel hiked up prices, the more profit AmerisourceBergen made.

200.    Other large retail customers have similar contractual provisions in their contracts with generic manufacturers that allow for greater compensation when prices are higher. For example, contracts between Walgreens, Boots ,Alliance Development GmbH, a GPO, and generic manufacturers contain provisions about rebates and administrative fees that are directly tied to "total contract sales," a number that increases when prices increase. In other words, the GPO, and other larger retail customers with similar contractual terms, can make more money when generic pharmaceutical prices are higher.

201.    The generic manufacturers are keenly aware that some of their customers benefit from their price increases. In fact, many of the generic drug manufacturers regularly tout these price increases in their discussions with customers. As just one example, when Teva met with large customer Red Oak (a joint venture between Cardinal Health and CVS) in December 2014, Teva boasted that its price hike of August 28, 2014, had increased the prices of twenty different product families, resulting in an estimated $29 million price increase value to the customer, paid for in part by Plaintiff.

**Defendants Deliberately Decided not to Bid for Customers or Market Certain Drugs**

202.    As mentioned, one aspect of the Price-Fixing Conspiracy was that Defendants sometimes decided not to bid for customers, or place sham bids they knew would not be accepted, in order to preserve their agreed "fair share" allocation.  For example, in August 2015, Defendant Taro declined to bid on Etodolac Extended Release (ER) Tablets at a large supermarket chain where Defendant Zydus was the incumbent because, as Taro voiced internally, competing would have violated the rules of the Price-Fixing Conspiracy about "playing nice in the sandbox," so Zydus would likely retaliate

and take share (*i.e.*, actually compete on price, albeit only temporarily and as a form of communication and punishment) from Taro on another product, such as what C.L., an analyst at Taro, identified as Warfarin Sodium Tablets. In addition, this pricing instability could spread to other products. As C.L. explained in an internal e-mail, Zydus "could hit us [Taro] on Warfarin. Not worth a fight in the sandbox over 300 annual units for Etodolac." Both Etodolac ER and Warfarin were drugs where Taro had previously agreed with its competitors, including Teva and Zydus, to fix prices and allocate customers. As these examples make clear, the inter-dependence among generic manufacturers transcends product markets as these companies make decisions not only based on what impact their actions will have in a given product market, but also on how those actions will impact other product markets where the competitors overlap, whether present or future markets.

203. Similarly, Defendants decided not to enter the market for certain drugs even when they could do so, in order to preserve the "fair share" allocation. Far more Defendants had FDA approval to sell different generic drugs than they actually did during the Relevant Period. Further, all Defendants could have obtained approval to manufacture, or otherwise acquired marketing rights, for more generic drugs during that Relevant Period than they actually manufactured, marketed and/or sold.

## DRUG-SPECIFIC ALLEGATIONS

204. Allegations specific to some of the Drugs at Issue are set forth below. The Price-Fixing Conspiracy affected the prices of all drugs Defendants manufactured, marketed, distributed and/or sold. Accordingly, Plaintiff paid an artificially inflated price for *all* Defendants' generic drugs Plaintiff paid for, and Plaintiff's claim in this action relates to all the Drugs at Issue, whether or not specific allegations in relation to particular

drugs are set forth below.  The allegations set forth below are simply examples of the operation of the Price-Fixing Conspiracy and concern generic drugs paid for by Plaintiff during the Relevant Period.

**Nystatin**

205.    As part of Defendants' participation in the Price-Fixing Conspiracy, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of Nystatin.

206.    Nystatin, also known by the brand name Mycostatin®, *inter alia,* is a medication used to fight fungal infections. It is produced in multiple formulations, including an external cream, an external ointment, and a tablet. During the Relevant Period, Defendants Actavis, Par, Perrigo, Sandoz and Taro were the primary manufacturers of Nystatin external cream, while Defendants Actavis, Perrigo and Sandoz were the primary manufacturers of Nystatin ointment, and Teva, Heritage, and Sun (through Mutual) were the primary manufacturers for Nystatin tablets.

**Nystatin Cream**

207.    In the second half of 2011, Taro, Perrigo, Par, and Actavis all raised the list prices of Nystatin external cream. Taro and Perrigo increased their prices in very close succession in the late spring of 2011. Par and Actavis followed the price increase in August and November 2011, respectively. Sandoz joined the price increase when it re-entered the market in 2013.

208.    As late as 2009, Sandoz enjoyed approximately a fifty percent market share for Nystatin cream, but by the following summer (of 2010), Sandoz was effectively out of the market, and Taro was left with almost the entire market.  In 2009, Taro had approximately forty percent, Perrigo had approximately seven percent and Par and Actavis

shared the remaining three percent. Sandoz's market share declined through 2009 and into 2010, and Actavis and Par also were effectively out of the market. While de minimis sales by Sandoz, Actavis, and Par continued, each had a market share of less than one percent by the spring of 2011; Perrigo had approximately a four percent share; and by May 2011, Taro had captured ninety-six percent of the Nystatin cream market.

209.     In June 2010, Taro initiated an enormous price increase: over 600 percent. Yet rather than using this opportunity to compete on price in order to gain market share, Perrigo – enjoying, as mentioned above, barely four percent of the market – followed almost immediately Taro's increase and raised its own prices to nearly identical levels. Perrigo ramped up production and gained some market share over the next two years, but, as contemplated by the overarching "fair share" agreement, market prices remained elevated and stable.

210.     Further, there was no shortage of the raw materials or API in Nystatin cream, which is evidenced in part by Perrigo's increase in production. Instead, this six-fold price increase was a direct result of the Price-Fixing Conspiracy.

211.     In August 2010, although it had only approximately one percent of the market, Par followed the Taro and Perrigo price increase in lockstep, also choosing to eschew price competition. Par also managed to grow its market share over the next couple of years, but it did so without eroding the elevated prices imposed by Taro and Perrigo, just as the "fair share" agreement intended.

212.     In November 2010, Actavis ramped up production of Nystatin cream and re-joined the market. It, too, immediately elevated its prices to match that of Taro, Perrigo

and Par, also choosing to forgo price competition and the prospect of winning a larger share of the market.

213.     Even a fourth entrant into the Nystatin cream market did not cause prices to erode. Defendants' agreement was working and held firm in the face of the entrants of multiple co-conspirators into the marketplace.

214.     Sandoz's share of the Nystatin cream market was close to zero until the fall of 2013, at which point it ramped up production for re-entry into the market. Like Perrigo, Par and Actavis, rather than compete on price in order to regain lost market share, Sandoz sold its Nystatin cream at the same price as its co-conspirators. The agreement was very much in effect: with even a fifth seller in the market, prices remained artificially inflated to the same price.

215.     Between around January 2012 to at least January 2017, Defendants Taro, Perrigo, Par and Actavis' prices of Nystatin external cream were virtually identical, and once in place the prices remained stable and elevated thereafter.  In around July 2013, Sandoz raised its prices for Nystatin external cream to match the prices charged by Taro, Perrigo, Par and Actavis and maintained that price until at least July 2017.

216.     It is particularly indicative of the unlawfully collusive and conspiratorial nature of Defendants' conduct that in 2009, prior to implementation of their anti-competitive scheme, Defendants had different prices for Nystatin cream, but once their anti-competitive pricing was in effect, their pricing was the same.

217.     At the start of 2009, prior to Defendants' implementation of their anti-competitive scheme, Defendants Sandoz, Taro, and Actavis both sold Nystatin cream for approximately $0.1/unit, while Defendant Par sold Nystatin at double  that price (but only

10 cents per unit more) for \$0.2/unit.   But once Defendants' conspiracy kicked in, all of the Defendants sold Nystatin for \$0.7/unit, merely tripling the cost of the product for Defendant Par, while Sandoz's, Actavis's, and Taro's cream septupled in price.

218.    Defendant Perrigo started at the same \$0.1/unit price as Sandoz, Actavis, and Taro, but in early 2009, doubled its price to match Par – and then, in early 2011, more than tripled that higher price to reach the same elevated level as its competitors.

219.    Further, after a long period of relatively low and stable pricing for Nystatin external cream, Defendants implemented large, abrupt and nearly uniform price increases. The AWP prices for Defendants' products also were elevated to essentially identical levels.

220.    As discussed above, no product shortages or other market changes can explain Defendants' price increases. In a competitive generic pharmaceutical market, prices decline as the number of sellers increases. Here, the elevated and stable pricing of Nystatin cream even as multiple sellers joined the market is consistent with anti-competitive conduct and inconsistent with competition.

221.    Throughout this period, Defendants had numerous opportunities to co-ordinate their pricing for Nystatin cream.  For example, Defendants had an opportunity to discuss pricing at the ECRM Retail Pharmacy Conference in March 2011, which was attended by representatives from Actavis, Par, Perrigo, Sandoz, and Taro.

222.    The next month, in April 2011, right before the price increases began, all Defendant manufacturers of Nystatin cream again gathered at the NACDS Annual Meeting. The Nystatin cream manufacturers continued to meet at trade shows thereafter.

223.    For example, leading into and following Sandoz's price increase for Nystatin external cream, Sandoz had multiple opportunities to meet with other Defendants.

In April 2013, Sandoz was joined by Actavis, Par, Perrigo and Taro at the NACDS Annual Meeting. Then, in June 2013, representatives from these same companies attended the GPhA/FDA CMC Workshop in Bethesda, Maryland. In August 2013, all five Nystatin cream manufacturers converged again at the NACDS Total Expo in Las Vegas. These meetings were also attended by many other Defendants.

224.    The elevated prices of Nystatin cream that resulted from Defendants' anti-competitive conduct has injured Plaintiff, causing Plaintiff to pay more for Nystatin cream than it would have paid in a free and fair market.

225.    The unlawful agreement between Defendants Actavis, Par, Perrigo, Sandoz and Taro regarding Nystatin cream was part of these Defendants' participation in the Price-Fixing Conspiracy.

**Nystatin External Ointment**

226.    Defendants' conduct with respect to Nystatin external ointment followed the same pattern as their conduct with respect to Nystatin external cream. In 2009, Sandoz had approximately seventy-five percent of the market, while Perrigo had twenty percent and Actavis had the remaining five percent. From that point through the summer of 2011, Actavis and Sandoz reduced production until they were effectively out of the market. By the summer of 2010, Actavis had approximately a zero percent market share, though *de minimis* sales appear to have continued, and by the summer of 2011, Sandoz's share of the market was reduced to approximately five percent, down from seventy-five percent two years earlier.

227.    In June 2011, after Sandoz and Actavis had all but ceded the Nystatin ointment market, Perrigo implemented a large price increase—more than 300 percent.

228.    Five months later, Actavis ramped up production of Nystatin ointment. Rather than undercut Perrigo's elevated price in order to gain market share, Actavis hiked its list prices to nearly identical levels as Perrigo. As part of the overarching "fair share" agreement and conspiracy among Defendants (and in contrast to the normal behavior in a competitive marketplace), the list prices and AWP price for Nystatin ointment remained virtually unchanged, even with the addition of a new seller in the marketplace.

229.    In the summer of 2012, this pattern repeated itself. Sandoz ramped up its production of Nystatin ointment in June 2012. But rather than compete on price to regain its lost market share, Sandoz raised its list prices to nearly identical levels as Perrigo and Actavis. Even with a third market participant prices remained the same, just as envisioned by Defendants' agreement., Fougera/Sandoz and Perrigo's list prices for Nystatin ointment increased between around January 2011 and July 2012, until the prices charged for Nystatin ointment by Defendants Actavis, Fougera/Sandoz and Perrigo were near identical.  The price increases were achieved by Defendants Actavis, Fougera/Sandoz and Perrigo raising the price of this product by different amounts and different multiples to reach the same final price, which is consistent with collusion and inconsistent with the functioning of a competitive market.  The price increases were also dramatic after a long period of relatively low and stable pricing for Nystatin ointment, Defendants implemented abrupt and virtually uniform price increases of approximately 300 percent for Defendant Perrigo and by approximately 700 percent for Defendants Actavis and Sandoz/Fougera. AWP prices for these products also were elevated to nearly identical levels.   Once each of these Defendants' prices for Nystatin ointment was identical or near identical, the prices then remained at that level until at least July 2017.

230.     No product shortages or other market changes can explain Defendants' price increases. The pricing conduct here is not consistent with competitive behavior. As multiple sellers enter the market, economic theory predicts that prices should decline. Yet, Nystatin ointment prices remained unchanged, which suggests an anti-competitive agreement among Defendants.

231.     Again, Defendants had the opportunity to discuss pricing of Nystatin external ointment at numerous industry events during the Relevant Period.  For example, in addition to other meetings, all Defendant manufacturers of Nystatin ointment attended the ECRM Retail Pharmacy Conferences and the NACDS Annual Meetings in 2011 and 2012.

232.     The elevated prices of Nystatin ointment that resulted from Defendants' anti-competitive conduct has injured Plaintiff, causing Plaintiff to pay more than it would have paid in a free and fair market.

233.     The unlawful agreement between Actavis, Perrigo and Sandoz regarding Nystatin ointment was part of these Defendants' participation in the Price-Fixing Conspiracy.

**Nystatin Tablets**

234.     In 2010 and 2011, the Nystatin oral tablet market was split between Teva and Sun. Teva held approximately sixty percent of the market, while Sun held forty percent. During that time, Teva and Sun had nearly identical list prices for their Nystatin tablets. Sun marketed and sold Nystatin tablets during the Relevant Period, at least in part through its subsidiary, Mutual.

235.     In the summer of 2012, Heritage entered the market. Rather than price its Nystatin tablets below that of the incumbent sellers, Heritage identically matched the list prices of Teva and Sun, consistent with the "fair share" agreement between them.

236.     As Heritage ramped up production, it reached out to Teva and Sun, and in April 2013, Sun, Heritage, and Teva began discussing pricing for Nystatin tablets. By this point in time, Sun had accumulated a larger share of the market. Defendants therefore devised a plan to reallocate the shares: Sun would implement a large price increase.  After Teva and Heritage obtained their "fair share" of the market, they would join Sun's price increase.

237.     On April 15, 2013, Defendants put their plan into action: Sun more than doubled its price for Nystatin tablets. Sun, Teva, and Heritage had ongoing communications before, during, and after this increase. The day after Sun increased its Nystatin prices, Sun Sr. Sales Manager Knoblauch called Heritage's NAM Sather and they spoke for approximately forty minutes.

238.     Knoblauch and Sather regularly communicated throughout the summer of 2013. For example, both Sather and Knoblauch attended the NACDS Total Store Expo in August 2013. This trade association meeting, which also was attended by representatives from most U.S. Defendants except Mayne, provided an opportunity to meet in person and exchange competitive information.

239.     In June 2013, Teva began internally discussing price increases for Nystatin tablets, contemplating when would be the appropriate time to join Sun's elevated prices. But Teva needed to coordinate with Heritage. Accordingly, on July 9, 2013, Teva's Patel called Heritage's Malek and they spoke for approximately twenty-one minutes. Malek knew

Patel from her previous work at AmerisourceBergen. They spoke throughout July 2013 with a nearly ten minute call on July 23, 2013 and two calls on July 30, 2013. The second call on July 30, 2013 lasted almost fifteen minutes.

240.    While Heritage's Malek was speaking with Patel at Teva, Heritage remained in contact with Sun. On July 30, 2013, he same day Malek spoke with Teva's Patel twice, Malek also spoke to Sun, for approximately eleven minutes.

241.    As these conversations continued, in late July 2013, Teva placed Nystatin tablets on its list of potential price increases.

242.    Similarly, throughout August 2013, Malek sent internal Heritage e-mails discussing drugs targeted for a price increase.   Nystatin tablets were identified as one of those drugs.

243.    However, discussions between Heritage and Teva about a Nystatin price increase were temporarily tabled when Teva's Patel went on maternity leave on August 12, 2013.

244.    On February 4, 2014, Teva's Patel was back from maternity leave and contacted Heritage's Malek.  Malek returned her call the next day and the two spoke for more than an hour. Upon information and belief, they discussed a price increase for at least the drugs Nystatin and Theophylline. Teva had been considering price increases for both drugs since early 2014.

245.    Three days after that, on February 7, 2014, an unidentified employee of either Heritage or Teva created a spreadsheet identifying Nystatin and Theophylline as candidates for price increases. Heritage's Malek and Teva's Patel continued discussing the possibility of such increases.

246.     Throughout February and March 2014, Heritage's Malek and Teva's Patel had a series of telephone calls discussing price increases for multiple drugs, including at least the pricing of Nystatin and Theophylline.

247.     Following these discussions, Teva implemented a price increase for Nystatin tablets with an effective date of April 4, 2014.  The increase more than doubled Teva's list price to a price nearly identical to Sun's.  Concurrent with this increase, Teva also implemented price increases for Theophylline.

248.     The early success in coordinating with Sun and Teva on Nystatin further encouraged Malek. During the week of April 14, 2014, he met with two Heritage employees and asked them to start analyzing the impact of price increases for numerous generic drugs, including at least thirteen generic drugs: Acetazolamide, Doxycycline Monohydrate, Fosinopril-HCTZ, Glipizide-Metformin HCI, Glyburide, Glyburide-Metformin, Leflunomide, Meprobamate, Nimodipine, Nystatin, Paromomycin, Theophylline and Verapamil.

249.     In another example of the wide-ranging nature of the Price-Fixing Conspiracy, where cooperation on one drug product was rewarded with cooperation on unrelated products (and, conversely, defection from the "rules of the road" on one product was punished with price-cuts on unrelated products), Heritage's Malek discussed all of this with Teva's Patel before introducing these market-wide price increases to the rest of his sales team. For example, on April 15, 2014, Malek had a seventeen minute telephone conversation with Patel, discussing at least seven different Drugs at Issue: Acetazolamide, Glipizide-Metformin HCI, Glyburide, Glyburide-Metformin, Leflunomide, Nystatin, and Theophylline.

250.     As Malek and Patel had already agreed in February 2014, Teva would lead the price increases for Nystatin and Theophylline.

251.     During their conversation, Malek and Patel agreed that if Heritage increased prices for the other five Drugs at Issue, Acetazolamide, Glipizide-Metformin HCl, Glyburide, Glyburide-Metformin, and Leflunomide, Teva would increase its prices for these drugs, or at a minimum, would not offer lower prices to any of Heritage's customers.

252.     Heritage's Malek and Teva's Patel spoke several times over the next several months to confirm their agreements on Nystatin and other drugs. Malek also kept Patel updated on the progress of Heritage's proposed price increases.

253.     And, in addition to Heritage and Teva, these seven generic drugs were also marketed and sold during the Relevant Period by Defendants Actavis, Apotex, Aurobindo, Citron, Mylan, Sun and Zydus, each of which was brought into the relevant drug-specific agreements. This type of agreement by multiple manufacturers across numerous drugs was typical of the overarching conspiracy among all Defendants. As demonstrated in the *quid pro quo* arrangements between Heritage and Teva, the various drug-specific agreements were interrelated and part of an overarching agreement to eliminate competition for the Drugs at Issue.

254.     On April 22, 2014, Heritage's Malek held a teleconference with his sales team. On the call, Malek dictated a price increase strategy for thirteen generic drugs. Prior to the conference call, Malek circulated a spreadsheet to his sales team, which identified each drug slated for a price increase, the competitors for each drug, and their respective market shares.

255.    This call was the start of additional pricing and market allocation discussions among Defendants and helped coordinate additional drug-specific agreements. Members of Heritage's sales team were assigned to specific competitors for whom they had primary, but not exclusive, responsibility for communicating about pricing and market share. Malek took personal responsibility to communicate with Defendants Teva and Zydus, as well as co-conspirator Ascend.

256.    Anne Sather was assigned to Sun to reaffirm the agreement on Nystatin. Sather also spoke with Sun about Paromomycin and spoke with Actavis to confirm agreements on Glyburide-Metformin and Verapamil and with Lannett to confirm agreements on Doxycycline Monohydrate. She also was assigned Actavis and Lannett. Her Heritage colleagues (Matt Edelson, Daniel Lukasiewicz, and Neal O'Mara), were responsible for pricing discussions with four other Defendants.

257.    On April 22, 2014, the same day Heritage held an internal meeting with its sales team to discuss a number of prices increases, Sather and Sun's Knoblauch spoke for more than forty-five minutes and agreed to increase the prices of numerous drugs, including, Nystatin tablets.

258.    With respect to Nystatin, by this time, Sun already had raised its price and Teva had just announced that it was matching that price increase. Sather and Knoblauch reaffirmed that Heritage, too, would follow the Nystatin price increase.

259.    Sather e-mailed Heritage's Glazer, Malek, Edelson, Rich Smith, and O'Mara immediately after her conversation with Knoblauch to report the agreements with Sun. Glazer immediately responded to Sather, instructing her not to put this type of information in writing. He then contacted her using his cellphone.

260.     During this time frame, Glazer directed Malek to call G.P. Singh, the President of Sun, to get further confirmation of Sun's pricing intentions. Ultimately, Malek decided not to reach out to Singh, whom he had never met.

261.     Four days later, however, on April 26-29, 2014, Glazer attended the NACDS Annual Meeting where he had the opportunity to meet in person with G.P. Singh from Sun, as well as with representatives from Teva and nearly every other Defendant.

262.     On or about May 8, 2014, Malek requested an update on the status of Sather's negotiations with competitors. Sather confirmed her agreement with Sun. The next day, Heritage had an internal call to discuss the status of the proposed price increases. Nystatin tablets were slated for a ninety-five percent increase.

263.     On June 23, 2014, the Heritage sales team had a meeting where they discussed the specific percentage amounts they would seek to increase on certain generic drugs and their strategy for doing so. Malek proposed the price increases for Acetazolamide (seventy-five percent increase), Fosinopril-HCTZ (200 percent increase, effective July 1, 2014), Glipizide-Metformin HCl (100 percent increase, effective July 1, 2014), Glyburide (200 percent increase, effective July 1, 2014), Nimodipine (forty-eight percent increase), Nystatin (ninety-five percent increase), Paromomycin (100 percent increase) and Theophylline (150 percent increase).

264.     One Heritage employee's notes about the June 23, 2014 call indicated that Heritage needed to promptly increase its Nystatin WAC price because Teva already had done so.

265.     Heritage had one final internal call to discuss price increases, including the price of Nystatin tablets, on June 25, 2014. While still participating in this internal call

about pricing, Heritage's Sather exchanged text messages with Sun's Knoblauch, informing her of the details of Heritage's anticipated price increases.

266.     Similarly, on the same day, June 25, 2014, Malek had a fourteen minute call with an individual in which he reported that Heritage's price increase notices would be mailed on June 26, 2014, for Nystatin tablets and several other drugs for which Heritage and Teva had agreed to raise prices.

267.     On June 26, 2014, Heritage began telling its customers that it was increasing its prices for a variety of drugs, including Nystatin tablets. Heritage issued price increase letters for generic drugs including Acetazolamide, Glipizide-Metformin HCI, Glyburide, Leflunomide, Nimodipine, Nystatin, Paromomycin and Theophylline.

268.     By July 2014, among the other price increases it implemented, Heritage increased its Nystatin oral tablet list prices to the identical level of Teva (and nearly identical to Sun). This affected Heritage's customers nationwide, including Plaintiff.

269.     In accord with their agreement, Teva did not undercut Heritage's prices, even when approached by large potential customers. For example, on July 8, 2014, a large retail customer e-mailed a Teva representative, asking for a quote for Nystatin tablets because it recently was notified of a large price increase from its current supplier. Teva either did not provide a bid or provided a cover bid that allowed Teva and Heritage to maintain their anti-competitive agreement.

270.     The price increases of approximately 100 percent initiated by Sun and joined by Teva and Heritage occurred after a long period of relatively low and stable pricing for Nystatin tablets. The AWP prices for Defendants' products also were elevated to nearly

identical levels. These prices remained stable and elevated above competitive levels thereafter.

271.     No product shortages or other market changes can explain Defendants' abrupt and nearly identical price increases.

272.     The elevated prices of Nystatin oral tablets that resulted from Defendants' anti-competitive conduct has injured Plaintiff, causing Plaintiff to pay more than it would have paid in a free and fair market.

273.     The unlawful agreement between Teva, Sun and Heritage regarding Nystatin tablets was part of these Defendants' participation in the Price-Fixing Conspiracy.

**Clonidine TTS Patch and Doxazosin Mesylate**

274.     Doxazosin mesylate ("Doxazosin"), also known by the brand names Cardura® and Carduran®, is a quinazoline compound used to treat high blood pressure and urinary retention associated with benign prostatic hyperplasia.

275.     The Clonidine TTS Patch ("Clonidine-TTS"), also known by the brand name Catapres-TTS®, is a transdermal patch that administers such medicines to treat high blood pressure.

276.     Teva began marketing Clonidine-TTS in 2010, after brand manufacturer Boehringer Ingelheim's patent on Catapres-TTS had expired.

277.     As part of the Price-Fixing Conspiracy, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of Doxazosin and the Clonidine TTS Patch.

278.     As of September 2011, Mylan and Teva were at rough parity in the market for generic Clonidine-TTS, with Mylan having approximately forty-eight percent market share

and Teva having approximately forty-four percent market share. At the end of 2011 and beginning of 2012, however, that relationship was changing.

279.     In November 2011, Walgreens solicited Teva to provide a bid for its Clonidine-TTS business. Teva was successful and took the Clonidine-TTS account at Walgreens from Mylan. Two months later, in January of 2012, Cardinal Health, Inc. ("Cardinal Health") solicited a bid from Teva for a one-time-buy to cover what Teva assumed was a short-term supply issue that Mylan was experiencing. A few days after Teva submitted its offer to Cardinal Health for the one-time-buy, Cardinal Health asked Teva to become Cardinal Health's primary supplier for ClonidineTTS. Because Teva believed that Cardinal Health's request was prompted by Mylan having supply issues, Teva accepted and took over the primary position at Cardinal Health for Clonidine-TTS. This would not have been a breach of the "rules of the road" of the Price-Fixing Conspiracy because Teva's bid did not erode prices and supplying a customer, if it's incumbent supplier was unable to do so, was acceptable so long as prices were maintained in accordance with what had been agreed to by Defendants.

280.     With the Walgreens and Cardinal Health business, Teva now had around seventy percent of the Clonidine-TTS market. On February 10, 2012, a senior sales and marketing executive at Teva, who will be referred to in this Complaint as K.G., told his colleagues to find out the extent of Mylan's supply issues. Following these orders, that same day, David Rekenthaler ("Rekenthaler"), then Vice President of Sales for US Generics at Teva, called a senior national accounts executive at Mylan, who will be referred to in this Complaint as B.P., to find out about Mylan's supposed supply issues.

281.     Later that day, Rekenthaler reported back to his Teva colleagues that Teva's assumptions were incorrect and cautioned that Mylan might retaliate against Teva for taking more than its "fair share."

282.     Sure enough, shortly thereafter, Mylan challenged Teva's Clonidine-TTS business at McKesson.   To de-escalate the situation, Teva ultimately conceded the business, but this was not enough to bring Teva back into compliance with the "fair share" aspect of the Price-Fixing Conspiracy, so in April 2012, Mylan challenged Teva's Clonidine-TTS business at CVS to gain back additional market share and further signal its displeasure with Teva for taking the Cardinal Health business, a signal that Teva understood: Teva backed off and conceded the CVS account to Mylan.

283.     However, as shown throughout this Complaint, the Price-Fixing Conspiracy was not limited to any single drug; rather, it spanned Defendants' entire portfolio of generic products. As a result, deviation from the Price-Fixing Conspiracy by a Defendant in one product line could be penalized in another.

284.     On May 4, 2012, just a few days after ceding CVS's Clonidine-TTS account to Mylan, Cardinal Health approached Teva about a different drug, Doxazosin. At the time, Mylan was the primary supplier for Doxazosin at Cardinal Health. Cardinal Health representatives told Teva that Mylan was on backorder for one of the four Doxazosin dosage strengths until the end of June 2012, but Cardinal Health wanted to move the entire Doxazosin line to Teva.

285.     Further illustrating this aspect of the Price-Fixing Conspiracy, K.G. cautioned his colleagues that doing so would be a bad idea. Rather than underbidding

Mylan and taking this business, and thus eroding Doxazosin pricing towards the competitive level, Teva left Cardinal Health's Doxazosin business with Mylan.

286.     On the morning of September 28, 2012, Mylan's Jim Nesta and Teva's then-Director of National Accounts, Kevin Green ("Green") spoke by telephone at least twice, once for four minutes and once for approximately fifteen minutes. On those calls, Nesta informed Green of Mylan's impending temporary exit from the Clonidine-TTS market.

287.     As expected, later in the day, Teva began getting solicitations from Mylan customers, such as Wal-Mart and CVS, seeking a bid from Teva for Clonidine-TTS because Mylan had just issued a temporary discontinuation notice.

288.     Mylan's temporary hiatus from the Clonidine-TTS market gave Teva the opportunity to raise prices and collusively reallocate the market at these inflated prices when Mylan re-entered the market.

289.     For example, in April 2012, before Mylan had challenged Teva's Clonidine-TTS account at CVS, Teva's direct invoice price to CVS for the 0.1mg, 0.2mg and 0.3mg Clonidine TTS was $22.13, $37.81 and $54.41, respectively.  Mylan's retaliation against Teva drove the prices for CVS down to below $10.49, $18.17 and $26.51 for those dosages, respectively. Because of Mylan's exit from the market, however, in October 2012 when Teva took back the CVS business, Teva charged CVS a direct invoice price of $33.28, $56.08 and $80.76, significant increases not only above the competitive price, but above the original pricing that Teva was charging at the start of the year.

290.     Mylan and Teva maintained regular contact as former Mylan customers came to Teva because of Mylan's supply issues with Clonidine-TTS. For example, Teva submitted bids to CVS and Wal-Mart, which were ultimately accepted by those companies

on October 4 and 5, 2012. In the days leading up to those bids, Teva and Mylan spoke repeatedly to ensure there were no misunderstandings that could lead to competition and price cuts (as had happened earlier in the year), including a one-minute call between Rekenthaler and B.P. and a five-minute call between Nesta and Green, both on October 1, 2012, and then on October 4, 2012, the day Teva submitted its CVS bid, Nesta and Green spoke again for eleven minutes.

291.    This time, there were no misunderstandings or competitive bids for other Defendants' customers. Instead, when, Mylan relaunched Clonidine-TTS early the following year and began seeking its former market share, Teva steered clear of underbidding.  Teva remained in constant contact with Mylan. In February and March 2013 alone, Teva and Mylan representatives called each other at least thirty-three different times and spoke for a total of nearly two hours and forty-five minutes.

292.    For example, in early March 2013, Mylan sought to secure the Clonidine-TTS business at Econdisc. Rather than competitively bid for the business, Teva chose to cede the Econdisc account to Mylan. By April 2013, Teva had also retroceded McKesson back to Mylan, as well, at Teva's increased pricing.

293.    A similar chain of events occurred with the CVS Clonidine-TTS account, as well. While Teva ultimately retained the CVS account, there was no competitive bidding to lower the prices described above.

294.    Because Teva had been able to increase the price at CVS following Mylan's exit, Mylan gave a bid to CVS that was higher than Mylan's previous pricing. CVS pushed Mylan to lower its bid in light of its prior prices, but Mylan, confident that its brinkmanship would work because it knew (through the constant communication just described) that

Teva would cooperate, Mylan refused to budge. Ultimately, CVS declined Mylan's bid because of Mylan's refusal to lower its bid in light of its prior pricing. Nonetheless, because Mylan's bid to CVS was not competitive, but rather an effort to allocate the market without eroding price, Teva was able to maintain its artificially higher prices at CVS.

295.    The conspiracy did not stop there.  On April 8, 2013, J.L., a marketing manager at Teva, reported internally to his Teva colleagues, including Rekenthaler, that Mylan had agreed to raise prices. In addition, Green and Nesta spoke twice that day, for one minute and for nine minutes, and the next day, they spoke again for eleven minutes, reconfirming Teva's and Mylan's agreement to implement increased prices, which they did shortly thereafter.

296.    Teva and Mylan were not the only participants in the Price-Fixing Conspiracy who were involved with its Clonidine-TTS aspect. Aptly illustrating Defendants' frequent entry and exit from various product markets, early the following year, on May 6, 2014, Actavis was granted FDA approval to market Clonidine-TTS.

297.    That day, as was standard practice among participants in the Price-Fixing Conspiracy, Teva and Actavis immediately discussed price and market share. Rekenthaler spoke by telephone three times (for fifteen minutes, one minute, and three minutes) with Marc Falkin, who was Actavis's Vice President of Marketing, Pricing and Contracts ("Falkin") until Actavis was acquired by Teva in August 2016.

298.    During his employment at Actavis, Falkin had established relationships with executives at many of the Defendants. For example, between August 2013 and July 2016, Falkin exchanged at least 2,562 telephone calls or text messages with his contacts at Defendants Zydus, Teva, Glenmark, Lannett, Aurobindo, Mylan, Lupin, Par, Greenstone,

Apotex, Taro, Amneal, Sandoz, and Wockhardt, including over 430 calls or text messages with Rekenthaler during that time period, at least 410 calls or text messages with Maureen Kavanaugh at Teva; 270 calls or text messages with Jim Brown at Glenmark; seventy-eight calls or text messages with Jim Nesta at Mylan; fifty-two calls or text messages with David Berthold at Lupin; forty-one calls or text messages with Jill Nailor at Greenstone; and at least twenty-one calls or text messages with Ara Aprahamian at Taro.

299.    On May 7, 2014, the day after speaking to Falkin about Clonidine-TTS, Rekenthaler announced to his colleagues that Actavis was entering the market. K.G. of Teva responded by requesting that Patel come up with a recommendation as to which customers Teva should concede to Actavis. At the same time, Teva employees bemoaned Actavis's so-called "ridiculous[ly]" low pricing.

300.    Teva personnel (successfully) worked to convince Actavis to increase its pricing for Clonidine-TTS by coordinating the incumbent supplier's (Teva) withdrawal from enough customers to give the newcomer its so-called "fair share" of the market.

301.    The next day, May 8, 2014, Rekenthaler spoke to Falkin three more times and Patel spoke with Rick Rogerson ("Rogerson"), Actavis's Executive Director of Pricing and Business Analytics. Shortly after her last call with Rogerson, Patel instructed her Teva colleagues to "Please concede Ahold and HEB," two of Teva's then-current customers, and the following day, May 9, 2014, Patel called Rogerson three times.

302.    Unsurprisingly, the agreement and inducements of the Price-Fixing Conspiracy held, and Actavis raised its Clonidine-TTS pricing while Teva quietly surrendered market share:  shortly after those telephone calls, Patel conveyed to her boss, K.G., that "I just found out that Actavis rescinded their offer."  Shortly after that, Patel also

learned that Actavis had "resent all of their offer letters at pricing that is higher than our [*i.e.*, Teva's] current [prices]."  In addition, Patel informed her colleagues that Actavis wanted twenty-five percent of the market and expected that ten to fifteen percent of that share to come from Teva.

303.     Rekenthaler was concerned that Actavis might thereafter defect from the Price-Fixing Conspiracy by competing for market share, but T.C., a senior sales executive at Teva, rebuked him, writing in an e-mail: "now, now Mr. Rekenthaler play nice in the sand box If history repeats itself[,] activist [*sic*] is going to be responsible in the market..." – "be responsible in the market" served as a euphemism that meant that, in accordance with the Price-Fixing Conspiracy, Actavis would not cut its pricing in return for the Clonidine-TTS market share that it was given.

304.     On May 14, 2014, for example, Patel told colleagues that Teva must be "responsible" and concede a particular wholesaler's account to Actavis, which Teva did a few days later.  On May 20, 2014 Patel again declined to bid at another customer due to the new entrant, Actavis, stating that "We are trying to be responsible with share and price."

305.     Mylan's brief supply issues described above cannot explain Defendants' price increases for Clonidine-TTS during the Relevant Period, in whole or in part, and no other shortages or other market features can explain Defendants' elevated pricing and price increases for Doxazosin and Clonidine-TTS during the Relevant Period.

306.     The elevated prices of Clonidine-TTS and Doxazosin that resulted from Defendants' anti-competitive conduct has injured Plaintiff, causing Plaintiff to pay more than it would have paid in a free and fair market.

307.     The unlawful agreements among Defendants Teva, Mylan, and Actavis regarding Clonidine-TTS and Doxazosin were part of these Defendants' participation in the Price-Fixing Conspiracy.

**Irbesartan**

308.     Irbesartan is a drug used in the treatment of hypertension. It prevents narrowing of blood vessels, thus lowering a patient's blood pressure. Irbesartan is also known by the brand name Avapro®. Teva received approval to manufacture generic Irbesartan in March 2012.

309.     As part of Defendants' participation in the Price-Fixing Conspiracy, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of Irbesartan.

310.     On March 6, 2012, Kevin Green's boss at Teva, K.G., polled the Teva sales team seeking information about competitors in the Irbesartan market. Later that morning, in response, Green called Berthold at Lupin and they spoke for over a quarter- hour; at 12:26 pm, within hours of K.G.'s request for sensitive commercial information from ostensible competitors, Green sent an answer to the team, including Rekenthaler and Maureen Cavanaugh, that "Lupin is looking for a fifteen percent share. They already have AmerisourceBergen. Confirmed Zydus is out," but was unable to get information on other players in the market.  A senior commercial operations executive at Teva responded via e-mail that afternoon, "Then work harder…" (ellipsis in original).

311.     Because participants in the Price-Fixing Conspiracy generally passed information indirectly from one ostensible competitor to another via intermediaries (as well as directly from time to time) Green called Berthold back the next morning, March 7, 2012, to get the requested information. The two spoke for just over seven minutes, around 10:54

am, but that was all the time that was needed for Berthold to pass on the requested sensitive competitive information, which Berthold did.

312.     A little over an hour later, at 12:20 pm, K.G., Green's boss at Teva, shared with the sales team the competitively sensitive information he had obtained, including the details Berthold gave Green regarding who was and who was not launching the drug, and which customers had received offers.  K.G. stated that Teva was in a position to take up to a forty percent market share when it launched Irbesartan a few weeks later, on March 30, 2012.  K.G.'s comment was indicative of the Price-Fixing Conspiracy, since it would have made little sense in a competitive market, where a supplier would want to try to take as much of the market as it could supply.

313.     No shortages or other market features can explain Defendants' elevated prices for Irbesartan during the Relevant Period.

314.     The elevated prices of Irbesartan that resulted from Defendants' anti-competitive conduct has injured Plaintiff, causing Plaintiff to pay more than it would have paid in a free and fair market.

315.     The unlawful agreement between Defendants Teva and Lupin regarding Irbesartan was part of their participation in the Price-Fixing Conspiracy.

**Nimodipine**

316.     Nimodipine, also known by the brand name Nymalize®, is a calcium channel-blocker that reduces problems caused by bleeding blood vessels in the brain.

317.     As part of Defendants' participation in the Price-Fixing Conspiracy, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of Nimodipine.

318.     Teva marketed and sold Nimodipine during the Relevant Period at least in part through its subsidiary, Barr.

319.     Sun marketed and sold Nimodipine during the Relevant Period at least in part through its subsidiary, Caraco.

320.     In June 2012, Teva was preparing to exit the market for Nimodipine.  This exit would leave Heritage and Sun as the only manufacturers of  Nimodipine.  Heritage wanted to use Teva's exit as a cover to raise Nimodipine prices.

321.     Pricing discussions with competitors were part of Defendants' toolkit for achieving and maintaining elevated prices on Drugs at Issue, and Defendants understood that to maintain market share and increase prices, they needed to play fair. With this in mind, Heritage devised a plan to approach Sun.

322.     Heritage's Malek wanted to reach out to other Defendants to coordinate and implement a market-wide price increase. To do so, Malek instructed his NAM Sather to contact Sun to discuss raising prices.

323.     At Malek's direction, Ann Sather contacted someone at Sun. Heritage's Sather exchanged numerous text messages and had multiple telephone calls with her contact at Sun throughout June 2012. These conversations between Heritage and Sun were successful. The ostensible competitors reached an agreement not to compete; their goal was to raise prices.

324.     Ultimately, Teva never completely exited the market for Nimodipine, yet it did reduce sales to a very small share, ceding the market to Sun and Heritage.

325.     Sather kept Malek apprised of her negotiations with Sun, including through a June 28, 2012, e-mail discussing the status of the agreement on Nimodipine between Heritage and Sun.

326.     That same day, Sather sent an analysis of a Cardinal Health RFP to Malek, Glazer, and other Heritage employees. Sather noted that Heritage would submit a bid at an artificially high price, which would allow Sun to retain Cardinal Health's business. Heritage informed Sun about the pricing before submitting to Cardinal Health. This information allowed Sun to retain Cardinal Health's business at a price that was significantly higher than it would have been in a competitive market.

327.     On July 20, 2012, another employee at Heritage circulated proposed pricing in response to the Cardinal Health RFP, which, upon information and belief, quoted pricing at a level lower than Sun. Malek responded the same day and exchanged e-mails with a Heritage employee about Heritage's pricing on Nimodipine and Heritage's agreement on pricing with Sun. Around the same time, Sather and her contact at Sun were also discussing at least Nimodipine.

328.     Heritage's Sather and Sun's Knoblauch communicated by text and telephone over the next few weeks. They also met in person at an industry event. Through these communications, at the end of July 2012, Heritage and Sun reaffirmed their agreement to raise prices and allocate the market for Nimodipine. As part of this understanding, as it had in June 2012, Heritage again agreed to provide a cover bid to Cardinal Health.

329.     As a result of Heritage's cover bid, Sun retained its business with Cardinal Health, and both Heritage and Sun were able to maintain Nimodipine prices above the competitive level.

330.     In September 2012, after Cardinal Health awarded Sun its Nimodipine business, Sun began to experience supply issues with its Nimodipine.

331.     In October 2012, Cardinal Health approached Heritage, asking for a new bid because it was concerned about Sun's supply chain. Although Sun never fully exited the market, its sales of Nimodipine declined to a small share.

332.     Sather immediately e-mailed Heritage's Malek, Glazer and Fleming to apprise them of Cardinal Health's request. Given the circumstances, Sather felt responding to Cardinal Health's request for a Request for Proposal ("RFP") did not violate Heritage's agreement with Sun because Cardinal Health was coming directly to Heritage, because of Sun's supply issues – and most importantly, because Heritage was not going to underbid Sun on price.

333.     Consistent with a price increase Heritage had recently imposed on a different wholesaler, Sather proposed that Heritage respond to Cardinal Health's request. Sather believed that Heritage could offer a higher price and still win the business from Cardinal Health because she had received Sun's Cardinal Health pricing from her contact at Sun. Sather also shared information she had learned at the earlier trade conference, which likely involved competitive market information.

334.     When she spoke with Sun's Knoblauch for thirty-eight minutes the next day, Sather confirmed her understanding that Heritage could submit a bid to Cardinal Health without violating its agreement with Sun.

335.    Heritage continued to communicate with Sun to monitor when Sun would re-enter the Nimodipine market. Malek e-mailed Sather on December 17, 2012, about Sun's supply issues. In response to Malek's e-mail, Sather reached out to her contact at Sun and kept Malek informed about her conversations.

336.    During this same time period, Sun (along with Actavis and West-Ward) increased prices on Doxycycline.  On April 16, 2013, Sather reported to Malek that Sun was not pursuing Nimodipine customers because it did not know when its product would be available. Heritage's Malek responded to this information by expressing his willingness to continue Heritage's pricing and market allocation agreement with Sun when Sun re-entered the Nimodipine market.

337.    Heritage's Sather continued speaking with Sun's Knoblauch to assess when Sun might re-enter the Nimodipine market. When they spoke on May 23, 2013, Sather learned that Sun might be returning to the Nimodipine market in June or July 2013. Sather immediately reported this development to Malek, and the two exchanged e-mails about pricing for Nimodipine.

338.    Ultimately, Sun decided not to re-enter the Nimodipine market. In the spring of 2013, Heritage more than doubled the price of Nimodipine capsules and maintained this inflated price for the duration of the Relevant Period.

339.    When Heritage's Malek learned that Ascend was planning to enter the Nimodipine market in April 2014, he immediately began the process of trying to contact Ascend and bring them into the "fair share" agreement.

340.    On April 8, 2014, Malek informed his staff that Ascend would be entering the Nimodipine market and personally took responsibility for coordinating with Ascend.

Malek had met John Dillaway, the Executive Vice President of Ascend, in February 2013, and he used that connection as a way to reach out to Dillaway through LinkedIn. The two executives communicated frequently through LinkedIn in the weeks leading up to April 22, 2014.

341.    During an internal Heritage teleconference on April 22, 2014, Malek identified numerous drugs that were slated for a price increase, including Nimodipine. That same day, Dillaway and Malek spoke on the telephone about Ascend's entry into the Nimodipine market for almost 20 minutes.

342.    Concurrently with Malek's discussions with Ascend, Malek and the rest of Heritage's sales teams were involved in large-scale outreach to Defendants to increase prices for numerous generic drugs.

343.    As part of an internal Heritage conference call on May 9, 2014, about industry-wide price increases for at least nine drugs (including Verapamil, Theophylline, Paromomycin, Nystatin, Nimodipine, Leflunomide, Glyburide-Metformin, Fosinopril-HCTZ, and Glyburide), the Heritage team discussed allocating customers to co-conspirators as part of their agreement, including, but not limited to, the potential allocation of certain customers to Ascend as part of the efforts to raise and/or maintain prices on Nimodipine.

344.    On June 6, 2014, Heritage's Malek e-mailed Ascend's Dillaway, trying to arrange a telephone call to discuss Nimodipine. They were unable to connect by telephone but agreed to meet in person several weeks later, at the NACDS Total Store Expo in Boston, to solidify their agreements.

345.     As discussed above, during an internal conference call on June 23, 2014, with the Heritage sales team, the targeted percentage price increases for eight drugs were discussed, including Nimodipine, which was slated for a forty-eight percent increase.

346.     Three days later, on June 26, 2014, Heritage began telling customers that it was increasing prices for nine different drugs, including Nimodipine. Price increase notices were issued on the same date.

347.     Although Ascend ultimately did not enter the Nimodipine market, Defendants did not have to include the anticipated effects of Ascend's threatened market entry in their Nimodipine prices.  This is because had Ascend entered the Nimodipine market, it would have entered at the collusive price agreed upon with Heritage. Further, in accordance with the terms of the Price-Fixing Conspiracy, Heritage would have walked away from certain customers to allow Ascend to build its market share.

348.     Sun's supply issues cannot explain Defendants' price increases for Nimodipine during the Relevant Period, in whole or in part, and no other shortages or other market features can explain Defendants' elevated pricing and price increases for Nimodipine during the Relevant Period.

349.     The elevated prices of Nimodipine that resulted from Defendants' anti-competitive conduct has injured Plaintiff, causing Plaintiff to pay more than it would have paid in a free and fair market.

350.     The unlawful agreement between ~~Defendants~~ Heritage and Sun regarding Nimodipine was part of their participation in the Price-Fixing Conspiracy.

**Valsartan HCTZ**

351.     Valsartan HCTZ ("Valsartan"), also known under the brand name Diovan®, is used to treat high blood pressure. Diovan was a so-called "blockbuster" drug that had

sales in the U.S. of, for example, approximately $1.6 billion for the 12 months ending June 30, 2012.

352.    Mylan was the first to file an ANDA to market the generic version, Valsartan HCTZ, which, if approved, would give Mylan 180 days of generic exclusivity. Sandoz manufactured the authorized generic. This meant that Sandoz and Mylan would be the only two manufacturers of the generic version of the drug for six months once Mylan entered the market.

353.    As part of Defendants' participation on the Price-Fixing Conspiracy, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of Valsartan.

354.    Mylan and Sandoz launched Valsartan HCTZ on the same day, September 21, 2012. Over the preceding three weeks, leading up to the launch, employees of Defendants Mylan and Sandoz spoke multiple times by telephone during which they discussed, *inter alia*, allocating market share for this product.

355.    On September 6, 2012, Mylan's Nesta called a senior sales executive at Sandoz, who will be referred to in this Complaint as CW-D.  Nesta, representing the incoming generic, discussed market allocation with CW-D. They spoke for twenty minutes and two short telephone conversations followed later that day.

356.    This is just one of the many examples of Defendants' employees speaking over the telephone on multiple occasions in the same day.  To avoid leaving permanent and easily accessible records of their communications.  Defendants' employees generally did not communicate by e-mail or leave voicemails even just to set up times for telephone calls.

357.    Similarly, internal e-mails between Defendants' employees generally did not record substantive information relating to the Price-Fixing Conspiracy.  For example,

among the many other illustrations of this in the Complaint, on February 7, 2014, when Teva received notice from a customer that it had received a competitive challenge from Par on the drug Labetalol HCL Tablets, rather than spell out in detail that she wanted T.S. to ask Par about the details, Patel simply forwarded the e-mail to T.S. with three question marks: "???" T.S. responded shortly thereafter: "left message." The message that T.S. had left was for R.K. at Par, and the two executives tried to reach each other by telephone five times that same day. After the last of these calls with R.K., T.S. responded back to Patel in writing an e-mail, transmitting the need to communicate but no actual, substantive information: "Let's speak on Monday. Just received call back with more information." Similarly, as mentioned, on Friday, September 7, 2012, Nesta and CW-D had multiple telephone conversations.

358.    The following week, Nesta called CW-D back and they spoke for approximately twenty minutes on September 12, 2012; then, the same day, CW-D called Nesta back for a minute and a half.  The next day, September 13, 2012, there were five calls between them, including one for approximately eleven minutes; finally, the week ended with a seven-minute call on Friday, September 14, 2012.

359.    The next week was the week of both companies' Valsartan launch, and Nesta and CW-D spoke multiple times on that Monday and Wednesday, September 17 and 19, 2012.

360.    Via these telephone calls, Sandoz and Mylan, through CW-D and Nesta, agreed to divide up the market for at least Valsartan without cutting prices, so that each "competitor" obtained a roughly fifty percent market share.

361.    Throughout this time, CW-D also kept her boss, Sandoz's Director of Pricing and Contracts, Armando Kellum, up to date on her discussions with Nesta and met with Kellum in person to discuss her customer accounts, including a meeting on September 14, 2012.

362.    In addition, on September 25, 2012 – only four days after the Valsartan HCTZ launch – since there was a new entrant to the market, who in a competitive market would have sought increased market share via price competition, AmerisourceBergen contacted Sandoz seeking a price reduction. S.G. forwarded the request to CW-A and Kellum, asking for guidance. Kellum replied, "No price change."

363.    In November 2012, Sandoz employees were e-mailing regarding the possibility of seeking additional business. Following the rules of the road for the Price-Fixing Conspiracy, Kellum responded, "I'm concerned we are going to disrupt the market. I understand the need for additional sales but we need to be thoughtful here." R.T. then directed the Sandoz team, "Do not approach new customers, with[out] me or Armando [Kellum]'s consent." R.T. did this to ensure that Mylan retained its so-called fair share without competition for market share between Sandoz and Mylan eroding prices.

364.    No shortages or other market features can explain Defendants' elevated pricing for Valsartan during the Relevant Period.

365.    The elevated prices of Valsartan that resulted from Defendants' anti-competitive conduct has injured Plaintiff, causing Plaintiff to pay more than it would have paid in a free and fair market.

366.    The unlawful agreement between Defendants Mylan and Sandoz regarding Valsartan was part of these Defendants' participation in the Price-Fixing Conspiracy.

**Doxycycline Hyclate**

367.     Doxycycline Hyclate is a tetracycline-class antibiotic used to treat a variety of bacterial infections. This medication is also used to prevent malaria. Doxycycline Hyclate is produced in a regular-release formulation ("Doxy RR") and in a delayed-release formulation ("Doxy DR").

368.     As part of Defendants' participation in the Price-Fixing Conspiracy, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of Doxycycline Hyclate.

**Doxy RR**

369.     Sun, Actavis, and West-Ward, as well as late entrants Mylan and Par, were the dominant market players for Doxy RR during the Relevant Period.

370.     Throughout 2012, Sun, Actavis, West-Ward, Par, and Mylan attended a number of trade events where they met and discussed the pricing of Doxycycline Hyclate.

371.     In late 2012, during the period in which Heritage and Sun were intensely communicating and coordinating pricing for Nimodipine (as discussed above), including at trade events, Sun imposed dramatic price increases on its Doxy RR products. West-Ward and Actavis quickly followed suit.

372.     These price increases were abrupt, very substantial, nearly identical, and nearly simultaneous. Within a two-week period, Sun, West-Ward and Actavis raised the WAC prices on their Doxy RR products by more than 2000 percent.

373.     The dramatic price increases followed a period of relatively low and stable pricing for Doxy RR. No shortages or other market changes can explain the extraordinary price increases imposed by Sun, West-Ward and Actavis.

374.    Defendant manufacturers of Doxycycline Hyclate continued to meet regularly at trade events after the initial price hikes.

375.    When Defendants Par (through DAVA) and Mylan entered the market, rather than trying to gain market share by undercutting the pricing of the incumbent manufacturers (as would have happened in a competitive market), they priced their Doxy RR at similarly elevated prices because of Defendants' "fair share" agreement.

376.    No shortages or other market features can explain Defendants' price increases for Doxy RR during the Relevant Period.

377.    The elevated prices of Doxy RR that resulted from Defendants' anti-competitive conduct has injured Plaintiff, causing Plaintiff to pay more than it would have paid in a free and fair market.

378.    The unlawful agreement between Sun, Actavis, West-Ward, Mylan, and Par regarding Doxy RR was part of these Defendants' participation in the Price-Fixing Conspiracy.

**Doxy DR**

379.    Mylan and Heritage were the dominant market players for Doxy DR during much of the Relevant Period. Heritage began selling Doxy DR on July 2, 2013. At the time, Mylan was the only other seller of generic Doxy DR. Mayne entered the Doxy DR market in 2014.

380.    Even before entering the market, Heritage contacted Mylan about refraining from price competition. Heritage did not want Doxy DR prices to erode when it entered the market. Mylan also wanted to maintain its prices. Consistent with their overarching "fair share" agreement, both Heritage and Mylan understood that cooperation and coordination was required to maintain Doxy DR prices.

381.    In April 2013, Heritage's Malek and its CEO Glazer traveled to India to meet their bosses at Heritage's Indian-based corporate parent, Emcure: Emcure CEO Mehta and Emcure President Thapar. The purpose of the trip was to discuss the workings of Heritage's plans to enter the Doxy DR market. These meetings included discussions about how to coordinate with Mylan so as to minimize the competition between the two companies for Doxy DR.

382.    During these discussions, it was decided that in order to work out an agreement between Heritage and Mylan relating to (at least) Doxy DR, Mehta would reach out to Rajiv Malik, a high-level counterpart at Defendant Mylan, in order to facilitate communication between Glazer and Malek and their Mylan counterparts.

383.    After returning to the U.S., on or about May 3, 2013, Heritage's Malek tried to set up a call with the Vice-President of Sales at Mylan.  Malek learned, however, that the Vice-President of Sales had little to do with National Accounts and was instead directed to the person at Mylan who did have responsibility for such accounts. On information and belief, that person was Jan Bell, who was a Senior Key Account Manager at Mylan from September 2010 to January 2013 and served thereafter as Director of National Accounts at Mylan.

384.    Malek promptly contacted Bell through LinkedIn. Malek and Bell communicated by telephone on multiple occasions and continued to communicate about various drugs, including Doxy DR.

385.    While Malek was in contact with Bell, other Heritage employees began reaching out to their counterparts at Mylan to discuss Doxy DR and other drugs.  For example, beginning on or about May 7, 2013, Glazer e-mailed Mylan's President and

Executive Director, Malik. He copied both Mehta and Thapar at Emcure on the e-mail. Malik responded to Glazer's e-mail with a telephone number where he could be reached in England, and the two spoke the next day, when they confirmed their agreement to refrain from competing in the Doxy DR market.

386.     Glazer told Malik that Heritage intended to pursue two of Mylan's large Doxy DR customers (wholesaler McKesson and retail pharmacy CVS), who collectively made up thirty percent of the market. Glazer further told Malik that Heritage wanted to gain market share without lowering the pricing of Doxy DR.

387.     In accordance with the terms of the Price-Fixing Conspiracy, Malik agreed with Glazer that Mylan would give up its accounts with McKesson and CVS, while Heritage would work with Mylan to keep the prices of Doxy DR elevated.  In the course of these communications with Glazer, Malik made clear that Mylan was willing to enter into this agreement relating to Doxy DR because Heritage had, in the past, abided by its "fair share" agreements with Mylan on other drugs.

388.     Malik told Glazer that he would inform others at Mylan about their agreement. Glazer also kept Heritage's Malek informed about his conversations with Mylan. In the months following Malik and Glazer's agreement, Mylan surrendered the McKesson and CVS accounts to Heritage.

389.     By allocating the McKesson and CVS accounts in the Doxy DR market, Mylan and Heritage were able to artificially maintain Doxy DR prices across the market. In a competitive market, Heritage's entry would have spurred price competition across all customers, which would have lowered market prices.  By foregoing this competition, Mylan and Heritage kept Doxy DR prices higher than they otherwise would have been.

390.    As discussed above, beginning in July 2013 and continuing through July 2014, Heritage had at least 513 different contacts with various generic drug manufacturers about the pricing of Drugs at Issue, including Doxycycline Hyclate. In addition, Defendants had the opportunity to discuss Doxy DR and other drugs while attending industry meetings.

391.    Following a number of spring and summer trade meetings in 2013, a series of inter-competitor communications led to anti-competitive agreements relating to multiple Drugs at Issue.

392.    For example, on June 11, 2013, an employee from Mylan called an employee at Heritage. They spoke for about ten minutes. Immediately after the telephone call, the Heritage employee called Malek and left a voicemail providing a report. Malek called the employee back fifteen minutes later and they spoke for approximately seven minutes.

393.    That same day, Heritage was also in contact with other generic drug manufacturers, who in turn communicated with other Defendants, including Par and Mylan. The next day, June 12, 2013, while Defendants were also discussing pricing for at least Doxy DR, Defendant Lannett increased the prices for Doxycycline Monohydrate, consistent with Defendants' conspiracy to raise and maintain prices.

394.    On June 18, 2013, a senior manager at Wholesaler A contacted a Mylan employee to inform him that Wholesaler A received an unsolicited bid for Doxy DR from a new entrant (Heritage). Mylan was asked to submit a bid by the close of business on June 21, 2013, to retain the business with the wholesaler. Consistent with its agreement to cede its Doxy DR business to Heritage, Mylan failed to submit a counterbid.

395.    On June 27, 2013, following Mylan's failure to bid, Heritage entered into a distribution agreement with Wholesaler A for Doxy DR.

396.     The conversations among Defendants continued throughout 2013.  When Heritage began selling Doxy DR in July 2013, Heritage spoke with Mylan and Sun on multiple occasions between July and November 2013.

397.     On July 8, 2013, Heritage submitted a proposal to a pharmacy to obtain Doxy DR business. The next day, the pharmacy rejected the proposal as being too high. Heritage submitted a revised bid to the pharmacy on July 11, 2013. During this time, Heritage and its parent, Emcure, continued to communicate with Mylan to make sure Mylan was committed to their Doxy DR agreement.

398.     As part of this effort, Heritage CEO Glazer's boss at Emcure, CEO Mehta, spoke to Malik, Mylan's President and Executive Director, on July 18, 2013. Information about the call was communicated to Glazer by an Emcure employee shortly after Mehta and Malik spoke.

399.     In response, Glazer e-mailed Mylan President and Executive Director Malik trying to schedule a telephone call that day. Malik told Glazer they could speak in the evening, and later that evening, Malik left Glazer a voicemail.  Fifteen minutes later, Glazer returned Malik's call and they spoke for approximately four minutes. During the call, Glazer informed Malik of Heritage's strategy with respect to at least Doxy DR and its bid to the pharmacy.

400.     In response to this conversation, Malik immediately spoke to certain Mylan employees, and ultimately, Mylan walked away from the pharmacy customer in order to avoid price erosion.

401.     The following month, in August 2013, Mylan was contacted by an executive at the pharmacy and was told that the pharmacy had received an unsolicited bid

for Doxy DR. Mylan was given a chance to submit a counterbid. In response, Mylan submitted a bid with pricing that it knew would be too high to retain the business. When Mylan was given a second opportunity to lower its pricing, Mylan failed to submit a revised bid, consistent with its agreement with Heritage. In September 2013, the pharmacy gave its Doxy DR business to Heritage.

402.    The business obtained from Wholesaler A and the pharmacy accounted for more than eighty percent of Heritage's Doxy DR business. Heritage maintains that business to this day.

403.    After Heritage obtained the pharmacy's business, on several occasions Heritage walked away from other Mylan customers in accordance with their agreement with Mylan and the terms of the Price-Fixing Conspiracy. For example, in November 2013, Heritage did not pursue a certain large account because the large account was Mylan's customer and was not allocated to Heritage.

404.    The anti-competitive conversations and agreements continued, including when Mayne prepared to enter the Doxy DR market a couple of months later. On January 7, 2014, about a month before Mayne's entry into the Doxy DR market, a Heritage employee and an employee at Mayne had a twelve minute telephone conversation about agreeing not to compete in the market for Doxy DR.

405.    These conversations continued throughout 2014, with the Heritage employee continuing to communicate with the Mayne employee, via text messages, e-mail, and including telephone conversations on March 13 and 17, 2014. The Heritage employee e-mailed and texted Malek, providing him with the information on Mayne's market share

and strategy that she had obtained. The shared goal of Heritage and Mayne was to maintain pricing within the Doxy DR market.

406.     After Mayne entered the market, it initially avoided competing with Heritage and instead targeted customers of Mylan. In one such instance, Mayne made a bid to a large wholesaler where Mylan was the incumbent provider and the wholesaler asked Heritage to also submit a bid.  Heritage declined, advising the wholesaler that it had an inadequate supply of Doxy DR, thereby honoring its on-going agreement with Mylan. Malek knew Heritage had sufficient supply of Doxy DR to fulfill a bid but instructed Heritage not to submit a bid in order to honor Heritage's agreement with Mylan.

407.     Two months later, Sather continued to communicate with her contact at Mayne about Doxy DR via telephone on March 13, 2014 and then on March 17, 2014.

408.     At the end of March 2014, Mayne presented a bid to one of Heritage's nationwide pharmacy accounts. This led to telephonic, e-mail and text discussions between Mayne and Heritage over the next several months, including on April 1, 2014, when Heritage's Sather and a Mayne employee spoke for approximately twenty-seven minutes. After the call, Sather and Malek exchanged text messages, likely about the substance of the conversation.

409.     Sather and a Mayne employee spoke again the next day for eleven minutes.  The same day, Malek e-mailed CEO Glazer to provide an update on negotiations with Mayne. Sather and a Mayne employee spoke for three minutes on April 9, 2014, and the next day exchanged multiple text messages. Sather reported these conversations to employees of Heritage, including at least Malek.

410.     Ultimately, because of the agreement between Heritage and Mayne not to compete in the market for Doxy DR, Heritage was able to retain the pharmacy customer at prices that were significantly higher than they would have been in a competitive market.

411.     In May 2014, it was Mayne's turn. Instead of competing on price, Heritage walked away from a customer being pursued by Mayne.

412.     Likewise, in August 2014, consistent with its agreement with Mylan, Heritage again refused to bid on an RFP issued by a Mylan customer.

413.     In November 2014, Mayne made offers to the One Stop Program of McKesson (a wholesaler) and Econdisc.  Malek contacted personnel at Mayne to discuss the situation and raised the idea that Heritage and Mayne could allocate customers by having Mayne withdraw its offer to McKesson. Malek worked out an agreement with Mayne by November 25, 2014, which Glazer subsequently confirmed. Follow up communications occurred in December 2014 by text message and an in-person meeting at a conference of the American Society of Health-System Pharmacists held on December 9, 2014.

414.     The agreement resulted in higher prices for Doxy DR. When Econdisc put its business out for bid again in January 2015, Heritage deliberately bid a higher price than Mayne, fulfilling its agreement to walk away from the Econdisc business. Likewise, when Heritage was requested to submit a bid by a large nationwide pharmacy chain in September 2015, it declined to do so after learning that Mayne was the incumbent supplier.

415.     The agreements between Mylan, Heritage and Mayne described herein caused prices for Doxy DR to be higher than they would have been in a competitive market and prevented price erosion that would have occurred in such a market.

416.    No shortages or other market features can explain Defendants' elevated pricing for Doxy DR during the Relevant Period.

417.    The elevated prices of Doxy DR that resulted from Defendants' anti-competitive conduct has injured Plaintiff, causing Plaintiff to pay more than it would have paid in a free and fair market.

418.    The unlawful agreement between Defendants Heritage, Mayne, and Mylan regarding Doxy DR was part of these Defendants' participation in the Price-Fixing Conspiracy.

**Doxycycline Monohydrate**

419.    As part of Defendants' participation in the Price-Fixing Conspiracy, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of Doxycycline Monohydrate.

420.    Like Doxy RR and Doxy DR, Doxycycline Monohydrate also known, *inter alia*, by brand names Acticlate® and Monodox® is a tetracycline antibiotic and is used in treating a variety of bacterial infections, and also to prevent malaria.

421.    During the Relevant Period, Heritage, Lannett, Mylan, and Par were the dominant market players for Doxycycline Monohydrate tablets.

422.    In February 2013, Heritage believed that demand for some doxycycline products was increasing and wanted to use this as a pretext to raise the price of Doxycycline Monohydrate. In accordance with their anti-competitive agreement, Heritage began reaching out to Lannett, Mylan, and Par to institute a price increase for Doxycycline Monohydrate. These pricing discussions occurred at the same time as Heritage and Dr.

Reddy's were discussing pricing and market share for Zoledronic Acid and Meprobamate, as discussed below.

423.    Starting in March of 2013, Heritage's Sather began communicating with Lannett about pricing for at least Doxycycline Monohydrate. On March 7, 2013, Heritage's Sather spoke to Lannett's Sullivan for fourteen minutes about an opportunity Heritage had at Cardinal Health.

424.    Six days later, on March 13, 2013, Sather sent an e-mail to Lannett's Sullivan about pricing for at least Doxycycline Monohydrate. They spoke for five minutes later the same day, again about pricing.

425.    On March 21, 2013, the same day that Malek instructed O'Mara and Edelson to seek a price increase on Meprobamate from Dr. Reddy's, Malek decided he also wanted to increase the price of Doxycycline Monohydrate by four times the current price. He consulted with Glazer about the price increase.

426.    On March 25, 2013, a Lannett employee sent an e-mail to her boss to provide an update on her conversations with Heritage about price increases for certain drugs, including Doxycycline Monohydrate. Lannett's Sullivan and Heritage's Sather communicated about Doxycycline Monohydrate by telephone, text message, and in-person meetings over the next several months.

427.    That same day, March 25, 2013, Malek sent an e-mail to his sales team discussing Heritage's price increases for at least Doxycycline Monohydrate and another drug.

428.    Heritage's Sather then called Lannett's Sullivan and left a message on April 25, 2013. Sullivan returned her call the next day; they spoke for about eight minutes.

429. While Heritage's NAMs were speaking with competitors about Doxycycline Monohydrate, in April 2013, Heritage's Malek and CEO Glazer were in India meeting with their bosses at Heritage's corporate parent, Emcure. Emcure's CEO Mehta and President Thapar discussed, among other things, how Heritage and Mylan could minimize competition and avoid price erosion when Heritage entered the Doxy DR market. Emcure's CEO Mehta decided to reach out to Mylan's President and Executive Director Malik to facilitate subsequent communications between Glazer and Malek and their Mylan counterparts.

430. Consistent with how the overarching conspiracy operated, throughout the rest of 2013, Heritage spoke with its competitors about pricing for a number of drugs, including Doxycycline Monohydrate. These communications often overlapped with trade association meetings. For example, on May 14, 2013, the day after Lannett's Sullivan and Heritage's Sather spoke for a few minutes, the two attended a conference together where they spoke in person and exchanged text messages discussing at least Doxycycline Monohydrate.

431. On June 4, 2013, Sather called and texted an employee at Lannett. While Sather was exchanging text messages with this Lannett employee, she was attending the HDMA's June 2-5, 2013, Business and Leadership Conference in Orlando, Florida. That conference was attended by key executives for generic sales and pricing from at least Actavis, Apotex, Aurobindo, Citron, Dr. Reddy's, Glenmark, Heritage, Lannett, Mylan, Par, Sandoz, Sun, Teva, West-Ward and Zydus.

432. Defendants agreed to implement price increases for Doxycycline Monohydrate in the late spring and summer of 2013. In the lead up to the price increases,

the four competitors selling Doxycycline Monohydrate—Par, Lannett, Heritage, and Mylan—were in frequent communication.

433.    For example, on June 11, 2013, the day before Lannett's price increase, a Heritage employee spoke with a Mylan employee for nearly ten minutes. During this same time period, a Lannett employee was communicating with an employee at Par. In turn, this Par employee frequently communicated with a Mylan employee. The Lannett and Par employees were friends and frequently spoke in person at trade association conferences, including about competitive information.

434.    In fact, these employees from Mylan and Par spoke numerous times between June and July 2013.  They had several calls on June 7 and June 13, 2013, the day after Lannett confirmed that it would increase its prices for Doxycycline Monohydrate. Mylan and Par both increased their prices of Divalproex shortly after these calls, on June 14 and June 26 2013.

435.    Further, an employee at Lannett exchanged nine text messages with a competitor on June 11-12, 2013.

436.    Heritage was concerned about supply issues for Doxycycline Monohydrate in 2013, and thus was cautious about the Doxycycline Monohydrate price increases. In a competitive market, supply challenges for one supplier create competitive opportunities for other suppliers. But Defendants' "fair share" agreement aimed to mitigate these risks of competition and disruption. Accordingly, Sather kept in frequent communication with Lannett during this period to stay abreast of any developments, and to reaffirm Heritage's commitment to their agreement.

437.    Sather also met with a Par employee while at a conference in Arizona on August 1 and 2, 2013.  Following Sather's meeting with Par in Arizona, there was a flurry of communications between Par, Mylan, Lannett, and Heritage about at least the pricing of Doxycycline Monohydrate.

438.    The NACDS Total Store Expo in Las Vegas, Nevada, on August 10-13, 2013, was attended by numerous Defendants, including those known to have exchanged pricing and customer information throughout the Relevant Period, including: Apotex (Hamilton), Aurobindo (Cunard), Citron, Dr. Reddy's, Glenmark, Heritage (Glazer, Malek, O'Mara, and Sather), Lannett (Sullivan), Mylan (Nesta, Aigner), Par, Perrigo, Sandoz, Sun (Knoblauch), Taro, Teva, West-Ward and Zydus (Lukasiewicz).

439.    Just as their convergence at the HDMA trade show in June 2013 led to many anti-competitive, inter-competitor communications, Defendants' attendance at the Total Store Expo facilitated discussions about market allocation and pricing for the Drugs at Issue.

440.    For example, when Malek asked Sather to obtain specific information about Lannett's price increase for Doxycycline Monohydrate, Sather used the Total Store Expo as an opportunity to meet in person with Lannett's Sullivan.

441.    On August 12, 2013, after meeting in person at the Total Store Expo, and in response to a directive from her boss Malek, Heritage's Sather sent a text message to Lannett's Sullivan.

442.    The next day, August 13, 2013, while still at the Total Store Expo, Sather and Sullivan texted again. Sather also exchanged several text messages and telephone calls

with another employee at Lannett. In addition, a Lannett employee also sent a text message to an employee at Par.

443.    Later in the evening of August 13, 2013, an employee at Par sent an internal e-mail, which was then circulated at Par. The e-mail included information about pricing agreements on the prices of Doxycycline Monohydrate and other drugs.

444.    A week after Par's internal discussion, on August 20, 2013, Heritage's Sather e-mailed Malek and confirmed Lannett's agreement related to the pricing of Doxycycline Monohydrate.

445.    By March 2014, Heritage increased its Doxycycline Monohydrate price to at least one customer and was working on a much larger across-the-board price increase on Doxycycline Monohydrate, as well as price increases on several other drugs.

446.    As discussed above, on April 22, 2014, Malek held a teleconference with Heritage's sales team to discuss the strategy for implementing price increases for numerous drugs, including Doxycycline Monohydrate.

447.    Malek and the Heritage NAM's took responsibility for communicating with specific Defendants about specific drugs, including Sather, who, among her other assignments, was responsible for communicating with Lannett about Doxycycline Monohydrate.

448.    Right after the Heritage conference call on April 22, 2014, Sather had a half-hour telephone conversation with Lannett's Sullivan about pricing for Doxycycline Monohydrate and calls with two other competitors on the same topic. Through these discussions, Sather reached a number of pricing agreements covering Doxycycline

Monohydrate and at least four other drugs, including Glyburide-Metformin, Verapamil, Nystatin, and Paromomycin.

449.    Similarly, on April 23, 2014, O'Mara, the employee at Heritage who was primarily responsible for communicating with Mylan, contacted a counterpart at Mylan and obtained an agreement to raise prices on Doxycycline Monohydrate (as well as Glipizide-Metformin HCI and Verapamil). Immediately after speaking with Mylan, O'Mara sent an e-mail to Malek, advising Malek of O'Mara's discussions with Mylan.

450.    On May 8, 2014, Malek requested an update on discussions with competitors. Sather responded to Malek's e-mail, providing an update on her communications with three Defendants about five drugs, including her conversations with Lannett about Doxycycline Monohydrate.  Shortly thereafter, on May 14, 2014, Sather attended the MMCAP National Member Conference where she was able to confirm, among other agreements, an agreement with Lannett on Doxycycline Monohydrate pricing. Sather also secured agreements with at least Aurobindo on Glyburide, Glyburide- Metformin, and Fosinopril-HCTZ, and with Sandoz on Fosinopril-HCTZ.

451.    No shortages or other market features can explain Defendants' price increases for Doxycycline Monohydrate during the Relevant Period.

452.    The elevated prices of Doxycycline Monohydrate that resulted from Defendants' anti-competitive conduct has injured Plaintiff, causing Plaintiff to pay more than it would have paid in a free and fair market.

453.    The unlawful agreement between Defendants Heritage, Lannett, Mylan and Par regarding Doxycycline Monohydrate was part of these Defendants' participation in the Price-Fixing Conspiracy.

**Zoledronic Acid**

454.    Zoledronic Acid belongs to a class of drugs known as bisphosphonates. It is used to treat high blood calcium levels (hypercalcemia) that may occur with cancer. Zoledronic Acid is also used with cancer chemotherapy to treat bone problems that may occur with multiple myeloma and other types of cancer, such as breast and lung cancer, that have spread to the bones. It is sold in two formulations: a five mg injection and a four mg injection.

455.    As part of Defendants' participation in the Price-Fixing Conspiracy, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of Zoledronic Acid.

456.    In early 2013, Heritage began preparing to launch a generic version of the five mg injection. It planned to be the first generic entrant in the Zoledronic Acid market. Dr. Reddy's was positioned to enter the Zoledronic Acid market shortly after Heritage.

457.    Par, which did not have an ANDA for Zoledronic Acid, eventually was able to obtain the rights to market and sell Zoledronic Acid using an ANDA obtained by Defendant Breckenridge Pharmaceutical, Inc. Par entered the market approximately eight months after Heritage and Dr. Reddy's.

458.    Being the first generic to the market was atypical for Heritage, and Heritage wanted to work with its competitors so that it could enter the market at a price that would not be challenged by subsequent market entrants. For that reason, on January 21, 2013, Heritage's Malek instructed O'Mara to reach out to his contact at Dr. Reddy's, VP of Sales and Marketing John Adams, to discuss market strategy and to raise the idea of keeping prices elevated above a competitive level.

459.     O'Mara attempted to call Dr. Reddy's Adams the next day, but Adams was unavailable. When O'Mara informed Malek that Adams was going to call him back later that morning, Malek outlined exactly what he wanted O'Mara to say when he did speak with Adams, including providing O'Mara with questions to ask.

460.     Adams called Heritage's O'Mara again on January 22, 2013, and they spoke for ten minutes.

461.     After the call, O'Mara reported to Malek the substance of the call:  O'Mara had learned that Dr. Reddy's would launch a four mg product on the first day it could produce a generic, but it was not certain if it would launch on the five mg formulation.  Dr. Reddy's ultimately did launch the five mg formulation. O'Mara also reported that Dr. Reddy's wanted its "fair share" of the market.  If Dr. Reddy's entered the Zoledronic Acid market first, consistent with fair share agreements that had long existed in the generic pharmaceuticals market, it expected a sixty percent share of the market. If Heritage entered the market at the same time as Dr. Reddy's, the expectation was that the market share would be split evenly.

462.     Less than an hour after they first spoke on January 22, 2013, O'Mara and Adams spoke again for approximately ten minutes and discussed a plan to keep the pricing of Zoledronic Acid elevated above competitive levels. O'Mara and Adams spoke for approximately twenty-four minutes again on January 24, 2013.

463.     Heritage knew that Dr. Reddy's was going to enter the market, but Heritage's Malek did not want to take any chance of other competitors disrupting Heritage's relationship with Dr. Reddy's, and in March 2013, Malek set out to confirm that there would be no other entrants to the market.

464.     Malek instructed another Heritage employee to reach out to competitors and large customers in an effort to confirm that no other manufacturers were planning on entering the generic Zoledronic Acid market. In his instructions to this employee, Malek provided the same list of questions he had provided to O'Mara for contacting Dr. Reddy's Adams.

465.     Prior to the launch, Heritage continued communicating with Dr. Reddy's to refine their agreement on market share and pricing.   While these conversations were occurring, Heritage's CEO Malek learned that Dr. Reddy's was threatening to disrupt Defendants' agreement by quoting low prices on Zoledronic Acid to customers, including Cardinal Health.  Malek e-mailed Sather and O'Mara on March 6, 2013 to express this concern and to ask about pricing.

466.     Malek also instructed O'Mara to speak with Dr. Reddy's Adams about Zoledronic Acid when they were both attending the same customer conference in March 2013. On March 12, 2013, the two spoke by telephone twice and exchanged numerous text messages.   The next day, Heritage's CEO Malek asked O'Mara for an update on Dr. Reddy's. O'Mara responded with information about his conversation with Adams.

467.     A few weeks later, on April 3, 2013, Heritage's O'Mara spoke with Adams at Dr. Reddy's, and confirmed that Dr. Reddy's had just begun shipping the five mg product. Adams also provided information about its pricing. O'Mara and Adams spoke numerous times throughout the rest of April about customers and pricing for both Zoledronic Acid and Meprobamate. At the same time, as discussed above, Sun and Heritage's Sather were discussing Nimodipine pricing and market share.

468.     Consistent with their agreement, in April 2013, both Heritage and Dr. Reddy's entered the Zoledronic Acid market at a higher price than they otherwise would have absent their collusive pricing agreement.   Heritage and Dr. Reddy's announced list prices that were within a few percentage points of each other. They maintained these list prices through at least early 2016. These list prices remained stable at this elevated, anti-competitive level even when a third manufacturer entered the market.

469.     After Zoledronic Acid launched, any disagreements about the allocation of customers between Heritage and Dr. Reddy's were resolved through direct communications between the two companies.

470.     Heritage's ability to contact Dr. Reddy's and obtain an agreement on the allocation of the market and the price of Zoledronic Acid would not have been possible absent the existing "fair share" agreement among Defendants. The discussions between Dr. Reddy's and Heritage make clear that they were building on an existing understanding about "fair share" and the avoidance of competition across numerous drugs.

471.     Defendants were aware that their conversations were anti-competitive and illegal. For example, on April 19, 2013, Malek sent a text message to his entire sales team reminding them not to put their pricing discussions with competitors in writing.

472.     Defendants' ability to exchange information and negotiate pricing agreements was aided by the near constant ability of Defendants to meet in person at trade association meetings and conferences, where they had the opportunity to, and in fact did, discuss and come to pricing agreements and discuss enforcing their agreements without leaving lasting electronic records of their illegal collusion.

473.     For example, shortly before Dr. Reddy's and Heritage's conversations in March 2013, both Defendants attended two trade association meetings where they also had the opportunity to exchange information: the GPhA Annual Meeting, held from Feb. 20-22, 2013, in Orlando, FL; and the ECRM Retail Pharmacy Generic Pharmaceuticals Conference, held from Feb. 24-27, 2013, in Dallas, TX. Both of those trade shows were attended by most Defendants, including Dr. Reddy's and Heritage.

474.     Similarly, shortly before Par entered the market for Zoledronic Acid, its sales employees attended the NACDS Total Store Expo in Las Vegas, which also was attended by numerous Defendants (including people directly implicated in anti-competitive communications): Apotex (Hamilton), Aurobindo (Cunard), Citron, Dr. Reddy's, Glenmark, Heritage (Glazer, Malek, O'Mara, and Sather), Lannett (Sullivan), Mylan (Nesta, Aigner), Sandoz, Sun (Knoblauch), Taro, Teva, West-Ward and Zydus (Lukasiewicz).

475.     When Par finally entered the market in late 2013, it announced list prices even higher than those of Heritage and Dr. Reddy's. List prices for Dr. Reddy's, Heritage and Par remained elevated thereafter. As it had done in the Doxycycline Monohydrate market discussed above, Par sought to avoid price competition. Although it was the third generic manufacturer into the market, Par did not undercut the prices of Heritage and Dr. Reddy's in an effort to gain market share, as normally happens in a competitive market for a generic pharmaceutical product and would have happened here, but for Defendants' anti-competitive agreement.

476.     Instead, Par complied with the terms of the Price-Fixing Conspiracy and imposed higher prices than a competitive market would have allowed and prevented price erosion in the market for Zoledronic Acid.

477.     No shortages or other market features can explain Defendants' elevated prices for Zoledronic Acid during the Relevant Period.

478.     The elevated prices of Zoledronic Acid that resulted from Defendants' anti-competitive conduct has injured Plaintiff, causing Plaintiff to pay more than it would have paid in a free and fair market.

479.     The unlawful agreement between Defendants Dr. Reddy's, Heritage, and Par regarding Zoledronic Acid was part of these Defendants' participation in the Price-Fixing Conspiracy.

**Tizanidine**

480.     In the same timeframe as Defendants Dr. Reddy's, Heritage, and Par were implementing the Zoledronic Acid part of the Price-Fixing Conspiracy, Dr. Reddy's was simultaneously working with Defendants Sandoz and Mylan on a different drug, Tizandidine, that was also part of the Price-Fixing Conspiracy.

481.     Tizanidine, also known by the brand name Zanaflex®, is used to treat muscle spasticity due to spinal cord injury or multiple sclerosis.

482.     Tizanidine had been on the market for years and its price had eroded significantly.

483.     As part of Defendants' participation in the Price-Fixing Conspiracy, Defendants conspired to fix, raise, maintain and/or stabilize the prices of Tizanidine.

484.     As of May 2013, Defendants Sandoz, Mylan, and Dr. Reddy's were sellers in the Tizanidine market. At that time, Dr. Reddy's was dominant in the market with fifty-

nine percent market share, because it had the lowest prices and in a commodity market, such as generic pharmaceuticals generally and Tizanidine in particular, market share follows pricing, while Mylan had twenty-four percent and Sandoz had seventeen percent.

485.     Dr. Reddy's led the increase on this product on Monday, May 13, 2013, increasing its Tizanidine WAC price and contract pricing by a factor of ten.

486.     When Sandoz learned that Dr. Reddy's was going to increase its price on Tizanidine by such a large multiple, a national account executive at Sandoz ("S.G."), sent an internal e-mail noting on May 10, 2013 noting this achievement by their nominal competitor.

487.     On the day Dr. Reddy's published its new WAC pricing for Tizanidine (Monday, May 13, 2013), Jim Nesta of Mylan called CW-D at Sandoz and they spoke for four minutes. Two days later, CW-A (a senior sales executive at Sandoz), sent an internal e-mail to Kellum regarding this.

488.     Meanwhile, Mylan's Nesta and Sandoz's CW-D continued their discussions regarding Tizanidine price increases, and Nesta brought a national account executive at Dr. Reddy's ("J.A.") into the loop on the discussions.  On May 20, 2013, Sandoz employee CW-D called Nesta to talk about Tizanidine pricing.

489.     On Thursday, May 23, 2013, Sandoz's price increase was imminent, and CW-D called Mylan's Nesta again, also for less than a minute; Nesta returned that call, the two spoke for a minute and a half, and then Nesta sent two text messages to J.A. at Dr. Reddy's.

490.     The next day, Friday, May 24, 2013, less than two weeks after Dr. Reddy's tenfold price increase, Sandoz matched Dr. Reddy's increased Tizanidine pricing, and in one

formulation, actually exceeded it. Nesta called J.A. one more time that day, and then they did not speak again until August 2013.

491.    Notably, however, while the resulting pricing was the same as Dr. Reddy's, because Sandoz's pre-increase pricing was higher than Dr. Reddy's, Sandoz's increases had to be by a lower amount, and lower percentages, as Dr. Reddy's, to get to the same final price.

492.    As a result, Sandoz's increases were "merely" between 248 percent and 344 percent, still outrageous and significant, but noticeably less than Dr. Reddy's 900 percent increase. The reason the price increases were sudden, dramatic, almost simultaneous, but by very materially different amounts and percentages, is because they were the result of the Price-Fixing Conspiracy, rather than from external market conditions, and Defendants wanted identical, inflated prices on their products.

493.    Mylan followed with similar pricing on July 2, 2013.

494.    No shortages or other market features can explain Defendants' price increases for Tizanidine during the Relevant Period.

495.    The elevated prices of Tizanidine that resulted from Defendants' anti-competitive conduct has injured Plaintiff, causing Plaintiff to pay more than it would have paid in a free and fair market.

496.    The unlawful agreement between Mylan, Dr. Reddy's, and Sandoz on Tizanidine was part of these Defendants' participation in the Price-Fixing Conspiracy.

**Meprobamate**

497.    Meprobamate, also known by the brand-names Miltown® and Equanil®, is a generic pharmaceutical drug used to treat short-term anxiety, tension, and insomnia.

498.     As part of their participation in the Price-Fixing Conspiracy, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of Meprobamate.

499.     Early in the Relevant Period, the market for generic Meprobamate was dominated by its sole suppliers: Heritage, Dr. Reddy's and Actavis. In 2013, Actavis exited the Meprobamate market, which left Heritage and Dr. Reddy's as the two remaining suppliers in the market. Heritage wanted to use Actavis's exit from the market as a pretext for price increases.

500.     While Dr. Reddy's and Heritage were negotiating pricing and market share for Zoledronic Acid (as discussed above), they also were discussing pricing for Meprobamate.

501.     By March 21, 2013, O'Mara had already been discussing the pricing of Zoledronic Acid with Dr. Reddy's Adams for several months. But on that day, Heritage's CEO Malek e-mailed O'Mara and Edelson, instructing them to communicate to Dr. Reddy's—the only remaining competitor in the Meprobamate market—that Heritage wanted to increase the price on Meprobamate. Malek's proposed price increase was approximately four times the current price.

502.     On March 22, 2013 during the same time they were exchanging price information for Zoledronic Acid with Dr. Reddy's, Heritage's O'Mara spoke to Dr. Reddy's Adams for nine minutes about at least Meprobamate, and likely also Zoledronic Acid. During that conversation, Dr. Reddy's and Heritage reached an agreement to, at a minimum, raise the price of Meprobamate. O'Mara confirmed the agreement in an e-mail to Malek that same day, stating, "Dr. Reddy's is on board."

503.     Three days later, on March 25, 2013, Malek e-mailed O'Mara about the agreement, and O'Mara responded again confirming that Dr. Reddy's would "follow suit" if Heritage raised the price on Meprobamate.

504.     In a competitive market, a supplier risks losing market share if it raises prices, but Dr. Reddy's assurance to Heritage that it would "follow suit" eliminated that risk and eliminated price competition in the market for Meprobamate.

505.     During this period, Dr. Reddy's was having supply issues with Meprobamate, and Heritage's O'Mara reported that this "lack of inventory" kept Dr. Reddy's prices "stationary."  As a result of these supply issues, on March 27, 2013, AmerisourceBergen asked Heritage to give a bid on both formulations of Meprobamate.

506.     Malek immediately forwarded the RFP internally and discussed Heritage's proposed response. Malek's response to this internal discussion reflected a clear understanding and an intention to abide by the agreement between Heritage and Dr. Reddy's on pricing for Meprobamate. This agreement was confirmed in a short conversation between Heritage and Dr. Reddy's on March 29, 2013.

507.     A few weeks later, in April 2013, Dr. Reddy's approached Heritage to discuss obtaining additional Meprobamate market share and asked Heritage to give up a specific large pharmacy chain. Because of their agreement, Heritage gave up some of its market share to Dr. Reddy's.

508.     Heritage sent an e-mail to the large pharmacy chain on April 24, 2013, and on May 17, 2013, Heritage's Malek provided Dr. Reddy's with clarifying information about precisely which business Heritage had agreed to give up to Dr. Reddy's.  O'Mara and Adams subsequently spoke on May 21, 2013 for nearly seven minutes.

509.    As a result of Heritage and Dr. Reddy's agreement, both raised Meprobamate prices across the board. Their price increases were nearly simultaneous. Heritage's price increase became effective in late April 2013, and Dr. Reddy's price increases became effective in early May 2013. Heritage and Dr. Reddy's imposed identical list prices for 200mg Meprobamate tablets (an increase of nearly 400 percent) and 400mg Meprobamate tablets (an increase of approximately 350 percent). AWP prices for both products were also elevated. Both list and AWP prices remained elevated above competitive levels thereafter.

510.    Dr. Reddy's supply issues with Meprobamate do not explain Defendants' abrupt, simultaneous, and identical price increases, in whole or in part, and no other product shortages or other market changes can explain Defendants' abrupt, simultaneous, and identical price increases.

511.    Dr. Reddy's and Heritage's Meprobamate pricing discussions happened nearly simultaneously with their pricing and market share discussions about Zoledronic Acid.

512.    Further, as discussed above, Defendants' ability to quickly reach agreement on market share and price increases was a function of their overarching conspiracy to fix prices across the markets for generic pharmaceuticals and was further aided by the prevalence of trade association meetings and conferences where the parties met in person. Heritage, Dr. Reddy's, and representatives of other Defendants attended at least three such meetings when these price increases were being discussed.

513.    Heritage and Dr. Reddy's continued to discuss pricing for Meprobamate throughout the Relevant Period.  For example, Meprobamate was identified during the

April 22, 2014 Heritage teleconference as one of the numerous drugs targeted for a price increase.

514.　On April 24, 2014, a Heritage employee exchanged six text messages with his contact at Dr. Reddy's about pricing for Meprobamate, and likely other drugs, as well. The two spoke briefly on May 6, 2014.

515.　On May 8, 2014, Malek e-mailed the Heritage sales team requesting an update on the status of agreements with competitors so that Heritage could move forward with the price increases discussed on April 22, 2014. A Heritage employee responded to Malek that he was awaiting feedback from one competitor about the drug Meprobamate.

516.　No shortages or other market features can explain Defendants' price increases for Meprobamate during the Relevant Period.

517.　The elevated prices of Meprobamate that resulted from Defendants' anti-competitive conduct has injured Plaintiff, causing Plaintiff to pay more than it would have paid in a free and fair market.

518.　The unlawful agreement between Defendants Dr. Reddy's and Heritage regarding Meprobamate was part of these Defendants' participation in the Price-Fixing Conspiracy.

**Nabumetone, Pravastatin, Ranitidine, Adapalene Gel**

519.　Nabumetone, also known by brand names such as Relafen, Relifex, and Gambaran, is a non-selective Non-Steroidal Anti-Inflammatory Drug (NSAID) used in the treatment of pain and inflammation.

520.　Pravastatin, also known by the brand name Pravachol, is a statin and is used to lower blood levels of lipids, including triglycerides and cholesterol.

521.     Ranitidine, also known by the brand name Zantac, among others, decreases stomach acid production, and is commonly used in treatment of peptic ulcer disease, gastroesophageal reflux disease, and Zollinger–Ellison syndrome.

522.     Adapalene Gel, also known by brand names such as Pimpal, Gallet, and Adelene, is a topical retinoid used primarily in treating mild-to-moderate acne.

523.     As part of Defendants' participation in the Price-Fixing Conspiracy, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of Nabumetone, Pravastatin, Ranitidine, and Adapalene Gel.

524.     In April 2013, Teva took a major step toward implementing more significant price increases by, as mentioned above, hiring Nisha Patel as its Director of Strategic Customer Marketing. Teva hired Patel specifically to identify generic drugs for which Teva could raise prices and then to conspire with the other Defendants to maintain those increased prices, which Patel did. This was a significant factor in her performance evaluations and bonus calculations and, as discussed more fully below, Patel was rewarded by Teva for doing it, including a bonus of over $30,000 – on almost $1 billion per quarter in additional revenue and profits that Teva was able to unlawfully extract from the victims of Defendants' conduct, including Plaintiff.

525.     Among other things, Patel's job responsibilities included serving as the interface between the marketing (pricing) department and the sales force teams to develop customer programs; establishing pricing strategies for new product launches and in-line product opportunities; and, most importantly, identifying suitable generic drugs for significant price increases, which included overseeing the customer bid process and product

pricing administration at Teva.  Patel had around ten direct reports in the pricing department at Teva.

526.     Prior to joining Teva, Patel had worked for eight years at a large drug wholesaler, AmerisourceBergen, working her way up to Director of Global Generic Sourcing. During her time at AmerisourceBergen, Patel had routine interaction with representatives from every major generic drug manufacturer, and developed and maintained relationships with many of the most important sales and marketing executives at Teva's competitors.

527.     Even before Patel started at Teva, she worked at enhancing Defendants' conspiracy by communicating with future "competitors" about her move to Teva  and new role there. For example, she used to work with Ala Aprahamian ("Aprahamian"), the Vice President of Sales and Marketing at Defendant Taro, when they were both formerly employed by Teva's and Heritage's current customer AmerisourceBergen.

528.     Thus, prior to joining Teva, Patel told Aprahamian about her move to Teva and new role there, and in turn – on April 2, 2013, still nearly three weeks before Patel started at Teva – Aprahamian sent an e-mail to his boss, Taro's Chief Operating Officer ("COO"), about Patel's move to Teva.  The Taro COO believed that this move would help the Price-Fixing Conspiracy.

529.     Once Patel began her employment at Teva, her communications with competitors became more systematic – and clustered around market events such as price increases, market entry, customer challenges, and loss of exclusivity.

530.     Once on board at Teva, Patel started to look very closely at Teva's relationships with its competitors to ensure close coordination as part of the Price-Fixing

Conspiracy.  Patel understood, and stressed internally at Teva, that it was very important to identify those competitors who were willing to share information about their price increases in advance, so that Teva would be prepared to follow quickly. Conversely, it was equally important for Patel to be able to inform Teva's competitors of Teva's increase plans so those competitors could also follow quickly. Either way, significant coordination was important for price increases to be as smooth, and, therefore, as profitable, as possible.

531.    For example, in one of her earliest conversations after joining Teva with CW-A (a senior sales executive at Sandoz), Patel told CW-A that Patel had been hired by Teva to identify drugs where Teva could increase its prices. She asked CW-A how Sandoz handled price increases. CW-A told Patel that Sandoz would follow Teva's price increases and, importantly, would not poach Teva's customers after any price increase by Teva. Not surprisingly, Sandoz was one of Teva's highest "quality competitors."

532.    From this point on, for the remainder of the Relevant Period, Patel and Teva based many price increase and market allocation decisions on this understanding with Sandoz, one example of which, involving Nabumetone, Pravastatin, Ranitidine, and Adapalene Gel, was shortly about to occur.

533.    Patel had multiple means of communicating with competitors, including telephone, text, message functions on Facebook and LinkedIn, encrypted communication services like Snapchat, and, of course, in person.

534.    Through her communications with other Defendants, Patel learned about their planned price increases, which Teva agreed to follow with increases of its own, rather than gaining increased market share at Defendants' expense.

535.    For example, on May 2, 2013, Patel had telephone calls with a senior sales executive at Glenmark, who will be referred to in this Complaint as CW-E, with CW-A at Sandoz for a quarter-hour, and for thirty minutes with Actavis's Rogerson. Like Falkin, Rogerson stayed in his role at Actavis until it was acquired by Teva, in August 2016.  Shortly thereafter, Rogerson moved on to Defendant Amneal as a Senior Director of Marketing and Business Analytics.

536.    After one of her calls on that day with Glenmark's CW-E, Patel sent an e-mail to one of her subordinates, directing him to add six different Glenmark drugs to Teva's price increase list, including Nabumetone, Pravastatin, Ranitidine, and Adapalene Gel.

537.    Two weeks later, on May 16, 2013, Glenmark raised its prices on these drugs and Teva followed with its own price increases shortly thereafter.

538.    No shortages or other market features can explain Defendants' price increases for Nabumetone, Pravastatin, Ranitidine, and Adapalene Gel during the Relevant Period.

539.    The elevated prices of Nabumetone, Pravastatin, Ranitidine, and Adapalene Gel that resulted from Defendants' anti-competitive conduct has injured Plaintiff, causing Plaintiff to pay more than it would have paid in a free and fair market.

540.    The unlawful agreement between Defendants Teva, Sandoz, and Glenmark regarding Nabumetone, Pravastatin, Ranitidine, and Adapalene Gel was part of Defendants' participation in the Price-Fixing Conspiracy.

**Acetazolamide**

541.    Acetazolamide, also known by the brand name Diamox®, among others, is used, *inter alia*, in treating glaucoma, epilepsy, periodic paralysis, and heart failure.

Acetazolamide is sold in two formulations:  tablets, manufactured by Taro and Lannett; and sustained release capsules, manufactured by Heritage, Zydus, and Teva.

542.     As part of Defendants' participation in the Price-Fixing Conspiracy, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of Acetazolamide.

**Acetazolamide tablets**

543.     Taro and Lannett dominate the market for Acetazolamide tablets. Since at least the spring of 2012, Taro and Lannett have coordinated pricing and market share in this market.

544.     Acetazolamide tablets come in two dosages: 125mg and 250mg. Both Taro and Lannett make the 250mg dosage, which is the predominant form. Only Taro makes the 125mg dosage, yet it was included in the agreement between Taro and Lannett to elevate the prices of Acetazolamide.

545.     Prior to the spring of 2012, Taro and Lannett priced their Acetazolamide tablets similarly, but not identically. Small price increases in 2009 and 2010 were implemented by both manufacturers, but were not identical, nor were they simultaneous. For example, when Taro implemented a price increase at the end of 2009, Lannett kept its prices unchanged for a year before implementing an increase. Market share between Taro and Lannett also shifted during this period.

546.     All of this began to change, however, in April-May 2012.

547.     In April-May 2012, Taro and Lannett imposed forty percent to fifty percent list price increases and brought their list prices for Acetazolamide 250mg tablets to identical levels. Taro also increased the list price of 125mg tablets around this time.

548.     Thereafter, in early 2013, Taro made slight price increases to both of its tablets. By the middle of 2013, Taro and Lannett appear to have worked out a remarkably stable split of the market, accounting for both 125mg and 250mg tablets.

549.     By the end of 2013, Taro and Lannett were ready to impose a large price increase. Within weeks of each other, in November and December 2013, Taro and Lannett imposed identical list prices for Acetazolamide 250mg tablets. The increases were well over 200 percent. Taro imposed a similarly large list price increase on 125mg tablets around this time. AWP prices for both products also increased significantly. The list and AWP prices for Acetazolamide tablets remained elevated above competitive levels thereafter.

550.     Throughout their coordinated price increases, Taro and Lannett captured remarkably stable shares of the 250mg tablet market, with Lannett claiming approximately fifty-six percent and Taro claiming forty-four percent.

551.     The actual agreement, however, was an even split of the market, fifty percent to each manufacturer, because Taro, the only one to manufacture the 125mg tablets, had 100 percent of sales of that dosage. As a result, the total dollar of sales across both products was virtually even, and remained remarkably stable.  Lannett's larger share of 250mg tablets was offset by Taro's sales of 125mg tablets.

552.     The lockstep price increases and nearly perfect market share split across multiple dosages by Taro and Lannett was a part of, and is consistent with, all Defendants' overarching "fair share" agreement.

553.     The pricing conduct of Taro and Lannett is not consistent with a competitive

market. Manufacturers would not impose a large price increase absent some assurance that

their competitor would do the same, lest they lose market share.

554.     No shortages or other market changes can explain the abrupt, simultaneous

and large price increases by Taro and Lannett.

555.     The ability of Taro and Lannett to reach agreement on market share and

price increases was a function of their overarching conspiracy to fix prices across the

markets for generic pharmaceuticals and was further aided by the prevalence of trade

association meetings and conferences where the parties were able to meet in person.

556.     For example, in August 2013, not long before the large price increases

imposed by Taro and Lannett, employees of both Defendants attended the NACDS Total

Store Expo.

557.     In October 2013, representatives from Taro and Lannett, among other

Defendants, attended the GPhA Fall Tech Conference in Bethesda, Maryland, which

provided another opportunity to discuss price increases for Acetazolamide.

558.     No shortages or other market features can explain Defendants' price

increases for Acetazolamide tablets during the Relevant Period.

559.     The elevated prices of Acetazolamide tablets that resulted from Defendants'

anti-competitive conduct has injured Plaintiff, causing Plaintiff to pay more than it would

have paid in a free and fair market.

560.     The unlawful agreement between Defendants Taro and Lannett regarding

Acetazolamide tablets was part of these Defendants' participation in the Price-Fixing

Conspiracy.

**Acetazolamide capsules**

561.    The vast majority of the Acetazolamide capsule market is captured by Heritage, Teva and Zydus, with Heritage and Teva having approximately seventy-eight percent of sales. Teva marketed and sold Acetazolamide capsules during the Relevant Period at least in part through its subsidiary, Barr.

562.    During the week of April 14, 2014, Heritage's Malek met with two employees and asked them to start analyzing the impact of price increases for numerous generic drugs, including Acetazolamide.

563.    Before introducing the market-wide price increases to the rest of his sales team, Malek was communicating with Patel at Teva, the competitor on seven Drugs at Issue on Malek's initial list. On April 15, 2014, Heritage's Malek spoke with Patel of Teva for approximately seventeen minutes. During that telephone call, Patel agreed to support Heritage's price increase for Acetazolamide and a series of other drugs. Patel had already secured Heritage's agreement to support Teva's price increases for Nystatin and Theophylline.

564.    Malek and Patel spoke several more times over the next several months to confirm their agreement to raise prices and to keep abreast of the progress of Heritage's price increases.

565.    On April 16, 2014, the day after Malek spoke to Patel, a Teva employee then called an employee at Zydus to discuss the pricing of at least Acetazolamide. The two spoke for approximately twenty minutes and spoke again the next day for approximately twelve minutes. Over the next several months, the two communicated often.

566.   On April 22, 2014, Heritage's Malek held a telephone conference with the sales team and dictated a pricing strategy that targeted numerous drugs for a price increase. This list included Acetazolamide.

567.   As with the other drugs he targeted, Malek believed it was important to raise the idea of an Acetazolamide price increase with competitors before implementing it. To that end, he and the Heritage NAM's contacted Teva and Zydus to discuss pricing and customers either via telephone, text, e-mail, or in person, often through industry trade association meetings and conferences.

568.   Malek personally took responsibility to communicate with Defendants Teva and Zydus. Anne Sather was responsible for Lannett, as well as two other Defendants. Matt Edelson, Daniel Lukasiewicz, and Neal O'Mara were responsible for contacting four other Defendants about pricing for various drugs.

569.   Four days after this telephone call, on April 26-29, 2011, CEO Glazer attended the NACDS Annual Meeting where he had the opportunity to meet with representatives from numerous Defendants, including the other manufacturers of Acetazolamide capsules, Teva and Zydus.

570.   While Teva's Patel and Heritage's Malek were discussing increasing prices for at least the seven Drugs at Issue discussed above, on April 24, 2014, Malek contacted a Zydus employee through the website LinkedIn to discuss at least Acetazolamide. The Zydus employee responded later the same day.

571.   In an e-mail exchange May 6-7, 2014, Malek explained that he had obtained agreements to raise the price of Acetazolamide. Malek had previously told a Heritage salesperson to hold off on responding to a large customer's request for a  price reduction.

After confirming his agreement with Teva and Zydus to raise the price of Acetazolamide, he informed his salesperson that Heritage would not agree to reduce its price.

572.    Malek also confirmed an agreement with another competitor on Acetazolamide pricing on May 7, 2014.

573.    During this time, Heritage avoided bidding on any potential customers where Zydus was already supplying Acetazolamide. Heritage did this in furtherance of Defendants' agreement not to compete in relation to generic drugs. During this time, employees at Teva and Zydus were also in close contact with each other about Acetazolamide. On May 14, 2014, employees of Teva and Zydus exchanged numerous text messages.

574.    All Defendants had plentiful opportunities to speak in person about these agreements without leaving electronic records of their communications. Between April and October 2014, all U.S. Defendants attended at least one of the many trade events organized by NACDS, MMCAP, HDMA, or GPhA, in addition to several customer conferences.

575.    Defendants used these meetings as an opportunity to reconfirm their agreements on pricing and otherwise engage in anti-competitive conduct related to the Drugs at Issue.

576.    For example, on June 3, 2014 at the HDMA Business and Leadership Conference, Heritage's Sather had dinner and drinks with salespeople from Sandoz, Par, and Lannett. Three weeks later, on June 23, 2014, the Heritage sales team had a meeting where they discussed the specific percentages by which they would increase prices on the identified drugs and their strategy for doing so. The slated increase for Acetazolamide capsules was seventy-five percent.

577.     On June 26, 2014, Heritage began sending out price increase notices to its customers for nine different drugs, including Acetazolamide. By July 9, 2014, Heritage had raised the price of Acetazolamide to at least seventeen different customers nationwide.

578.     No shortages or other market features can explain Defendants' price increases for Acetazolamide capsules during the Relevant Period.

579.     The elevated prices of Acetazolamide capsules that resulted from Defendants' anti-competitive conduct has injured Plaintiff, causing Plaintiff to pay more than it would have paid in a free and fair market.

580.     The unlawful agreement between Defendants Heritage, Teva and Zydus regarding Acetazolamide capsules was part of these Defendants' participation in the Price-Fixing Conspiracy to restrain trade unreasonably and to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

**Temozolomide**

581.     Temozolomide, also known by the brand name Temodar, is used to treat brain cancer, including glioblastoma multiforme and refractory anaplastic astrocytoma.

582.     As part of Defendants' participation in the Price-Fixing Conspiracy, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of Temozolomide.

583.     The patent on Temozolomide was set to expire in early 2014, but both Teva and Sandoz had independently obtained the right to launch in August 2013 – six months prior to the patent's expiration. Leading up to the launch of the generic, Teva coordinated with Sandoz to divide up the market.

584.     On July 18, 2013, a large retail pharmacy customer submitted an RFP to Sandoz for Temozolomide.  Playing by the rules of the road, Sandoz waited to see what Teva

was going to do before submitting its own bid. That same day, CW-A received a telephone call from Patel. Patel sought information on Sandoz's current customers and discussed options to allocate customers for Temozolomide.

585. On July 22, 2013, P.G., a senior Sandoz executive, instructed his team to find out Teva's plans with regard to this customer. As directed, the next morning, S.G., a national account executive at Sandoz, spoke with the pharmacy and asked about Teva's plans for this customer's Temozolomide business.

586. At the same time, CW-A was reaching out to Teva directly to get more information. CW-A called Patel at approximately 1:45pm on July 23, 2013. After exchanging voicemails, they spoke for fifteen minutes. On that same afternoon, the pharmacy replied to Sandoz and delivered Teva's message regarding its plans for the Temozolomide business, telling Sandoz the timing of Teva's Temozolomide launch, that Teva had sufficient Temozolomide stock for the fifty percent market share that the "rules of the road provided," but would not seek more than that, and wanted to reconfirm Sandoz's intentions. Although the message was coded, Sandoz received and understood it.

587. Just under a week later, on July 29, 2013, Patel called CW-A at Sandoz and they spoke for nine minutes, discussing how to carve up the market for Temozolomide, on which they were exclusive manufacturers.

588. Teva and Sandoz were also coordinating through other channels. On July 29, 2013, after receiving the RFP from the pharmacy, Sandoz's S.G., spoke with a senior account executive at Teva, T.S., for seven minutes; and the same day, there were two telephone calls exchanged between Teva's then-Director of National Accounts, Kevin

Green ("Green"), and CW-B at Sandoz, regarding the pharmacy and its Temozolomide business.

589.    The next day, on July 30, 2013, a different retail pharmacy, CVS Caremark, contacted Teva to ask for a Temozolomide bid. A senior sales executive at Teva, T.C., discussed the matter with her boss, Rekenthaler. Rekentaler responded by alluding to the arrangement they had with Sandoz.

590.    The day after that, July 31, 2013, arrangements were finalized: Green and CW-B discussed the pharmacy and its Temozolomide business, speaking for approximately six minutes. In addition, T.S. and S.G. spoke for approximately eleven minutes, after which S.G. suggested internally that Sandoz submit a cover bid and cede the pharmacy's Temozolomide business to Teva, which Sandoz ultimately did.

591.    On August 12, 2013, the same day as Teva's Temozolomide launch, CW-B met in person with Rekenthaler in Las Vegas during the NACDS Total Store Expo conference. There, Rekenthaler discussed, among other things, Temozolomide and informed CW-B that Teva had officially launched and shipped all formulations of the drug.

592.    Although Teva initially obtained the CVS account in August 2013, due to Sandoz's inability to supply the 250mg dose of Temozolomide, the companies had agreed that the account would revert to Sandoz once Sandoz could supply that dosage strength. In addition, CW-A spoke to Patel both before and after Sandoz sent out any offers regarding Temozolomide in an effort to develop and ensure there was an appropriate agreement between the two competitors in accordance with the Price-Fixing Conspiracy.

593.    Sandoz's inability to supply the 250mg dose of Temozolomide cannot explain Defendants' elevated prices for Temozolomide during the Relevant Period. Indeed,

no other shortages or other market features can explain Defendants' elevated prices for Temozolomide during the Relevant Period.

594.    The elevated prices of Temozolomide that resulted from Defendants' anti-competitive conduct has injured Plaintiff, causing Plaintiff to pay more than it would have paid in a free and fair market.

595.    The unlawful agreement between Defendants Sandoz and Teva regarding Temozolomide was part of these Defendants' participation in the Price-Fixing Conspiracy.

**Azithromycin Suspension**

596.    Azithromycin Suspension is an antibiotic used to treat a variety of infections, including strep throat, pneumonia, and middle ear infections.

597.    As part of Defendants' participation in the Price-Fixing Conspiracy, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of Azithromycin Suspension.

598.    In November 2013, Defendant Greenstone began planning to increase prices on several drugs, including some that overlapped with Teva: Azithromycin Suspension, Azithromycin Oral Suspension, and Medroxyprogesterone Tablets. Patel and R.H., a national account executive at Greenstone, were communicating frequently during that time, including exchanging six text messages on November 16, 2013 and a telephone call on November 23, 2013.

599.    Because Greenstone was a high-quality competitor, and because the companies had successfully conspired to raise prices previously, it was understood between the two that if Greenstone raised prices Teva would follow and would not seek to poach Greenstone's customers after the increase.  Defendant Pfizer was directly involved in the

approval process for these price increases.  On November 18, 2013,  only two days after Patel and R.H. exchanged text messages, a senior pricing executive at Greenstone sent an e-mail to Greenstone's General Manager, seeking approval to implement the price increases.  Because Greenstone was a mere instrumentality of Pfizer, the General Manager could not make a decision on the price increase on his own; instead, he had to send a message to a senior Pfizer executive for sign off, and to help convince the Pfizer executive to approve the increase (because the considered decision of senior Greenstone management was unimportant to Pfizer), the Greenstone General Manager told the Pfizer executive that the price increases that Greenstone was seeking to take were consistent with Defendants' other price increases, in other words, he wanted to know that Pfizer was not risking losing customers in a commoditized industry by raising prices, which would be the result in a non-collusive market.

600.     Pfizer approved the price increases on November 22, 2013, the Friday before that year's Thanksgiving holiday. The next day, Saturday, Patel spoke to R.H. at Greenstone, discussing the increases.

601.     The Monday following the Thanksgiving holiday, on December 2, 2013, Patel and RH had two telephone calls, whereupon Patel sent an internal e-mail to her colleagues at Teva, informing them of Greenstone's upcoming price increases.

602.     Later that week, on Thursday, December 5, 2013, Patel continued her communications with R.H. about the Greenstone increases and how Teva would react to unsolicited customer requests for bids,  trading two voicemails. The same day, Teva declined to bid on Azithromycin at multiple customers.

603. Over the next several months, during the period of time before Teva followed Greenstone's price increases, Teva continued to refuse to bid (and avoid taking Greenstone's market share) when requested by customers, for both Azithromycin formulations and Medroxyprogesterone Tablets.

604. For example, on January 27, 2014, Teva was approached by a large wholesaler asking for bids on both Azithromycin Suspension and Medroxyprogesterone. While Teva was not experiencing any supply issues of its own, after speaking with R.H. of Greenstone for a few minutes that same day, Patel agreed with the recommendation not to provide a bid to that customer.

605. Consistent with the understanding between the two companies, rather than gaining market share in a commodity market when its competitor raised its price, Teva followed Greenstone's price increases for Azithromycin Oral Suspension, Azithromycin Suspension, and Medroxyprogesterone Tablets on April 4, 2014. Patel spoke twice with R.H. from Greenstone that same day.

606. No shortages or other market features can explain Defendants' price increases for Azithromycin Suspension, Azithromycin Oral Suspension, and Medroxyprogesterone Tablets during the Relevant Period.

607. The elevated prices of Azithromycin Suspension, Azithromycin Oral Suspension, and Medroxyprogesterone Tablets that resulted from Defendants' anti-competitive conduct has injured Plaintiff, causing Plaintiff to pay more than it would have paid in a free and fair market.

608. The unlawful agreement between Defendants Teva and Pfizer/Greenstone regarding Azithromycin Suspension, Azithromycin Oral Suspension, and

Medroxyprogesterone Tablets was part of these Defendants' participation in the Price-Fixing Conspiracy.

**Tolterodine Extended Release**

609.     Tolterodine Extended Release ("Tolterodine ER"), also known by the brand name Detrol LA®, is used for treating an overactive bladder.

610.     As part of Defendants' participation in the Price-Fixing Conspiracy, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of Tolterodine ER.

611.     Pfizer is the branded drug manufacturer for Detrol LA.  To resolve patent claims related to Detrol LA, Teva and Pfizer entered into a settlement agreement under which Teva would distribute an authorized generic of Tolterodine ER. To resolve similar claims, Mylan entered into its own settlement agreement with Pfizer, which allowed Mylan to launch its own generic version of Tolterodine ER.

612.     On October 31, 2013, Mylan's ANDA for Tolterodine ER was approved. Under their respective settlement agreements with Pfizer, this triggering event allowed Teva and Mylan to launch their respective generics on January 2, 2014.

613.     Teva planned to launch on January 2, 2014. During the first half of December 2013, Teva understood, based on conversations with potential customers, that Mylan would not be in a position to launch until thirty to sixty days after Teva launched. Nonetheless, Teva was considering how to allocate the market with Mylan when it did eventually launch.

614.     On December 3, 2013, J.K., a marketing executive at Teva, sent an e-mail to Rekenthaler, K.G., and several other Teva colleagues stating "we prepared for 50-60 share… I am looking into the numbers as far as what this means." To prepare offers and

figure out the allocation of customers that would bring Teva its desired fifty to sixty percent market share, Teva executives were instructed to gather usage from potential customers.

615.    Through the first half of December 2013, as Teva was soliciting usage amounts from potential customers, customers were asking Teva to send in pricing offers before the launch. Teva resisted sending out those offers and instead did not plan to do so until the launch date of January 2, 2014.

616.    Teva's delay in putting together pricing for potential customers was part of a plan to drive up the amount it could charge for Tolterodine ER. Teva expected that on January 1, 2014, its last day before generic competition entered the market, Pfizer would raise the price of branded Detrol LA. This would allow Teva to peg its price to the now inflated price of the branded drug and thereby command a higher price for Tolterodine ER on the January 2, 2014 generic launch date.

617.    At the end of the day on Friday December 20, 2013, T.C. of Teva learned from D.H. at Cardinal Health that Mylan intended to launch its Tolterodine ER on January 2, 2014.  D.H. further provided T.C. with Mylan's pricing for two dosages, and conveyed that Mylan was looking for a forty percent market share and that Teva "can figure the rest out," illustrating the pervasive nature of the conspiracy and the involvement of third parties, often wholesalers with cost-plus distribution contracts that meant they also benefitted from the illegal profits of the Price-Fixing Conspiracy.

618.    T.C. informed her Teva colleagues of Mylan's new launch date. K.G. of Teva then worked over the weekend to turn this information into initial pricing for all of Teva's potential customers and then shared it internally. In a telling admission that Teva had no intention to bid competitively for all accounts, K.G. noted that the next step was "to

pick who should receive" bids.  The goal in "pick[ing] who should receive" bids was to ensure that both Mylan and Teva received their previously stated market share goals: Teva wanted a fifty to sixty percent market share while, in accordance with what the Price-Fixing Conspiracy would sometimes euphemistically refer to as the "rules of the road," Mylan sought a forty percent market share.

619.    On Monday, December 23, 2013, Rekenthaler, Patel, K.G., T.C., and several others at Teva had a telephone conference scheduled from 8:00am to 9:00am to discuss the Tolterodine ER launch strategy.

620.    Just minutes before the meeting was to start, Rekenthaler tried calling Nesta at Mylan. Nesta returned Rekenthaler's call at 8:15 am, during the Teva Tolterodine ER telephone conference. Rekenthaler nonetheless answered Nesta's call on his cell telephone and the pair spoke for a minute and a half. Immediately after the Tolterodine ER telephone conference, Rekenthaler tried calling Nesta two more times.

621.    Later that same morning, at 10:22 am, Nesta returned Rekenthaler's calls and they spoke for an additional twelve minutes. During these calls, Defendants Rekenthaler and Nesta exchanged the details about their offers to various customers, including the specific contractual language used in their offers.

622.    During these calls between Nesta and Rekenthaler, Teva and Mylan reached an agreement to allocate the Tolterodine ER market on launch day so that Teva and Mylan could reach their target share without eroding pricing.

623.    In addition, at 10:33 am, while Rekenthaler was still on the telephone with Nesta, K.G. sent an e-mail to Rekenthaler and others, asking about the appropriate contractual language to use in offers about the potential for price increases. Minutes later,

at 10:41 am, Rekenthaler replied to K.G. with the exact language, in quotes, that Mylan was using, in an e-mail titled "Subject: RE: Proposed Price Increase Language": "Mylans [*sic*] language is vague. 'Pricing subject to change at Mylan's sole discretion.'"

624.     Later on December 23, 2013, K.G. circulated a revised version of Teva's pricing plan for the Tolterodine ER launch. This new version incorporated Teva and Mylan's plan to allocate the market, including the submission of cover bids and abstention from bidding. Notably, the revised pricing plan included a chart identifying the major customers, and their associated market share percentage, that Teva would receive to get close to its desired sixty percent market share: Teva would retain CVS (with eighteen percent of the market), EconDisc (fifteen percent), Cardinal Health (eight percent), McKesson (six percent), Wal-Mart (five percent), Rite Aid (four percent), Anda (two percent) and Omnicare (one percent). Meanwhile, Mylan would get its forty percent share from the remainder of the market, including Walgreens, Cigna, Humana, Optum Rx ("Optum"), Prime Therapeutics ("Prime"), and Kaiser.

625.     In order to facilitate this market division, Teva had to arrange to lose the accounts. This was easily accomplished, however; Teva simply jacked up its prices on the major accounts, which Teva sometimes wanted to retain for other products, and some others, and refused to submit bids to the other customers that Mylan targeted.

626.     Specifically, after Rekenthaler and Nesta spoke, Teva's direct invoice price for thirty capsules of the two mg and four mg dose for Walgreens was raised by thirty percent: by $24.90, from $83.03 to $107.93 for 30 capsules; by $74.72, from $249.08 to $323.80, for 90 capsules; and Teva raised the price by $415.13, from $1,383.78 to $1,798.91, for 500 capsules.

627.    For Cigna, Humana, Optum, and Prime, after Rekenthaler and Nesta spoke, Teva's somewhat higher (than for Walgreens) direct invoice price was raised by twenty-three percent:  by $19.95, from $88.05 to essentially the same higher price as Walgreens, $108.00 for thirty capsules; by $59.85, from $264.15 to $324.00, for ninety capsules; and by $332.50, from $1,467.50 to 1,800.00, for 500 capsules.

628.    Finally, for Kaiser, after Rekenthaler and Nesta spoke, Teva's direct invoice price for thirty capsules of the two mg and four mg dose was raised by only four and a half percent: by $4.15 from $91.85 to $ 96.00 for thirty capsules; by $12.45 from $275.15 to $288.00 for ninety capsules; and by $69.17, from $1,530.83 to 1,600.00 for 500 capsules.

629.    The fact that Teva did not intend to actually win with these bids is further illustrated in the discrepancy between how Walgreens, Cigna, Humana, Optum, Prime, and Kaiser were priced before the Nesta-Rekenthaler conversations versus how they were priced after:  before, there were significant differences in the direct-invoice pricing. Walgreens had the best price, $83.03 for thirty capsules; Cigna, Humana, Optum, and Prime all had the same middle price of $88.05, and Kaiser got the worst price, $91.85. After Nesta and Rekenthaler spoke, however, Kaiser now had the best price ($96.00), while Walgreens now shared the worst pricing with Cigna and the others ($108); there was simply no need to bother with proportionate final prices because Teva knew (and intended) these bids would not be successful, anyway.

630.    In addition to submitting inflated bids for Walgreens, Cigna, Humana, Optum, Prime, and Kaiser, Teva agreed to refrain from bidding for certain customers, such as Publix, Ahold, Hannaford, and PVA Health.

631.    The following day, on December 24, 2013, Rekenthaler and Nesta had two more calls to confirm and refine Teva and Mylan's market allocation agreement. Those calls lasted for nine minutes and eight minutes, respectively.

632.    No shortages or other market features can explain Defendants' elevated prices for Tolterodine ER during the Relevant Period.

633.    The elevated prices of Tolterodine ER that resulted from Defendants' anti-competitive conduct has injured Plaintiff, causing Plaintiff to pay more than it would have paid in a free and fair market.

634.    The unlawful agreement between Defendants Teva and Mylan regarding Tolterodine ER was part of all Defendants' participation in the Price-Fixing Conspiracy.

**Tolterodine Tartrate**

635.    Like Tolterodine ER, Tolterodine Tartrate ("Tolterodine"), also known by the brand name Detrol®, is used for treating an overactive bladder.

636.    As part of Defendants' participation in the Price-Fixing Conspiracy, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of Tolterodine.

637.    As with the many other examples cited herein, the integrated nature of the Price-Fixing Conspiracy is illustrated by the combined examples of Tolterodine and Tolterodine ER.   While Tolterodine ER is more convenient, allowing once-daily dosing, at some price point, the inflated price in the market for the ER formulation would drive patients to the market for the regular-release formulation.   Whichever way consumers turned, they ran into the Price-Fixing Conspiracy, because just as it covered Tolterodine ER, so it covered Tolterodine's regular-release formulation.

638.     Teva was already a manufacturer of Tolterodine tablets when Defendant Greenstone decided to enter the market, planning its entry for late January 2014.

639.     In the days leading up to Greenstone's entry, Greenstone's Senior Director of Sales and National Accounts, Jill Nailor ("Nailor") reached out to her counterparts at Teva (Patel and Rekenthaler) to coordinate Greenstone's entry into the market, in particular to ensure that their pricing was consistent and to allocate customer accounts to the new entrant, Greenstone, which Teva ultimately did, including one of its largest accounts, CVS, which held more than twenty percent of Teva's Tolterodine business.

640.     In addition, one of Nailor's subordinates, a national account manager at Greenstone ("R.H."), was part of the conversation, which was conducted by voice and text message, but not e-mails, which are more permanent records of what was said and are more easily recovered in discovery.

641.     Thus, on the afternoon of January 21, 2014, Nailor reached out to Patel via telephone, twice, but they were not able to speak.   Illustrating the broad web of the Price-Fixing Conspiracy, Patel did not call back; instead, she texted R.H., less than two hours after Nailor's initial calls.

642.     R.H. then telephoned her own boss at Greenstone, Nailor, and after speaking for a few minutes, R.H. then telephoned Patel at Teva back, and they spoke for nearly twenty minutes, at the conclusion of which call, R.H. then again telephoned her own boss, Nailor.   Nailor, in turn, then telephoned Rekenthaler, twice, but could not reach him and left a voicemail.

643.    The following morning, January 22, 2014, Rekenthaler returned R.H.'s calls at 9:47 am by calling Nailor, but wasn't able to get through, and then at 11:25 am, someone at Teva called Nailor again, and they spoke for about ten minutes. That afternoon, Patel called Nailor back twice, at 3:33 pm, but was not able to get through, so she sent two texts to Nailor, also at 3:33 pm.

644.    At 4:00 pm, Nailor sent two texts to Patel, to which Patel replied the same minute, followed by another text at 4:01pm. Upon information and belief, Patel and Nailor deleted these texts from their telephones to hide the existence of, and their participation in, the Price-Fixing Conspiracy.

645.    At 4:26 pm, Nailor and Patel were finally able to speak directly, for eleven minutes, and confirm their arrangements. During these calls and text messages, Teva and Greenstone agreed that Teva would concede significant business to Greenstone in order to avoid price erosion.

646.    The very next day, on January 23, 2014, Greenstone entered the market for Tolterodine Tartrate one mg and two mg Tablets ("Tolterodine") with the exact same WAC prices as Teva for all formulations.

647.    The day after Greenstone's entry, January 24, 2014, in a message to Teva's NAM's about how important it was for them to determine and document which competitor was challenging Teva for business in a particular situation (because it would help Teva determine whether to concede or not), Defendant Patel stated that "[a]s we've heard, Greenstone is entering the market for Tolterodine. I'm sure we will have to concede somewhere."

648.     A few days later, on Tuesday, January 28, 2014 Teva was informed by CVS that it had received a competitive price challenge on Tolterodine.  K.G. of Teva immediately asked: "do we know who this could be?" Rekenthaler responded that it was Greenstone, but did not want to put the details into writing:  in a reply e-mail from 4:02 pm, copied to Patel and Maureen Cavanaugh, on the subject "RE: price challenge delphi 10707 cvs tolterodine," Rekenthaler wrote "It's Greenstone, new to market.  We can discuss." The next day, January 29, 2014, Patel and R.H. tried to reach each other several times.

649.     A few days later, on February 3, 2014, Patel instructed a colleague at Teva to concede the business at CVS by providing a small price reduction that she knew would not be sufficient to retain the business.

650.     T.C. of Teva, who had the customer relationship with CVS, challenged the decision to concede the business. Rekenthaler responded, again refusing to put the details in writing, at 11:29 am, saying: "I'll discuss the details of this with you later. There was a strategy here and you weren't in the office Thursday or Friday so we proceeded. Again, it will make sense after I discuss with you."

651.     The next day, February 4, 2014, Patel spoke to R.H. (at Greenstone) for approximately fifteen minutes.

652.     Shortly thereafter, Teva conceded the CVS account to Greenstone. CVS represented more than twenty percent of Teva's Tolterodine business.

653.     No shortages or other market features can explain Defendants' elevated prices for Tolterodine during the Relevant Period.

654.     The elevated prices of Tolterodine that resulted from Defendants' anti-competitive conduct has injured Plaintiff, causing Plaintiff to pay more than it would have paid in a free and fair market.

655.     The unlawful agreement between Greenstone and Teva regarding Tolterodine was part of these Defendants' participation in the Price-Fixing Conspiracy.

**Capecitabine**

656.     Capecitabine, also known by the brand name Xeloda®, is a chemotherapy agent used in treating breast and colon cancers.

657.     As part of Defendants' participation in the Price-Fixing Conspiracy, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of Capecitabine.

658.     As early as January 2014, Teva and Mylan were planning their eventual Capecitabine launch.  Part of this planning process included sharing the market between them so they could allocate Capecitabine customers between them.

659.     For example, in a January 31, 2014 e-mail, J.P., a national accounts executive at Teva, told K.G., Rekenthaler, and others at Teva, that Mylan was courting a specific customer, Armada Health Care. Teva incorporated this information from Mylan into its launch plan for Capecitabine.

660.     On February 26, 2014, Mylan's Nesta called Rekenthaler at Teva and they spoke for approximately fifteen minutes.  Nesta told Rekenthaler that Mylan would not be able to launch Capecitabine on time, which Rekenthaler immediately passed on to his Teva colleagues; this meant that, as the sole generic supplier of Capecitabine, Teva would charge a higher price than it could if it faced generic competition.

661.    A week or two later, in early March 2014, Teva launched as the sole generic supplier of Capecitabine, and remained the exclusive generic Capecitabine manufacturer until August 2014, when Mylan entered the market.

662.    On August 4, 2014, Nesta and Rekenthaler spoke three times by telephone, during which calls they discussed how to divide up the market between them, including that Teva would concede its Capecitabine business at AmerisourceBergen, Econdisc, and McKesson/Rite-Aid to Mylan.

663.    After their 12:46 pm call, Rekenthaler e-mailed Maureen Cavanaugh, his boss at Teva, regarding this issue, to which Cavanaugh replied that they should discuss in person when she was back in the office the next day.

664.    Less than an hour later, Rekenthaler sent another e-mail, with a sole recipient, requesting Patel to run a customer report and indicating that Mylan will "be looking at AmerisourceBergen, McKesson, and Econdisc as well as a couple small guys, probably aiming at thirty-five percent share." Just as Rekenthaler said, Mylan did in fact seek the business for each of these three companies, and Teva conceded each of them, pursuant to the agreement Rekenthaler had reached with Nesta.

665.    A few days later, on August 7, 2014, McKesson told Teva it had received a bid for Capecitabine and gave Teva the opportunity to bid to retain the business.  Patel then sent an e-mail to K.G., Rekenthaler, and a senior operations executive at  Teva, C.B. C.B. did not want to put their plan in writing. Instead C.B. told Patel she needed to discuss it. K.G., separately, questioned whether the competitive bid was coming from Mylan, and asked Rekenthaler whether he had any additional information. Rekenthaler also did not want to put that information in writing.

666.     The same day that Mylan put in its bid to McKesson, August 7, 2014, Nesta and Rekenthaler spoke by telephone for nearly thirteen minutes. On that call, Nesta and Rekenthaler discussed Mylan's bid to McKesson and reconfirmed their market allocation scheme, including that the McKesson Capecitabine account would go to Mylan.

667.     This market allocation scheme was highlighted in other e-mails as well. On August 10, 2014, C.B. e-mailed Rekenthaler, Patel, and K.G. about the plan. Rekenthaler knew Mylan was targeting Econdisc, even though Econdisc had not contacted Teva, because he and Nesta had previously discussed it.

668.     The next morning, at 8:30am on August 11, 2014, Rekenthaler alerted others at Teva that Mylan had received formal approval to market Capecitabine. Five minutes later, Rekenthaler received a call from Nesta. After exchanging voicemails, the two spoke at 8:52 am. The call lasted just under six minutes. Shortly after hanging up the telephone, at approximately 9:02 am, Rekenthaler e-mailed K.G., Defendant Patel and others at Teva to confirm Mylan's participation in the scheme.

669.     In accordance with their market allocation scheme and in furtherance of the Price-Fixing Conspiracy, Mylan targeted the Capecitabine accounts of AmerisourceBergen, Econdisc, and McKesson/Rite-Aid; and in accordance with their market allocation scheme and in furtherance of the Price-Fixing Conspiracy allocation, Teva conceded all three of those accounts.

670.     In addition, and also pursuant to these agreements, Teva conceded some smaller customers, as well.  For example, on August 14, 2014, Cigna told Teva that Cigna had received a bid for Capecitabine. On August 18, 2014, Rekenthaler called

Nesta to discuss the market allocation scheme and Mylan's bid to Cigna. The pair talked for thirteen minutes. The next day, K.G. circulated an internal e-mail confirming that Teva "will be conceding this business" at Cigna. Teva did not retain Cigna's Capecitabine business; instead, it went to Mylan.

671.    No shortages or other market features can explain Defendants' elevated pricing for Capecitabine during the Relevant Period.

672.    The elevated prices of Capecitabine that resulted from Defendants' anti-competitive conduct injured Plaintiff, causing Plaintiff to pay more than it would have paid in a free and fair market.

673.    The unlawful agreement between Defendants Teva and Mylan for Capecitabine was part of these Defendants' participation in the Price-Fixing Conspiracy.

**Dexmethylphenidate HCL Extended Release**

674.    Dexmethylphenidate HCL Extended Release ("Dexmeth ER"), also known by the brand name Focalin, is used to treat attention-deficit hyperactivity disorder ("ADHD")..

675.    As part of Defendants' participation in the Price-Fixing Conspiracy, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of Dexmeth ER.

676.    When Sandoz decided it was going to start marketing the forty mg dose of Dexmeth ER, it followed what was by then standard procedure: reaching out to fellow participants in the Price-Fixing Conspiracy to coordinate entry without decreasing price. So Sandoz's CW-A began speaking regularly with Patel about Dexmeth ER.

677.   For example, on February 10, 2014, after discussing marketing this dose at work during the day, CW-A telephoned Patel in the evening to discuss Dexmeth ER and they spoke for approximately fifteen minutes.

678.   Two days later, Sandoz submitted a bid to AmerisourceBergen for Dexmeth ER. The same day, CW-A and Patel spoke by telephone and Teva agreed to concede the AmerisourceBergen account to Sandoz, in order to avoid price competition between the two suppliers. Patel then e-mailed her colleagues at Teva to summarize the details of the deal she had worked out with Sandoz.

679.   Two days after that, on February 14, 2014, Anda, a large GPO customer, in light of Sandoz's entry into the market, approached Teva and asked for a price reduction on Dexmeth ER. Rather than lower its price to retain the account, Teva refused, handing that business to its nominal competitor and co-conspirator, Sandoz.

680.   On February 18, 2014, Patel left a voicemail for CW-A; and that same day, Patel's firm, Teva, ceded the Rite-Aid account to CW-A's company, Sandoz. The two confirmed their arrangement again two days later, again via telephone. Two days after that, on February 20, 2014, another large retail customer approached Teva indicating that because a new competitor had launched for Dexmeth ER, the customer was entitled to certain price protection terms (i.e., a lower purchase price for the drug). The same day, Patel spoke to CW-A for almost twenty-one minutes. The next day, around February 21, 2014, Patel responded internally about the customer's request, with additional inside information from Sandoz. Patel and CW-A spoke again a few days later, on February 27, 2014, to further coordinate about Dexmeth ER.

681. Teva and Sandoz were not alone in allocating customers for certain formulations of Dexmeth ER. The agreement was also carried out by other manufacturers, allowing Sandoz to take a share from them. In February 2014, for example, as Sandoz was seeking share on the fifteen mg dosage strength of Dexmeth ER, Par assisted them.

682. Simultaneously, with Patel's coordination with Sandoz, Teva's Rekenthaler was speaking to M.B., a senior national account executive at Par, including two calls on February 10, 2014, which lasted eighteen and three minutes, two calls on February 19, 2014, which lasted two and twenty-two minutes, and calls on February 24 and 25, 2014, in order to effectuate the scheme.

683. Throughout this time period, Sandoz, Par, and Teva all abided by the fair share principles as part of Defendants' ongoing conspiracy, ceding customer accounts to Sandoz in order to abide by the "rules of the road" to accommodate the new market entrant without lowering prices. In accordance with the terms of the Price-Fixing Conspiracy, Sandoz's target market share for varying strengths of Dexmeth ER varied by how many manufacturers were in the market.  Further, the scheme was not limited to any particular dose of Dexmeth ER.

684. On May 6, 2015, for example, Teva declined to submit a bid to Walgreens for the five mg dose of Dexmeth ER. Similarly, on June 30, 2015, Sandoz declined to put in a bid to Managed Health Care Associates, a large GPO, on Dexmeth ER 20mg, on the basis that Sandoz already had fifty-seven percent market share, greater than its sole competitor on this dosage strength, Teva. When a Sandoz national account

representative communicated this decision to the customer, however, he lied and told the customer that the decision not to bid was based on limited supply.

685.    No shortages or other market features can explain Defendants' elevated prices for Dexmeth ER during the Relevant Period.

686.    The elevated prices of Dexmeth ER that resulted from Defendants' anti-competitive conduct has injured Plaintiff, causing Plaintiff to pay more than it would have paid in a free and fair market.

687.    The unlawful agreement between Defendants Sandoz, Par, and Teva regarding Dexmeth ER was part of these Defendants' participation in the Price-Fixing Conspiracy to restrain trade unreasonably and , and/or stabilize the prices of the Drugs at Issue.

**Piroxicam**

688.    Piroxicam, also known by the brand name Feldene®, is another NSAID used in the treatment of pain and inflammation associated with rheumatoid arthritis, juvenile rheumatoid arthritis, and other disorders.

689.    As part of Defendants' participation in the Price-Fixing Conspiracy, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of Piroxicam.

690.    On March 3, 2014, Defendant Greenstone received FDA approval to market Piroxicam capsules in ten mg and twenty mg doses. Greenstone entered the market with the exact same WAC pricing as the incumbent generic manufacturer, Defendant Teva, and immediately sought out customers.

691.    At 10:07 am on March 5, 2014, Teva's Patel received an e-mail about Greenstone's Piroxicam approval and the fact that Greenstone was trying to take business from Teva.

692.     Under Defendants overarching conspiracy, this was acceptable conduct because, like Teva, Greenstone was entitled to its "fair share." Nevertheless, to ensure that Greenstone would abide by what Defendants referred to as the "rules of the road," Patel reached out to her contacts at Greenstone that same day, less than an hour after receiving the e-mail with the news that Greenstone was entering the Piroxicam market. Patel called R.H. at Greenstone at l0:55am and they spoke briefly. Shortly thereafter, Patel called R.H.'s superior, Jill Nailor. At 2:14 pm that afternoon, Patel and Nailor spoke briefly, and then Patel replied to the 10:07 am e-mail discussing Greenstone's Piroxicam strategy.

693.     The following day, March 6, 2014, the day after Greenstone's Piroxicam launch, rather than focusing on her customers, Patel had multiple conversations with R.H. and Jill Nailor. Internally, Patel requested a sales and profitability analysis of Teva's Piroxicam customers so she could figure out which accounts to cede to Greenstone.

694.     The following day, Patel sent an internal e-mail to a marketing manager, identifying specific customers to concede to Greenstone because under the "rules of the road" for being a "Quality Competitor" as part of the overarching conspiracy, and further based on Patel's several conversations with Greenstone, Greenstone had to take additional Teva customers to reach its "fair share" of the market.

695.     However, by the middle of the following week, on March 12, 2014, Patel learned that Greenstone attempted to get more than its "fair share" by also targeting Teva's largest Piroxicam account, CVS, which was responsible for over a quarter of Teva's Piroxicam business.

696.    This challenge was outside of the conduct permitted by the overarching conspiracy, so, unlike other examples of cooperative inaction detailed elsewhere herein, Teva fought to keep this particular account for this particular drug. Teva lowered its price to CVS for Piroxicam by twenty percent and CVS stayed with Teva.

697.    Teva and Greenstone continued to coordinate their allocation over the coming days and weeks. On March 17, 2014, Patel called R.H. at Greenstone; R.H. called Patel back at 11:35 pm that night and they spoke for fifteen minutes.

698.    Immediately after speaking to Patel, R.H. called Nailor and they spoke for ten minutes. Teva retained the CVS account but conceded other customers, representing less market share, to Greenstone through March and April 2014. For example, on March 25, 2014, Teva learned of a challenge from Greenstone at Anda, a wholesaler distributor. Following an analysis of its market share, Teva determined that it still had more than its fair share of the market. Pursuant to the understanding among generic manufacturers alleged herein, Teva conceded the Anda business to Greenstone on Piroxicam. Patel agreed with the decision to concede on April 1, 2014.

699.    No shortages or other market features can explain Defendants' price increases for Piroxicam during the Relevant Period.

700.    The elevated prices of Piroxicam that resulted from Defendants' anti-competitive conduct injured Plaintiff, causing Plaintiff to pay more than it would have paid in a free and fair market.

701.    The unlawful agreement between Teva and Greenstone for Piroxicam capsules was part of these Defendants' participation in the Price-Fixing Conspiracy.

**Niacin ER**

702.   Niacin Extended Release ("Niacin ER"), also known by the brand name Niaspan ER, is used to treat high cholesterol.

703.   As part of Defendants' participation in the Price-Fixing Conspiracy, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of Niacin ER.

704.   As would be expected from the large and elaborate overarching conspiracy alleged herein, Fenofibrate was not the only drug on which Defendants Teva, Lupin, and Zydus colluded; Niacin ER was another.

705.   Teva entered the Niacin ER market on September 20, 2013, and as a result of patent litigation under the Hatch-Waxman Act, Defendant Teva had been awarded 180 days of exclusivity from that date. As a result, Teva's exclusivity was set to expire six months later, on March 20, 2014.

706.   Teva knew that Defendant Lupin planned to enter the market on March 20, 2014, and that Lupin would have 100 days of semi-exclusivity before a third generic manufacturer could enter the Gabapentin market, on June 28, 2014.

707.   Knowing that Lupin was a "High Quality Competitor," . one that would stick to Defendants' overarching agreement and not compete with Teva on price, Teva increased price on Niacin ER by ten percent on March 7, 2014, in advance of its competitors' entry.   Teva did this because it knew Lupin would not erode Teva's price to gain market share beyond the so-called "fair share" allocated to Lupin.

708.   In the days leading up to the price increase, all three competitors exchanged several calls during which they discussed, among other things, the price increase on Niacin ER and the allocation of customers to the new entrants, Zydus and

Lupin.  The communications between Green (now of Zydus) and Patel and Rekenthaler of Teva, and Berthold of Lupin included, on March 3, 2014 two approximately twenty minute calls, one from Green to Rekenthaler and one from Rekenthaler to Patel, and then the following day, on March 4, 2014 an approximately thirteen minute call between Green and Berthold.

709.    These calls were in preparation for a March 6, 2014 meeting between Patel and Rekenthaler regarding which customers they would give to their competitors.

710.    The same day, Patel called Green to discuss which Niacin ER customers would Teva cede to Zydus. They agreed that Teva would cede forty percent of the market to Zydus.

711.    Although in a competitive market, a second generic entrant typically charges about fifty percent less than the incumbent, here, Zydus charged only ten percent less than Teva's already-increased price, so the net result was essentially that both Defendants continued to charge what Teva originally charged during its exclusivity period, thereby avoiding the price erosion that would have occurred in the presence of competition.

712.    Additional calls among the three followed on May 7-9, 2014. Ultimately, the competitors agreed that Teva would retain its Niacin ER account with AmerisourceBergen but concede its account with McKesson and Cardinal Health, both large wholesalers, to Zydus and Lupin, respectively.

713.    On June 5, 2014, a Director of National Accounts at Teva ("J.P.") sent an internal e-mail regarding competition in the Niacin ER market and noted the loss of the McKesson Niacin ER account in Teva's internal database, – and noted that the reason

for the concession was that it was a strategic decision, which was the conspirator's code for allowing "fair share" of the relevant market to their co-conspirator competitors.

714.    On June 28, 2014, Zydus launched Niacin ER and published WAC pricing that matched the per-unit cost for both Teva and Lupin.

715.    The agreement between Zydus, Teva, and Lupin caused prices for Niacin ER to be higher than they would have been in a competitive market and prevented price erosion that would have occurred in such a market.

716.    No shortages or other market features can explain Defendants' elevated prices for Niacin ER during the Relevant Period.

717.    The elevated prices of Niacin ER that resulted from Defendants' anti-competitive conduct has injured Plaintiff, causing Plaintiff to pay more than it would have paid in a free and fair market.

718.    The unlawful agreement among Zydus, Teva, and Lupin regarding Niacin ER was part of these Defendants' participation in the Price-Fixing Conspiracy.

**Baclofen**

719.    Baclofen, also known by brand names Gablofen® and Lioresal®, is a muscle relaxant and is used in treating muscle spasms caused by certain conditions, such as multiple sclerosis and spinal cord injury or disease.

720.    As part of Defendants' participation in the Price-Fixing Conspiracy, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of Baclofen.

721.    During the Relevant Period, Defendant Teva was a dominant supplier of generic Baclofen. In early 2014, the primary suppliers in the market for Baclofen were

Teva (around sixty-two percent), Qualitest (around twenty-two percent), and Upsher-Smith (almost seven percent).

722.     Prior to February of 2014, Defendant Upsher-Smith (or "Upsher") was a bit-player in the Baclofen market and Baclofen was not a very profitable drug for the firm, but its collusion with Teva changed all that.

723.     Effective February 21, 2014, Upsher imposed a significant price increase on its Baclofen customers, more than tripling or quadrupling its WAC price, depending on the formulation.

724.     Upsher's price increase meant Teva was now the lowest-priced supplier of Baclofen: Upsher's more than tripling/quadrupling of its price meant that Teva Baclofen now sold at a sixty-six to seventy-five percent discount to Upsher. In a competitive market, some or all of Upsher's customers would have moved their business to Teva to take advantage of Teva's lower pricing on its functionally-indistinguishable product. But that is not what happened because Teva would not let them.

725.     Instead, because of its anti-competitive, conspiratorial agreement with Upsher and all the other Defendants, Teva did not seek out additional business, even though it was now the lowest-priced market participant. Not only did Teva not seek out new business, but refused to accept new business that fell into its lap, instead deferring those requests to Upsher, and likely falsely explaining to customers that industry wide supply issues meant Teva could not service additional, new accounts.

726.     Upsher-Smith, on the other hand, was able to secure several new customers as a result of Qualitest's exit from the market – and at more than triple or quadruple the earlier price. As a result of this implementation of Defendants'

overarching scheme, Baclofen suddenly (literally, overnight) became highly profitable to Upsher.

727.   In early April 2014, Teva learned that Qualitest was exiting the market for at least three to four months, if not permanently.   Upon learning that the only significant remaining competitor in the market would now be Upsher-Smith, a so-called "high-quality competitor" who would collude with Teva, Teva immediately decided to follow the Upsher price increase.

728.   Patel had a pre-existing relationship and understanding with a national account executive at Upsher ("B.L.") and appeared to consider Upsher a competitor which could be relied on to adhere to the Price-Fixing Conspiracy. In the weeks before she started her employment at Teva, after leaving her previous job at wholesaler AmerisourceBergen, Patel and B.L. exchanged text messages, and during her first week on the job Patel spoke to B.L. on April 29, 2013 for nearly twenty minutes.

729.   During these initial communications, Patel and B.L. solidified the understanding and agreement that Teva and Upsher would follow each other's price increases and would not compete for each other's customers after a price increase. Their agreement was further cemented in June and July 2013, when the two competitors agreed to substantially raise the price of Oxybutynin Chloride.

730.   By April of 2014, a year after those initial discussions and agreement, there was no need for the two to speak directly because it was already agreed between them that Teva would follow an Upsher price increase in any market.

731.   Effective April 15, 2014, Teva raised its WAC and SWP pricing to match Upsher pricing exactly. Just as Upsher had done in February 2014, now Teva imposed a

significant price increase on its Baclofen customers, more than tripling or quadrupling its WAC price, depending on the formulation.

732.     As discussed above, pursuant to the agreement between the companies, Teva did not seek to take any customers from Upsher-Smith during the time period after Upsher's increase and before Teva's increase. Teva would not have increased its prices on Baclofen without its agreement in place with Upsher or in the absence of the Price-Fixing Conspiracy.

733.     Two months later, in June 2014, Lannett entered the market for Baclofen at the same WAC prices as Defendants Teva and Upsher-Smith. Teva and Lannett colluded so that Lannett could seamlessly enter the Baclofen market without eroding the dramatically higher prices that Defendants' over-arching conspiracy had already set.

734.     On June 12, 2014, Sullivan sent a message to her competitor, Patel, using Facebook Messenger, rather than e-mail or text. Less than fifteen minutes later, Patel returned Sullivan's message with a telephone call. During the conversation, Sullivan confided to Patel that Lannett would shortly be entering the Baclofen market, a message that was confirmed in a follow-up via Facebook Messenger that afternoon.

735.     After additional telephone calls and texting between Sullivan and Patel on July 1 and 11, 2014, on July 22, 2014, a customer informed Teva that it had received a lower price on Baclofen. Even though that price was only slightly below Teva's price, Teva decided not to submit a lower price on Baclofen to that customer, and noted this in its internal Delphi database.

736.     Teva had significantly increased its price for Baclofen in April 2014, following the Upsher-Smith price increase, and was able to maintain those prices even

after Lannett entered the market a few months later. In fact, when Lannett entered the market, it came in at the exact same WAC price as Teva.

737.     No shortages or other market features can explain Defendants' price increases for Baclofen during the Relevant Period.

738.     The elevated prices of Baclofen that resulted from Defendants' anti-competitive conduct has injured Plaintiff, causing Plaintiff to pay more than it would have paid in a free and fair market.

739.     The unlawful agreement among Teva, Upsher, and Lannett regarding Baclofen was part of these Defendants' participation in the Price-Fixing Conspiracy.

**Glipizide-Metformin HCI**

740.     Glipizide-Metformin HCl, also known by the brand name Metaglip®, is used to treat high blood sugar levels that are caused by Type 2 Diabetes Mellitus.

741.     As part of Defendants' participation in the Price-Fixing Conspiracy, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of Glipizide-Metformin HCI.

742.      Since 2009, numerous Defendants have sold Glipizide-Metformin HCI, including Mylan, Teva, Sandoz (which had mostly exited the market by 2010), Actavis (which had mostly exited the market by 2014), Heritage (which entered the market in 2010 and mostly exited the market by July 2017), Sun (sold *de minimis* amounts up until 2016) and Zydus (entered the market in September 2016).

743.     By April 2014, Defendants Heritage, Teva and Mylan controlled nearly the entire Glipizide-Metformin HCI market.

744.     As noted above, on April 15, 2014, Heritage's Malek called Teva's Patel and the two spoke for approximately seventeen minutes and discussed seven different Drugs at Issue for which Teva was a competitor of Heritage, including Glipizide-Metformin HCl. During their conversation, Patel agreed that if Heritage increased prices for the seven drugs they discussed, including Glipizide-Metformin HCl, Teva would support the price increases.

745.     Heritage's Malek and Teva's Patel spoke several more times over the next several months to confirm and finalize their agreements regarding numerous drugs, including Glipizide-Metformin HCl.

746.     As discussed above, during an April 22, 2014, Heritage sales team teleconference, numerous drugs were slated for a price increase, including Glipizide-Metformin HCl. Concurrent with these discussions, and as outlined throughout, Heritage sales staff were also speaking with Defendants to formalize pricing agreements. For Heritage, O'Mara was responsible for communicating with Mylan (either Aigner or Nesta) about a number of drugs, including Glipizide-Metformin HCl.

747.     On April 23, 2014, the day after Malek directed Heritage's sales team to contact Defendants about price increases, Mylan and Heritage agreed to raise prices on at least three different drugs, including Glipizide-Metformin HCl (as well as Doxycycline Monohydrate and Verapamil). O'Mara conveyed this agreement with Mylan to Malek via e-mail the same day.

748.     Teva and Mylan were also in frequent communication with each other about pricing. On May 9, 2014, an employee at Mylan and an employee at Teva spoke with each other multiple times about pricing for at least Glipizide-Metformin HCl. Their

conversations included one call that lasted approximately seven minutes. Their communications continued throughout 2014.

749.    Also, on May 9, 2014, Heritage held an internal call about price increases. Glipizide-Metformin HCI was one of the drugs slated for a price increase.

750.    Heritage had a call on June 25, 2014 and discussed an analysis of the proposed price increases and reviewed inter-competitor communications. The next day, Heritage began notifying customers of price increases for nine drugs, including Glipizide- Metformin HCI. Glipizide-Metformin HCIwas slated to double in price, effective July 1, 2014. Price increase notices were also mailed on June 26, 2014.

751.    By July 9, 2014, Heritage had increased prices of Glipizide-Metformin HCI nationwide for at least twenty-seven different customers.

752.    On August 20, 2014, an unidentified individual updated a Sun employee via text messages on the agreements Heritage had reached with Actavis to increase the prices of Glyburide-Metformin and Verapamil. These text messages occurred just days before the start of the 2014 NACDS Total Store Expo, which was attended by employees of Heritage, Teva, Mylan, and Sun who are directly implicated in anti-competitive communications: Heritage (Glazer, Malek, O'Mara and Sather), Mylan (Aigner and Nesta), and Teva (Patel). Numerous other Defendants' employees attended as well.

753.    Because of their anti-competitive agreement, neither Teva nor Mylan challenged Heritage on its price increases. By November 2014, Teva had increased its bid prices of Glipizide-Metformin HCI to potential customers.

754.    Throughout the rest of the Relevant Period, following Heritage, Mylan and Teva's price increases, the list (WAC) prices announced for Glipizide-Metformin HCI

by Heritage, Mylan and Teva, as well as by Defendants Actavis, Sandoz and Zydus, were virtually identical and unchanged, regardless of the number of sellers in the market and despite multiple entrances and exits from the market.  This is because price competition was absent from this market and is further evidence of Defendants' "fair share" agreement. Rather than compete in the market, Defendants announced identical list prices, then, as described above, colluded with each other to elevate the prices paid by their customers.

755.    No shortages or other competitive market features can explain the elevated pricing of Glipizide-Metformin HCI.

756.    The elevated prices of Glipizide-Metformin HCI resulted from Defendants' anti-competitive conduct and has injured Plaintiff, causing Plaintiff to pay more than it would have paid in a free and fair market.

757.    The unlawful agreement between at least Heritage, Mylan and Teva regarding Glipizide-Metformin HCI was part of these Defendants' participation in the Price-Fixing Conspiracy.

**<u>Glyburide</u>**

758.    Glyburide is a commonly prescribed oral anti-diabetic medication used to treat high blood sugar levels caused by Type Two Diabetes. Introduced in the mid-1980's under the brand names Micronase® and DiaBeta®, generic Glyburide has been available since the mid-1990's.

759.    As part of Defendants' participation in the Price-Fixing Conspiracy, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of Glyburide.

760.    As of April of 2014, Defendants Aurobindo, Heritage, and Teva were the dominant sellers of Glyburide. A few months later, Defendant Citron entered the Glyburide market, in July 2014.

761.    As detailed above, on April 15, 2014, Heritage's Malek called Teva's Patel and they discussed seven different Drugs at Issue, including Glyburide. During their conversation, Heritage and Teva agreed not to compete in the Glyburide market. Malek and Patel spoke several more times over the next several months to confirm and finalize their agreements regarding Glyburide and numerous other drugs.

762.    As discussed above, on April 22, 2014, the Heritage sales team held a teleconference during which Malek identified a large number of drugs that Heritage targeted for price increases, including Glyburide. At the time of this call, Aurobindo and Teva were Heritage's only competitors in the Glyburide market.

763.    Malek was responsible for communicating with Teva and Lukasiewicz was assigned to communicate with Aurobindo. Malek and Glazer directed Heritage employees to communicate with their competitors in order to reach agreements to raise prices. Malek and Glazer sent several e-mails directing their sales staff to reach agreements with their competitors in the generic Glyburide market, among other generic markets, as soon as possible.

764.    For example, on April 28, 2014, Malek sent an e-mail to one Heritage employee concerning the status of discussions with Aurobindo.

765.    Glazer followed up on April 29, 2014 with an e-mail to Lukasiewicz requesting further information, and Malek sent another e-mail the day after that, on April 30, 2014, requesting an update. Lukasiewicz eventually connected with his Aurobindo

contact on May 8, 2014, when the two spoke for fifteen minutes. During this call, they agreed to raise the price of a number of drugs, including Glyburide.

766.     Lukasiewicz also spoke with his contact at Glenmark for fifteen minutes the same day, and the following day, an Aurobindo employee spoke with an employee of Glenmark, likely about Fosinopril-HCTZ. While coordinating price increases for Glyburide as part of the overarching conspiracy, Aurobindo, Heritage, Glenmark and Sandoz were also coordinating price increases for Fosinopril-HTCZ.

767.     On May 9, 2014, Heritage's sales team had another teleconference to share the results of their conversations with competitors and further discuss planned price increases for at least nine generic drugs, including Glyburide.  Verapamil, Theophylline, Paromomycin, Nystatin, Nimodipine, Leflunomide, Glyburide-Metformin, and Fosinopril-HCTZ were all slated  for price increases.

768.     The following week, on May 14, 2014, Heritage's Sather met in person and discussed price increase strategies with several competitors at MMCAP in Bloomington, Minn. During that meeting, Aurobindo and Heritage's Sather agreed to raise the prices of Glyburide. Sather confirmed this agreement in a May 15, 2014 e-mail to Malek. Sather also indicated that she would try to meet with Teva at MMCAP.

769.     On June 23, 2014, Heritage employees met and discussed the specific percentage amounts they would seek to increase Glyburide, as well as other generic drugs, and the strategies for doing so. They reached a consensus that Glyburide prices would be increased by 200 percent.

770.     Over the next several weeks, Heritage employees continued reaching out to numerous generic drug competitors and potential competitors, including in the

Glyburide market, in order to secure agreements to raise prices for Glyburide and other generic drugs.

771.     On June 25, 2014, one Heritage employee texted a contact employed at Defendant Citron, to discuss whether Citron would be selling Glyburide in the near future. Once it was determined that Citron would be entering the Glyburide market, Citron and Heritage had extensive telephone, text message, and in-person conversations concerning Citron's pricing and bidding strategies for Glyburide.

772.     For example, on July 1, 2014, an employee of Citron called an employee at Heritage and they spoke for approximately thirteen minutes, confirming Citron's agreement to raise prices on certain drugs, including Glyburide. During this conversation, the Citron employee told Heritage that they should not communicate with Citron via e-mail, but should instead orally convey any sensitive information about pricing for Glyburide or other drugs. The two then spoke for approximately twenty-two minutes the next day.

773.     As Citron entered the Glyburide market in July 2014, it frequently contacted Heritage about Glyburide pricing and bidding strategies. Citron set an initial target of obtaining less than ten percent of the Glyburide market.  Citron was careful, however, to coordinate with Heritage so that it could acquire additional market share without eroding the price increases.

774.     Citron and Heritage's discussions did not occur in isolation. Concurrent with these pricing discussions, Heritage's Malek and his sales team continued to communicate with Defendants about pricing for Glyburide and other generic drugs.

775.    By July 9, 2014, Heritage had announced Glyburide price increases for at least seventeen customers. Teva also increased pricing on Glyburide. On July 15, 2014, Citron, after confirming internally that Heritage had increased its list prices for Glyburide, also increased its Glyburide pricing in line with the price increases.

776.    Throughout the summer, Teva, Aurobindo, Citron, and Heritage were in contact with each other to ensure they were complying with their agreements on pricing for Glyburide, in accordance with the Price-Fixing Conspiracy.

777.    For example, because of Heritage's price increases, on July 9, 2014, a large national retail chain asked Teva to bid on both Glyburide and Nystatin. But instead of quoting a price that would win the business, Teva raised its own prices for Glyburide to a similar level as Heritage's prices.

778.    Similarly, in response to Heritage's price increase on Glyburide and other drugs discussed in this Complaint, a large wholesaler separately e-mailed Teva and Aurobindo on July 25, 2014, and asked for bids. Aurobindo and Teva immediately contacted Heritage to coordinate their responses and to ensure that they were complying with their pricing agreements.

779.    Teva's Patel and Heritage's Malek spoke for fifteen minutes on the day the wholesaler's request was received. After this conversation, Teva declined to provide a bid to the wholesaler.

780.    The same day, Malek sent a text message to an unidentified individual. Malek and this individual then spoke for almost fifteen minutes and agreed Aurobindo would not provide a Glyburide bid to the wholesaler. Ultimately, neither Teva nor Aurobindo responded to the request for a bid.

781.     While Teva, Aurobindo, and Heritage were trying to maintain their price increases for Glyburide, Citron was also communicating directly with Aurobindo, likely to coordinate its entry into, at least, the Glyburide market.

782.     On July 28, 2014, a Citron employee called and texted an Aurobindo employee several times until the two were finally able to connect by telephone. They spoke later that day for approximately twenty-four minutes, discussing the pricing of Glyburide and other Drugs at Issue.

783.     No shortages or other competitive market features can  explain Defendants' price increases for Glyburide.

784.     The elevated prices of Glyburide that resulted from Defendants' anti-competitive conduct has injured Plaintiff, causing Plaintiff to pay more than it would have paid in a free and fair market.

785.     The unlawful agreement between Aurobindo, Citron, Heritage and Teva regarding Glyburide was part of these Defendants' participation in the Price-Fixing Conspiracy.

**Glyburide-Metformin**

786.     Glyburide-Metformin, also known by the brand name Glucovance®, is an oral medication used to treat Type 2 diabetes.

787.     As part of Defendants' participation in the Price-Fixing Conspiracy, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of Glyburide-Metformin.

788.     Glyburide-Metformin has been marketed and sold by a number of Defendants since 2009, including Actavis, Aurobindo, Citron (which entered the market

in August 2014), Dr. Reddy's (which sold only *de minimis* amounts during the Relevant Period), Heritage (which entered the market in January 2013), Par (selling only *de minimis* amounts by 2010), Sandoz (which sold only *de minimis* amounts by 2013), Teva, and Zydus (which entered the market in September 2016).

789.    As of April 2014, the dominant sellers in the market for Glyburide-Metformin were Teva, Aurobindo, and Actavis. Heritage had approximately a five percent market share, but nonetheless wanted to raise prices.

790.    As discussed above, on April 15, 2014, Heritage's Malek called Teva's Patel and the two discussed a number of generic drugs, including Glyburide- Metformin. Patel and Malek agreed not to compete on these drugs. Over the next several months, Malek and Patel spoke several more times reconfirming and finalizing their agreements.

791.    On April 22, 2014, Heritage held a teleconference during which Malek identified a large number of drugs that Heritage targeted for price increases, including Glyburide-Metformin.

792.    Heritage NAM Sather was assigned to speak with Defendants Actavis, Sun, and Lannett and, through her discussions, reached pricing agreements on at least five drugs: Nystatin, Paromomycin, Glyburide-Metformin, Verapamil, and Doxycycline Monohydrate. Right after the Heritage sales call and in response to Malek's direction, Sather communicated with three different competitors about multiple drugs—including with Actavis about Glyburide-Metformin. Sather spoke with Actavis for nine minutes the day of the April 22, 2014 pricing call and reached an agreement with Actavis to raise the price of Glyburide-Metformin (and, as discussed below, Verapamil). Sather updated Malek on her communications with Actavis on May 8, 2014.

793.     On April 28, 2014, an e-mail to the Actavis sales and pricing team discussed the agreement and potential price increases for a number of different drugs.

794.     In response to that April 28, 2014 e-mail, on May 6, 2014 an Actavis employee called an employee at Mylan, and they spoke for five minutes. They spoke three more times on May 6, 2014 with one call lasting fifteen minutes. They continued to communicate over the next several months and likely continued to discuss pricing for Glyburide-Metformin.

795.     On April 28, 2014, Heritage CEO Glazer sent an e-mail to Lukasiewicz directing him to contact Aurobindo about potential price increases on a number of drugs, including Glyburide-Metformin.   Glazer told Lukasiewicz not to put any of his communications with Aurobindo on pricing in writing. Lukasiewicz exchanged several voicemails with his contact at Aurobindo on April 28 and 29, 2014. Glazer requested status updates from Lukasiewicz several times at the end of April 2014.

796.     Heritage's Lukasiewicz and his Aurobindo contact spoke for approximately fifteen minutes on May 8, 2014. During this telephone call, they reached an agreement to raise the prices of at least Glyburide, Glyburide-Metformin and Fosinopril-HCTZ.

797.     In addition, on May 15, 2014, while attending the MMCAP National Member Conference, Sather confirmed pricing agreements for five different drugs with three different Defendants. Among the agreements Sather confirmed was an agreement with Aurobindo on pricing for Glyburide-Metformin and two other drugs.

798.     Concurrent with these discussions, on May 12, 2014, an employee of Actavis spoke with Bob Cunard, the CEO of Aurobindo twice about its Glyburide-

Metformin pricing.  Between May 19 and May 22, 2014, that same Actavis employee also exchanged thirty text messages with a Teva employee about drug pricing.

799.    On June 25, 2014, a Heritage employee texted a friend at Citron about Citron's entrance into the Glyburide market.  As part of this discussion, they also spoke about Glyburide-Metformin, a drug which Citron had approval to sell, but was not actively selling at the time.

800.    In July 2014, both Heritage and Teva increased their WAC prices for Glyburide-Metformin.

801.    Citron took note of these actions. On July 9, 2014, in an internal memo, Citron noted that both Heritage and Teva had increased their prices on three different drugs, including Glyburide-Metformin. In the same memo, a Citron employee then reiterated Citron's intent to abide by the agreement with Heritage and Teva.

802.    On August 20, 2014, an unknown individual exchanged text messages with a Sun employee. The text exchange described the  agreements reached with Actavis to increase the price of Glyburide-Metformin and Verapamil.  As part of the Price-Fixing Conspiracy, generic drug manufacturers (in this case, Sun) were kept apprised of agreements (in this case, between Actavis and Heritage) relating to Drugs at Issue that they did not market or sell (in this case, Glyburide-Metformin).

803.    By September 2014, Citron was ready to enter the Glyburide-Metformin market, but instead of undercutting the prices of Actavis, Aurobindo, Heritage and Teva in an effort to gain market share, Citron announced list (WAC) prices higher than all of the incumbent suppliers.

804.    No shortages or other market features can explain Defendants' price increases for Glyburide-Metformin.

805.    The elevated prices of Glyburide-Metformin that resulted from Defendants' anti-competitive conduct has injured Plaintiff, causing Plaintiff to pay more than it would have paid in a free and fair market.

806.    The unlawful agreement between Actavis, Aurobindo, Citron, Heritage and Teva regarding Glyburide-Metformin was part of these Defendants' participation in the Price-Fixing Conspiracy.

**Leflunomide**

807.    Leflunomide, also known by the brand name Arava®, is an immunosuppressive disease-modifying antirheumatic drug used to treat active, moderate-to-severe rheumatoid arthritis and psoriatic arthritis.

808.    As part of Defendants' participation in the Price-Fixing Conspiracy, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of Leflunomide.

809.    As of April 2014, the main sellers in the market for Leflunomide were Defendants Apotex, Teva, and Heritage. Heritage was a dominant seller in the market, with a sixty percent market share.

810.    As discussed above, during the week of April 14, 2014, Malek met with two employees and asked them to analyze the impact of price increases for numerous generic drugs, including Leflunomide.

811.    Before introducing the market-wide price increases to the rest of his sales team, Malek began communicating with Patel at Teva about at least seven Drugs at Issue, including Leflunomide.

812.     On April 15, 2014, Malek and Patel spoke on the telephone and agreed that if Heritage increased prices for at least Leflunomide, Acetazolamide, Glipizide-Metformin HCI, Glyburide, and Glyburide-Metformin, Teva would follow those increases and impose identical or nearly-identical prices on its own customers.

813.     Malek and Patel spoke several more times over the next several months to coordinate, confirm their agreements and to keep each other updated on market developments for Leflunomide and other pharmaceuticals. During this time, Malek kept Patel updated on the progress of Heritage's proposed price increases.

814.     While Malek was speaking with Teva's Patel about increasing prices on Leflunomide, he and other Heritage employees were also in contact with individuals from Apotex to discuss price increases for at least Leflunomide.

815.     During the April 22, 2014 Heritage sales call, Malek identified Leflunomide as a drug slated for an increase. In the wake of this call, Malek personally took responsibility for communicating with Teva. Matt Edelson was assigned communicating with Apotex.

816.     Defendants had numerous opportunities to meet in person at industry meetings and conferences to discuss and coordinate their pricing of Leflunomide. For example, on April 26-29, 2014, Heritage's Glazer attended the NACDS Annual Meeting where he had the opportunity to meet with representatives from Teva and Apotex, among others.

817.     On May 2, 2014, Heritage's Edelson spoke with Apotex's Beth Hamilton for thirteen minutes about at least Leflunomide. Four days later, on May 6, 2014, after

learning that Teva would be exiting the Leflunomide market, a Heritage employee had two more telephone calls with Apotex's Hamilton.

818.    After speaking with Hamilton, Edelson e-mailed Malek to report what they discussed. Malek replied, confirming the strategy with Edelson. That same day, May 6, 2014, either Malek or Edelson called an Apotex employee. They had two calls, each lasting nine or eight minutes.

819.    On May 7, 2014 – Edelson and Hamilton had two more telephone conversations where they agreed to avoid competition and increase prices on Leflunomide. After seven telephone calls in five days, the agreement was finalized.

820.    On May 8, 2014, in response to an e-mail from Malek requesting a status update, Edelson provided an additional update on his discussions with Apotex.

821.    On May 9, 2014, Heritage had another internal conference call discussing the list of drugs proposed for increases, including for Leflunomide. During the conference call, the Heritage sales team shared the results of their conversations with competitors, including Apotex.

822.    On May 27, 2014, Heritage learned that Apotex had increased its price on Leflunomide to bring it line with Heritage's price.

823.    A month later, on June 26, 2014, Heritage began sending new price increase notices to its customers for at least nine drugs, including Leflunomide.

824.    Beginning the month after that, in July 2014, rather than compete for Leflunomide sales, Teva ceded the market to Apotex and Heritage and began to exit the market.

825.    No shortages or other market features can explain these Leflunomide price increases.

826.    The elevated prices of Leflunomide that resulted from Defendants' anti-competitive conduct has injured Plaintiff, causing Plaintiff to pay more than it would have paid in a free and fair market.

827.    The unlawful agreement between Apotex, Heritage and Teva for Leflunomide was part of these Defendants' participation in the Price-Fixing Conspiracy.

**Paromomycin**

828.    Paromomycin, also known by the brand names Humatin®, Catenulin® and others, is a broad-spectrum antibiotic used to treat amoeba infection in the intestines and complications of liver disease.

829.    As part of Defendants' participation in the Price-Fixing Conspiracy, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of Paromomycin.

830.    Sun and Heritage were the sellers of Paromomycin during the Relevant Period. Heritage was a dominant seller, with approximately sixty-five percent market share.

831.    As discussed above, starting in at least June 2012, Heritage and Sun began discussing price increases and market allocation for at least Paromomycin and Nimodipine.

832.    At Malek's direction, Sather exchanged numerous text messages and had multiple telephone calls with her Sun contact throughout the summer of 2012.

833.    Heritage and Sun, as well as other Defendants, had the opportunity to discuss pricing and market share and otherwise further their conspiratorial discussions

at trade meetings throughout this period, including at the October 2012 GPhA Fall Technical Conference.

834.    As part of the Price-Fixing Conspiracy, by the end of October 2012, Sun had increased its list WAC prices for Paromomycin to be identical with Heritage's pricing. Despite their different initial prices, Heritage and Sun kept their list prices at the same level thereafter.

835.    After a Heritage sales team teleconference on April 22, 2014, in which Paromomycin was targeted for a price increase, Malek assigned Sather to again communicate with its competitors.

836.    Right after that Heritage sales call, Sather communicated with three different competitors, Sun, Actavis, and Lannett, and reached a number of pricing agreements with these Defendants covering at least five different drugs, including Paromomycin.

837.    When Sather reached out to Sun, she did so through Knoblauch, her Sun counterpart. During their forty-five minute conversation, Sather and Knoblauch discussed pricing and agreed to increase the prices of numerous drugs, including Paromomycin. Sather thereafter immediately reported her agreement with Sun to Malek.

838.    In response to a May 8, 2014 status request from Malek, Sather e-mailed him to report the agreement she had reached with a number of competitors, including with Sun for Paromomycin. Sather also reported agreements she reached with Actavis for Glyburide-Metformin and Verapamil, with Lannett for Doxycycline Monohydrate, and with Sun for Nystatin; during an internal Heritage call the next day, Paromomycin remained on the list of drugs slated for a price increase.

839.     Heritage and Sun spoke again for more than twelve minutes on May 20, 2014. During the call, Heritage learned that Sun would be making changes to the production of Paromomycin. Malek was immediately informed of this development.

840.     On June 23, 2014, Heritage employees discussed the specific percentage increases they would seek for a variety of drugs. Paromomycin was slated for a 100 percent increase.

841.     Heritage had a final call confirming that Paromomycin would have a price increase on June 25, 2014, and the next day Heritage began sending out price increase notices.

842.     By July 9, 2014, Heritage announced price increases for Paromomycin to at least thirteen different customers nationwide.  Over the ensuing months, pursuant to their agreement, Heritage and Sun continued to increase their prices for Paromomycin.

843.     No shortages or other market features can explain Defendants' price increases for Paromomycin.

844.     The elevated prices of Paromomycin that resulted from Defendants' anti-competitive conduct has injured Plaintiff, causing Plaintiff to pay more than it would have paid in a free and fair market.

845.     The unlawful agreement between Heritage and Sun regarding Paromomycin was part of these Defendants' participation in the Price-Fixing Conspiracy.

**Theophylline Extended Release**

846.     Theophylline Extended Release ("Theophylline or "Theophylline ER"), also known by the brand name Theodur®, is used to treat asthma and airway narrowing associated with long-term asthma or other lung problems, such as chronic bronchitis and

emphysema. Theophylline is an extended release medication, which means that it is released into the body throughout the day.

847.     As part of Defendants' participation in the Price-Fixing Conspiracy, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of Paromomycin.

848.     Prior to Heritage's entry into the market for 300mg and 450mg Theophylline tablets in late 2011, Teva had captured nearly 100 percent of sales.  Teva marketed and sold Theophylline during the Relevant Period at least in part through its subsidiary, PLIVA.

849.     Instead of pricing its Theophylline products below Teva's, in order to gain market share, Heritage announced list prices that were identical to, or even slightly higher than, those of Teva. Even with Heritage's market entry, Theophylline prices remained relatively high and stable.  Consistent with their "fair share" agreement, prices did not decline, as would be expected in a competitive market.

850.     In early 2014, Teva began considering Theophylline for another price increase. On February 4, 2014, Teva's Patel contacted Heritage's Malek.  Malek returned her call the next day and the two spoke for more than an hour, discussing price increases for Theophylline and at least one other drug (Nystatin, as discussed above).

851.     Three days later, on February 7, 2014, a Heritage employee created a spreadsheet that included Theophylline as a candidate for price increases.

852.     Throughout February and March of 2014, Malek and Patel had a series of telephone calls discussing price increases for multiple generic drugs, including Theophylline.

853.     Shortly thereafter, Teva began implementing across-the-board price increases for Theophylline. These price increases also had an effective date of April 4, 2014.

854.     By the time Heritage held its April 22, 2014 meeting with its sales team to discuss a number of price increases, it had already agreed to follow Teva on at least the Theophylline and Nystatin price increases. As he outlined the proposed price increases, Malek specifically told his sales team that Heritage would follow Teva's price increase on Theophylline.

855.     On April 24, 2014, Teva received an e-mail from a customer seeking an adjustment to its price increase. Consistent with its agreement with Heritage, Teva stuck to its price increase for Theophylline.

856.     On May 9, 2014, Heritage had an internal sales call regarding the drugs subject to price increases, including Theophylline. Several weeks later, on June 23, 2014, Heritage employees discussed the specific percentage price increases they would seek. Theophylline was slated for a 150 percent increase.

857.     On June 25, 2014, Malek had a nearly fourteen minute call with a Teva employee. Malek reported that Heritage would be sending out price increase notices on June 26, 2014 for Theophylline and several other drugs, drugs which Heritage and Teva had agreed to raise prices.

858.     The next day, June 26, 2014, Heritage began telling customers that it would be increasing prices for nine drugs, including Theophylline. By July 9, 2014, among the other price increases it implemented, Heritage increased its Theophylline prices to at least twenty different customers nationwide.

859.     Teva and Heritage imposed list price (WAC) increases of approximately eighty percent on 300mg tablets and approximately thirty percent on 450mg tablets.

860.     No shortages or other market features can explain Defendants' price increases for Theophylline.

861.     The elevated prices of Theophylline that resulted from Defendants' anti-competitive conduct has injured Plaintiff, causing Plaintiff to pay more than it would have paid in a free and fair market.

862.     The unlawful agreement between Heritage and Teva regarding Theophylline was part of these Defendants' participation in the Price-Fixing Conspiracy.

**Verapamil HCL**

863.     Verapamil HCL ("Verapamil"), also known by various brand names, is a calcium channel blocker used to treat hypertension, angina, and certain heart rhythm disorders. It relaxes the muscles of the heart and blood vessels.

864.     As part of Defendants' participation in the Price-Fixing Conspiracy, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of Verapamil.

865.     From 2009 forward, Actavis and Mylan have dominated the market for Verapamil HCL regular release tablets and for certain dosages of Verapamil HCL sustained release capsules.  Combined, the two companies enjoyed nearly 100 percent market share until Heritage began to gain market share in 2013.

866.     Heritage entered the Verapamil tablet market in the second half of 2011, but its share remained around five percent until 2013.  When Heritage entered, it announced list (WAC) prices identical to Mylan and slightly higher than Actavis for eighty mg tablets. Heritage announced prices slightly higher than both Mylan and

Actavis for 120mg tablets. Heritage did not begin to sell forty mg Verapamil tablets until the second half of 2015, at which point it set list prices identical to Actavis, the only seller of forty mg tablets at that time.

867.     Instead of entering the market with lower prices of Verapamil tablets in order to gain market share, as would occur in a competitive market, Heritage priced its tablets identically or even higher than the incumbent producers, Actavis and Mylan. While inconsistent with a competitive market, this was entirely consistent with Defendants' "fair share" agreement, and in fact was done pursuant to it.

868.     Without offering better prices, Heritage was hard pressed to gain market share, and initially was able to capture only a sliver of the market. In October 2012, however, Mylan increased its tablet prices by approximately fifty percent, which facilitated Heritage rapidly gaining market share.     By January of 2013, Heritage had captured more than twenty-five percent of the entire tablet market.  As devised by their "fair share" agreement, market shares between Actavis, Heritage and Mylan quickly stabilized and remained relatively constant thereafter.

869.     In the months prior to Mylan's price increases, Actavis, Heritage and Mylan had numerous opportunities to meet and discuss Verapamil.  For example, all three Defendants attended the HDMA Business Leadership Conference in San Antonio in early June 2012.  All three also attended the GPhA Fall Technical Conference in Bethesda, MD, which took place on October 1-3, 2012.

870.     Similarly, shortly after the 2013 NACDS Total Store Expo in Las Vegas attended by (among others), representatives from Actavis, Mylan and Heritage, Mylan raised the WAC prices of its Verapamil capsules to identical levels as Actavis.

871.    As market shares for Verapamil tablets between Actavis, Heritage and Mylan stabilized, Heritage aimed to implement a price increase. Verapamil was on the list of drugs that Heritage's Malek identified on the April 22, 2014 sales team call.

872.    As part of those price increase discussions, Heritage's O'Mara had the primary responsibility for communicating with Mylan about Verapamil. On April 23, 2014, O'Mara contacted Mylan. O'Mara and the Mylan employee he spoke to agreed to raise prices on at least three different drugs, including Verapamil and, at least, also Doxycycline Monohydrate and Glipizide-Metformin HCl.

873.    Immediately after speaking with Mylan, O'Mara e-mailed Malek, providing an update of his discussions with Mylan.

874.    Heritage's Sather was responsible for speaking with Actavis about Verapamil, among other drugs. On April 22, 2014, she and an Actavis employee spoke for approximately nine minutes and reached an agreement to raise the price of Verapamil and other drugs.

875.    News of the agreement on Verapamil and at least one other drug (as discussed above, Glyburide) reached the Actavis sales and pricing team no later than April 28, 2014, as reflected by an internal e-mail discussing possible price increases for a list of drugs.

876.    A week after the April 28, 2014 e-mail, on May 6, 2014, an Actavis employee called a Mylan employee and left a message seeking to discuss, at least, pricing for Verapamil. The two spoke for three minutes on May 9, 2014 and spoke for almost seven minutes on May 19, 2014 likely about pricing of, at least, Verapamil. They continued to communicate with each other over the next several months.

877.     On May 8, 2014, Malek e-mailed the Heritage sales team requesting an update on competition communications. A Heritage employee responded to Malek's e-mail, providing an update on communications with at least Actavis (about Verapamil and Glyburide-Metformin), Lannett (about Doxycycline Monohydrate), and Sun (about Nystatin and Paromomycin).

878.     While Heritage did not increase its Verapamil prices across the whole market in July 2014 as it did for other drugs, it announced a price increase for Verapamil to at least one customer as the result of Defendants' price increase efforts.

879.     On August 20, 2014, a Heritage employee exchanged text messages with an employee at Sun. The text exchange described the agreement Heritage and Actavis reached to increase the price of Verapamil among other drugs.

880.     Throughout this period, Actavis and Mylan coordinated increases on their Verapamil HCL sustained release capsules (120mg, 180mg, 240mg).  Throughout the Relevant Period, price increases by Actavis and Mylan were staggered, but steady and unexplained by market forces, because they were the result of Defendants' anti-competitive agreement, including pricing agreement and coordination between Actavis and Mylan.

881.     From April of 2012 (shortly before Mylan imposed a price increase for its Verapamil tablets) through April of 2016, Actavis and Mylan attended at least twenty-five trade events together. Over this period, despite very different starting places, the prices of Mylan's and Actavis's Verapamil capsules came to the same, much higher, place:  Mylan's prices nearly tripled, and Actavis's prices doubled. By the spring of 2016, Actavis and Mylan had imposed virtually identical list (WAC) prices.

882.    The higher prices for 120mg, 180mg, and 240mg capsules enabled Actavis also to raise its prices for 360mg capsules, for which it was the lone seller in the market, again illustrating one of the many ways in which the Price-Fixing Conspiracy reached to include products that some Defendants were not even selling. As a result of this conspiracy, Actavis's prices for 360mg capsules nearly tripled between April 2012 and May 2016.

883.    No shortages or other market features can explain Defendants' price increases for Verapamil during the Relevant Period.

884.    The elevated prices of Verapamil that resulted from Defendants' anti-competitive conduct has injured Plaintiff, causing Plaintiff to pay more than it would have paid in a free and competitive market.

**Fenofibrate**

885.    Fenofibrate, also known by brand names such as Tricor, is a medication used to treat cholesterol conditions by lowering blood levels of "bad" cholesterol and fats (such as LDL and triglycerides) and raising blood levels of high-density, "good" cholesterol (HDL).

886.    As part of Defendants' participation in the Price-Fixing Conspiracy, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of Fenofibrate.

887.    As of the end of 2012, Teva and Lupin were the only major suppliers of generic Fenofibrate forty-eight mg and l45mg tablets, with Teva having approximately sixty-five percent market share and Lupin having approximately thirty-five percent market share.

888.     On February 27, 2013, a senior marketing executive at Teva e-mailed multiple Teva colleagues, asking them to provide information on Mylan's potential entry to the market, including details of the timing of Mylan's planned launch – sensitive competitive information that, in the absence of the Price-Fixing Conspiracy, would have been unavailable to Teva.  In advance of this launch, Teva, Lupin and Mylan conspired to allocate the market for Fenofibrate.

889.     In order to get this information, Teva's then-Director of National Accounts, Kevin Green, called Mylan's Vice President of National Accounts, Jim Nesta. Over the course of that day, Green and Nesta spoke at least four different times. That same day, Green reported back to his Teva colleagues what he had learned: that Mylan planned to launch Fenofibrate forty-eight mg and 145mg in November 2013.

890.     A few months later, in early May 2013, Teva learned that Mylan was moving its launch date for Fenofibrate to May 17, 2013.  In a competitive market, this information would have been closely held by Mylan, who would have wanted to surprise its competitors.  However, given the existence of the Price-Fixing Conspiracy, this information was disseminated to Mylan's competitors.

891.     On May 6, 2013, Lupin's David Berthold called Teva's Patel regarding this price increase, and they spoke for approximately 22 minutes.

892.     The next day, May 7, 2013 Mylan's Nesta called Teva's Green and Lupin's Berthold on the same subject, speaking to Green for approximately eleven minutes and to Berthold for approximately three minutes.

893.     The day after that, May 8, 2013, Nesta called Berthold again on the same subject, speaking to Berthold for approximately four minutes.  Later that day, May 8,

2013, Green e-mailed his colleagues at Teva seeking Teva's profitability and sales data on Fenofibrate, a request that was repeated the following day by Green's superior at Teva, who also did so while mentioning the fact that Mylan's launch date for Fenofibrate was imminent.

894. At the time, Green's and Patel's superior at Teva was K.G., Senior Director, Marketing Operations.

895. On May 10, 2013, K.G. received the Teva sales and profitability information he had requested. Because Defendants' conspiracy meant Teva would not compete for business beyond the agreed division of the market, and before there was even a formal price challenge by Mylan at any of Teva's customers, K.G. decided that Teva would cede Teva's Econdisc business to Mylan, even though Econdisc was a significant source of revenue and profit on Fenofibrate; indeed, Econdisc was Teva's largest single customer (by volume) for the forty-eight mg dose.

896. That same day, May 10, 2013, Green reached out to Nesta, his contact at Mylan, and told him that Teva was on board with the scheme and Mylan would get the Econdisc account. They spoke for a little over ten minutes, whereupon Nesta reached out to Patel, who in turn left a message for Berthold, who then called Patel back to discuss the conspiracy, in particular, pricing and allocating the Fenofibrate market. Lupin and Patel spoke twice that day, for a total of approximately thirty minutes.

897. On May 15, 2013, Econdisc informed Teva that a new market entrant had submitted a competitive offer for Fenofibrate forty-eight mg and 145mg tablets and asked Teva for a counteroffer to retain Econdisc's business.

898.     Because of Defendants' conspiracy, it took Green less than an hour after receiving the notice of the price challenge to recommend to his superior at Teva that Teva concede the Econdisc account to Mylan.  Teva did so.

899.     Following Teva's internal confirmation of the market allocation scheme, Teva executives spoke with executives at Mylan and Lupin numerous times over the next two days, when Mylan actually launched, and when the news that Mylan was selling Fenofibrate was finally made public.

900.     Patel spoke with Berthold on at least three separate calls on May 16, 2013, and an eleven minute call the next day, May 17, 2013, the day of Mylan's Fenofibrate launch.

901.     In a competitive market, the sales force of a company usually spends its time speaking to its customers and prospective customers in the lead-up to a product launch, not to its competitors.  However, because of the Price-Fixing Conspiracy, the Fenofibrate launch was not a normal launch.

902.     The day of Mylan's Fenofibrate launch resulted in multiple conversations between the relevant Defendants, specifically Teva, Mylan and Lupin.  Mylan's Nesta spoke with Lupin's Berthold for two minutes and with Teva's Green twice, for a total of almost thirty minutes. Green spoke with Berthold for ten minutes and with Patel for approximately the same length of time, all confirming the conspiracy and the ceding of the Econdisc Fenofibrate business from Teva to Mylan..

903.     Teva, Mylan, and Lupin were not the only Defendants involved in the Fenofibrate part of the Price-Fixing Conspiracy.  In February 2014, Zydus was preparing to launch into the Fenofibrate market on March 7, 2014.

904. By this time, Green was now at Zydus as the Associate Vice President of National Accounts, and maintained relationships with his former Teva colleagues, Patel and David Rekenthaler, then Vice President of Sales for US Generics at Defendant Teva until April 2015.

905. In addition, Rekenthaler transitioned from Defendant Teva to Defendant Apotex, where – as VP of Sales – he maintained and cultivated the cross-manufacturer relationships he had begun developing while at Teva, including at least 1,044 telephone calls and text messages with his contacts at Defendants Actavis, Mylan, Par, Aurobindo, Apotex, Zydus, Sandoz, Rising, Amneal, Breckenridge, Lupin, Dr. Reddy's, Glenmark, Greenstone, Taro, Lannett, and Wockhardt, further, including at least. This included around 433 calls or texts with Defendant Actavis's Marc Falkin in the two years prior to joining Actavis in 2015; 102 calls or texts with Defendant Mylan's Jim Nesta in the three years from April 2012 to March 2015; eighty-nine calls or texts with G.B. at Defendant Par in the approximately four years from January 2011 to February 2015; seventy-five calls or texts with R.C. at Defendant Aurobindo in the approximately four years from October 2011 to March 2015; sixty-five calls or texts with J.H. at Defendant Apotex in the two years from May 2013 to March 2015; and around forty-two calls or texts with Green, during his time at Zydus, from November 2013 to March 2015,.

906. In addition to doing so with Patel and Rekenthaler, Green continued to share pricing information and allocate market share with Nesta and Berthold, for the benefit of his new employer.

907. Between February 19 and February 24, 2014, Patel and Green spoke by telephone at least seventeen times – including two calls on February 20, 2014 lasting a

combined total of over thirty minutes, and another call the next day, lasting almost thirty minutes.

908.     On February 21, 2014, Patel sent a calendar invite to her superior, K.G., and to Rekenthaler for a meeting three days later, on February 24, 2014. One discussion item was Zydus's planned entry into the Fenofibrate market. Notably, Defendant Zydus did not enter the Fenofibrate market until two weeks later, on March 7, 2014.

909.     Beyond the communications detailed above, in the days leading up to Zydus's Fenofibrate launch, Defendants from all four competitors were in regular contact with each other to discuss pricing and allocating market share to Zydus, exchanging at least twenty-six calls or voicemails with each other between March 3 and March 7, 2014.

910.     As discussed, in a competitive market for generic pharmaceuticals, new entrants come in at a price below the incumbent suppliers in order to obtain customers, who otherwise have no incentive to switch from the incumbents.  That is not what happened here; instead, because of the Price-Fixing Conspiracy, Defendant Zydus entered the Fenofibrate market with WAC pricing that matched Defendants Teva, Mylan, and Lupin.

911.     On March 17, 2014, Teva's Patel and Green now at Zydus' Green had two separate telephone conversations, discussing how to divide the market for separate products where Zydus was entering the market, including Fenofibrate. Patel then reported the results of this discussion to K.G. in an e-mail sent that same day.

912.     In the months that followed, Teva ceded several customers to Zydus in accordance with the agreement they had reached.

913.    For example, on Friday March 21, 2014, J.P., a Director of National Accounts at Teva, sent an internal e-mail to certain Teva employees, including Patel and Rekenthaler, notifying them that Zydus had submitted an unsolicited bid to a Teva customer, OptiSource. That same morning, Patel sent a calendar invite to Rekenthaler and to K.G. scheduling a meeting to discuss this development.

914.    The following Monday, March 24, 2014, Patel called Green and they spoke for fifteen minutes. She also spoke with Berthold for about twelve minutes. That same day, Patel sent internal e-mails directing that Teva cede the OptiSource and Humana accounts to Zydus.

915.    No product shortages or other market changes can explain Defendants' price increases. The pricing conduct here is not consistent with competitive behavior. As multiple sellers enter the market, prices in a competitive market decline. Yet, Fenofibrate prices remained elevated above the competitive level because of the anti-competitive agreement among Defendants.

916.    No shortages or other competitive market features can explain the elevated pricing of Fenofibrate.

917.    The elevated prices of Fenofibrate that resulted from Defendants' anti-competitive conduct has injured Plaintiff, causing Plaintiff to pay more than it would have paid in a free and fair market.

918.    The unlawful agreement between Mylan, Teva, Lupin, and Zydus regarding Fenofibrate was part of these Defendants' participation in the Price-Fixing Conspiracy.

**Diflunisal**

919.     Diflunisal is a salicylic acid derived non-steroidal anti-inflammatory drug with analgesic properties.

920.     As part of Defendants' participation in the Price-Fixing Conspiracy, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of Diflunisal.

921.     By February 26, 2014, Patel had a list of "P[rice] I[ncrease] Candidates," which she forwarded to another colleague for his review. In addition to other drugs described elsewhere in this Complaint, such as Niacin ER and Azithromycin suspension, the list included Diflunisal and correctly noted in the "Market Notes" column that the drug was "Shared only with Rising."

922.     Patel and Rekenthaler both communicated multiple times with Taro, Lupin, Actavis, Greenstone, Zydus, Heritage, and Rising to coordinate the price increases, calls and text messages.

923.     On March 17, 2014, having confirmed the cooperation of these Defendants with the planned price increases, Patel sent a near final version of the "PI Candidates" spreadsheet to K.G. for approval.

924.     At that time, Rising had a twenty-one percent market share and Teva dominated the market with the remaining seventy-nine percent.

925.     That same day, Rekenthaler spoke with CW-B twice. During those calls, CW-B told Rekenthaler that Rising was having supply problems for Diflunisal and might be temporarily exiting the market at some point in the future. CW-B confirmed that it would be a good opportunity for Teva to take a price increase.

926.     Rekenthaler and CW-B spoke again on March 31, 2014, shortly before Teva's Diflunisal price increase. On April 4, 2014, Teva increased its WAC pricing on Diflunisal by as much as thirty percent and its contract pricing by as much as 182 percent.

927.     Rising exited the Diflunisal market for a short period of time a few months later, in mid-July 2014.   When Rising decided to exit the market, CW-B called Defendant Rekenthaler to let him know.  Four months later, when Rising's supply problems were cured, Rising re-entered the market for Diflunisal. Consistent with the fair share principles of Defendants' cartel, CW-B and Rekenthaler spoke by telephone on several occasions in advance of Rising's re-entry to identify specific customers whom Rising would obtain and, most importantly, to retain the high pricing that Teva had established through its price increase on April 4, 2014.

928.     On December 3, 2014, Rising re-entered the market for Diflunisal Tablets.  Its new pricing exactly matched Teva's WAC price increase from April 2014.

929.     No shortages or other competitive market features can explain Defendants' price increases for Diflunisal Tablets.

930.     The elevated prices of Diflunisal Tablets that resulted from Defendants' anti-competitive conduct has injured Plaintiff, causing Plaintiff to pay more than it would have paid in a free and fair market.

931.     The unlawful agreement between Teva and Rising regarding Diflunisal Tablets was part of these Defendants' participation in the Price-Fixing Conspiracy.

**Ketoconazole**

932. Ketoconazole is an imidazole antifungal drug and is primarily used to treat fungal infections. Ketoconazole is sold commercially as a tablet for oral administration and as a cream for topical administration.

933. As part of Defendants' participation in the Price-Fixing Conspiracy, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of Ketoconazole.

934. Although they were not listed on the original list that Teva's Patel sent to K.G., on January 14, 2014, Patel identified Ketoconazole Cream and Ketoconazole Tablets as price increase candidates sometime in January or February 2014, and included them on the list of price increase targets that she sent to a Teva colleague on February 26, 2014.

935. Taro was a common competitor on both drugs, but there were different sets of competitors for each formulation. For Ketoconazole Cream, Teva's nominal "competitors" (and co-conspirators) were Taro and Sandoz; for the Ketoconazole Tablets, Teva's nominal "competitors" (and co-conspirators) were Taro, Mylan and Apotex.

936. Teva led the price increases for both drugs, but made sure to coordinate with all of its competitors as it was doing so. Meanwhile, Taro and Sandoz were also communicating directly with each other. For example, on April 4, 2014, the day of Teva's price increase, Patel spoke separately with both Aprahamian of Taro and CW- A of Sandoz and told them about Teva's Ketoconazole price increase.

937. That same day, April 4, 2014, Aprahamian then spoke to a senior sales executive at Sandoz, who will be referred to in this Complaint as CW-C, for

approximately twenty minutes to discuss the Teva increase and coordinate their response. They agreed that at least Taro would follow the increase and raise its prices. CW-C then sent an internal e-mail, informing his Sandoz colleagues about Teva's immediate price increase and Taro's commitment to follow the price increase, and directing them not to bid on any new opportunities for Ketoconazole; Aprahamian sent a similar message to his colleagues at Taro.

938.    Also, that same day, Teva's Rekenthaler spoke to Nesta at Mylan.  He had previously communicated with a senior sales executive at Apotex, J.H., a few weeks earlier on March 20 and 25, 2014.

939.    The following Monday, April 7, 2014, Taro received a request for a bid from the Minnesota Multistate Contracting Alliance for Pharmacy ("MMCAP"), a GPO. MMCAP asked for a bid on its Ketoconazole Tablets account owing to Teva's price increase from the previous week. In accordance with its agreements with other Defendants under the Price-Fixing Conspiracy, Taro refused to bid on the account.

940.    The next day, Tuesday, April 8, 2014, Aprahamian called Patel and the two spoke for more than fifteen minutes. Later that same day, Aprahamian initiated a price increase for all of Taro's customers on both Ketoconazole Cream and Tablets. Aprahamian directed that the notice letters be sent to customers on April 16, 2014, with an effective date of April 17, 2014.

941.    Although Sandoz already knew that it would follow the increased prices, it was not able to implement them until October 2014. The delay was due to the fact that Sandoz had contracts with certain customers that contained price protection terms which would expose Sandoz to substantial penalties if it increased its prices at that time. Those

penalties outweighed the profits to be made from the increased prices, so Sandoz delayed following the price increases until that October 2014.

942.    This put Sandoz in a bind.  Its prices were lower than its competitors, which would normally lead to an increase in business.  However, increased market share would mean Sandoz was getting more than the overarching "fair share" agreed with other Defendants.

943.    To avoid violating Defendants' overarching agreement, Sandoz did not seek out additional business, even though it was now the lowest-priced market participant. Likewise, Teva did not seek out new business or accept new business when opportunities to do so arose.

944.    For example, a month after the price increase, Cardinal Health approached Teva to ask for a bid on its Ketoconazole business.  The request was forwarded to Patel, who communicated several times via text and telephone with Aprahamian at Taro, and then directed that Teva decline to bid for Ketoconazole at Cardinal Health. The same day, May 14, 2014, Patel also directed that Teva decline to bid for Ketoconazole at AmerisourceBergen, thus protecting Taro from price competition.

945.    The Teva increases on Ketoconazole were significant. For the cream, Teva, Taro and Sandoz all more than doubled the WAC price. For the tablets, Teva's WAC increases were more than triple, but its customer price increases were even larger, averaging more than five times the original price.

946.     No product shortages or other market features can explain Defendants' abrupt, simultaneous (or, in Sandoz's case, delayed by six months), and substantially identical price increases during the Relevant Period.

947.     The elevated prices of Ketoconazole that resulted from Defendants' anti-competitive conduct has injured Plaintiff, causing Plaintiff to pay more than it would have paid in a free and fair market.

948.     The unlawful agreement among Teva, Taro, Sandoz, Mylan, and Apotex on Ketoconazole was part of these Defendants' participation in the Price-Fixing Conspiracy.

**Fluocinonide**

949.     Fluocinonide, also known by the brand name Lidex®, is a topical corticosteroid used for the treatment of a variety of skin conditions, including eczema, dermatitis, psoriasis, and vitiligo. It is one of the most widely prescribed dermatologic drugs in the U.S. and is sold in multiple formulations, including 0.05 percent cream, 0.05 percent emollient-based cream, 0.05 percent gel, and 0.05 percent ointment.

950.     As part of Defendants' participation in the Price-Fixing Conspiracy, Defendants conspired to fix, raise, maintain, and/or stabilize the price of Fluocinonide.

951.     In July 2013, Teva coordinated with Taro and Sandoz to raise the WAC price of all four formulations by between ten to seventeen percent, based in part on discussions between Patel and Taro's Aprahamian and Taro's agreement to join Teva's pricing.

952.     As of May 2014, only Defendants Teva, Taro, and Sandoz were making any of the four Fluocinonide formulations identified above. Taro had the dominant market share in several of these formulations.

953.     On May 14, 2014, Patel and Aprahamian texted and called each other. Aprahamian told Patel that Taro wanted to increase prices on its Fluocinonide formulations.

954.     Shortly thereafter, Patel ordered another Teva employee to create a spreadsheet for price increases of products, including the four Fluocinonide formulations. Two weeks later, knowing that Taro's price increases were soon to be implemented, but before they had been revealed to customers or others outside Taro, Patel received the spreadsheet, including reference to Taro's upcoming price increase for the Fluocinonide formulations.

955.     A few weeks later, on June 2, 2014, Taro notified its customers that as of the next day, June 3, 2014, Taro was implementing a dramatic WAC price increase.  The price of the cream at least tripled, and in some cases, increased more than seven-fold. The price of the emollient-based cream at least doubled, and in some cases, more than tripled.  The price of the gel at least doubled, and in some cases, more than tripled.  The price of the ointment at least doubled, and in some cases, went up almost five-fold , all literally overnight.

956.     Patel knew of these, and other, Taro increases well in advance, and was prepared so that Teva would be able to quickly follow the price increases. Patel was already preparing the next round of price increases, to be implemented by Teva in August 2014.

957.     On June 3, 2014, the Taro increases on Fluocinonide became effective. On that day, CVS reached out to T.C., a senior sales executive at Teva, indicating that it wanted bids on Fluocinonide 0.05 percent Cream and Fluocinonide 0.05 percent

Emollient Cream, offering to move a significant amount of business from Taro to Teva, but did not give a reason for providing that opportunity to Teva. However, Patel knew the reason for the offer, because of Taro's (not-publicly known) price increase. K.G. at Teva noted that this was a good opportunity to take some share from Taro, which was the market share leader on several of the Fluocinonide formulations, but because of Defendants' overarching anti-competitive agreement, including the previous communication between Patel and Aprahamian, Teva did not give CVS a bid lower than Taro's newly-increased price.

958.    Similarly, on June 4, 2014, Teva received a bid request from another large customer, Walmart. Shortly after that e-mail was forwarded to her, Patel responded by making it clear that Teva would play nice in the sandbox with Taro. As a result, Teva did not submit a bid on the Walmart business at all.

959.    The following week, on June 13, 2014, Patel sent an internal e-mail with a list of drugs to increase prices on, including Teva's Fluocinonide formulations, and in the e-mail directed Teva employees not to compete with Defendants Zydus or Taro for Fluocinonide accounts, even if/when approached by those companies' customers.

960.    As Teva was planning to implement its price increase to follow Taro, on both June 17 and June 19, 2014, Patel had telephone calls with Aprahamian and with Zydus' Green.

961.    On June 23, 2014, Patel sent a spreadsheet with Taro pricing information in it to a Teva colleague. The spreadsheet included prices for the different Fluocinonide formulations for different types of customers, such as GPOs, wholesalers, retailers, etc. These contract prices came from Aprahamian and were not publicly available.

962.     Aprahamian was also coordinating with the only other "competitor" in the Fluocinonide space, Sandoz. Sandoz made both the gel and ointment formulations, but actively marketed only the gel because it was leaving the ointment market. Aprahamian spoke with CW-C at Sandoz at least once each day on June 17-20, 2014, including three calls on June 20, 2014.  On June 17 and 19, 2014, Aprahamian spoke with both Patel and CW-C.

963.     As he had done with Patel, during one of the calls with CW-C on June 20, 2014, Aprahamian gave his company's non-public pricing information to a nominal "competitor" and co-conspirator, which CW-C wrote down for the purpose of having Sandoz follow their pricing, which Sandoz in fact did.  Three months later, on October 10, 2014, Sandoz raised the WAC price on its Fluocinonide gel product almost five-fold.

964.     No shortages or other market features can explain Defendants' price increases for Fluocinonide during the Relevant Period.

965.     The elevated prices of Fluocinonide that resulted from Defendants' anti-competitive conduct has injured Plaintiff, causing Plaintiff to pay more than it would have paid in a free and fair market.

966.     The unlawful agreement among Teva, Taro, Sandoz and Zydus regarding Fluocinonide was part of these Defendants' participation in the Price-Fixing Conspiracy.

**Warfarin, Carbamazepine, and Clotrimazole**

967.     Warfarin, also known by the brand name Coumadin, *inter alia*, is an anticoagulant for blood and is commonly used to help prevent strokes and other cardiac events and to treat blood clots, such as deep vein thrombosis.

968.     Carbamazepine, also known by the brand name Tegretol, *inter alia*, is an anticonvulsant medication used primarily in the treatment of epilepsy and neuropathic pain, and is used in schizophrenia along with other medications and as a second-line agent in bipolar disorder.

969.     Clotrimazole, also known by the brand name Canesten, *inter alia*, is an antifungal medication. It is used to treat yeast infections, oral thrush, and certain types of ringworm, including those that cause tinea pedis and tinea cruris.

970.     As part of Defendants' participation in the Price-Fixing Conspiracy, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of Warfarin, Carbamazepine, and Clotrimazole.

971.     As of May 2014, there were three suppliers in the market for Warfarin, Teva, Taro and Zydus.

972.     On May 14, 2014, Patel and Aprahamian exchanged eight text messages and had one telephone conversation lasting just under five minutes. Thereafter, Patel directed a colleague at Teva, T.S., to create a list of future price increase candidates, based on a set of instructions and data she provided.

973.     On May 28, 2014, T.S. then sent Patel the requested list of "2014 Future Price Increase Candidate Analysis." The list included several drugs sold by Taro, including Carbamazepine, Clotrimazole, and the four formulations of Fluocinonide just discussed, all with "Follow/Urgent" listed as the reason for the increase, even though Taro had not yet increased its price on those drugs or notified its customers that it would be doing so.

974.     A few days later, on June 3, 2014, Taro increased prices on, *inter alia*, Warfarin, Carbamazepine, Clotrimazole, Fluocinonide, and Patel and Aprahamian exchanged five text messages. After exchanging those text messages, Patel confirmed to K.G. and another Teva colleague that Taro had raised its pricing on these drugs.   Patel added:  "I'll be looking at shares and intel tomorrow and will provide commentary." She also noted that "Taro is a high-quality competitor. It's just a matter of who the others are."

975.     By "high-quality competitor," Patel meant, and K.G. understood, that Taro could be relied on to adhere to the Price-Fixing Conspiracy.

976.     At 5:08 pm on June 3, 2014, Patel called Aprahamian and the two spoke for nearly seven minutes. The next morning, Patel and Aprahamian exchanged text messages. Then at 9:56am, the two spoke again for a little less than thirty minutes. Shortly after hanging up the telephone with Aprahamian, Patel sent an e-mail to K.G., making it clear that she had obtained additional information regarding the Taro price increases.

977.     The following week, on June 11, 2014, Green called Rekenthaler and they spoke for eight minutes and Patel and Green also spoke on the telephone.  The next day, June 12, 2014, Patel called Aprahamian just before 8:00 am and they spoke for just under ten minutes.

978.     The very next day, June 13, 2014, Green (at Zydus) called Patel (at Teva), just after 8:15 am, and they spoke until nearly 8:30 am.  Zydus then raised its price on Warfarin tablets.

979.    Later that same day, a customer gave Teva an offer for a one-time buy on Warfarin.  Patel responded, "We will review, but note that we intend to follow [the] Taro and Zydus increase price."  Later that day, Patel sent an internal e-mail alerting her group, including K.G., about a list of drugs on which Teva planned to raise prices. A number of them, including Carbamazepine Chewable Tablets, Carbamazepine Tablets, Clotrimazole Topical Solution, Warfarin Tablets, and Fluocinonide Cream, Emollient Cream, Gel and Ointment, included the notation "Follow/Urgent – Taro" as the reason for the increase.

980.    For that list of drugs, Patel directed that "we should not provide any decreases on these products."  This meant Teva would not seek to compete for market share against Taro or Zydus when approached by customers due to those cartel members' price increases.

981.    On August 28, 2014, Teva followed the Taro price increases on Carbamazepine Chewable Tablets, Carbamazepine Tablets, Clotrimazole Topical Solution, and Warfarin Sodium Tablets.  Teva coordinated those increases with Taro and Zydus through direct communications with those competitors in the days leading up to the increase.

982.    No shortages or other market features can explain Defendants' price increases for Warfarin, Carbamazepine, or Clotrimazole during the Relevant Period.

983.    The elevated prices of Warfarin, Carbamazepine, and Clotrimazole that resulted from Defendants' anti-competitive conduct has injured Plaintiff, causing Plaintiff to pay more than it would have paid in a free and fair market.

984.     The unlawful agreement among Defendants Teva, Taro, and Zydus regarding Warfarin, Carbamazepine, and Clotrimazole was part of these Defendants' participation in the Price-Fixing Conspiracy.

**Tobramycin**

985.     Tobramycin, also known by the brand name Tobi, is an eye drop used to treat bacterial infections.

986.     As part of Defendants' participation in the Price-Fixing Conspiracy, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of Tobramycin.

987.     Beginning in October 2013, prior to the first generic launch of Tobramycin (for which Teva would have 180-day generic exclusivity), Sandoz began making plans for its entry after Teva's statutory exclusivity period expired. These plans included trying to get a so-called "fair share" for Sandoz, but depended on the incumbent generic manufacturer, Teva, being cooperative, or as Defendants like to refer to their co-conspirators, it required Teva to act as a "Quality Competitor."

988.     Nearing Teva's loss of exclusivity and Sandoz's entry, on July 1, 2014, Teva and Sandoz began sharing information and coordinating to divide up the market for Tobramycin. Patel exchanged seven calls with a Sandoz pricing executive on July 1, 2014, during which they discussed Sandoz's launch plans and how to divide up the market for Tobramycin. Patel conveyed some of Sandoz's information in an internal Teva e-mail the same day.

989.     On July 7, 2014, Patel and the Sandoz pricing executive spoke five more times, including one call lasting approximately eleven minutes. On these calls, Patel and the Sandoz pricing executive discussed how to divide up the market for Tobramycin, including specific accounts that each would maintain or concede to the other. Patel then

memorialized the agreement in an e-mail two days later. The agreement was that Teva would take Walgreens, McKesson Corporation ("McKesson") (a wholesaler), Econdisc (a GPO that includes Express Scripts, Kroger, and Supervalu), AmerisourceBergen, and Omnicare; while Sandoz would take CVS, Cigna, Prime Therapeutics, Kinney Drugs, and OptumRx. Teva also planned to concede the Cardinal Health business to Sandoz.

990.    Patel told the Sandoz pricing executive specifically that Teva would not even submit a bid to CVS. This was significant because Tobramycin was a very expensive product, and Sandoz was able to acquire the CVS business by offering only a nominal reduction to the extremely high price that Teva was able to set when it was the only generic manufacturer, and was very close to the branded price that was charged during the patented and 180-day exclusivity periods.

991.    As planned, Teva conceded the CVS business to Sandoz after CVS contacted Teva and requested that Teva submit a lower price to retain the business. Teva also went through with its plan to concede Cardinal Health to Sandoz.

992.    The Sandoz pricing executive, in turn, told Patel that Sandoz would not pursue business from AmerisourceBergen and Walgreens. The Sandoz pricing executive spoke with Kellum about his conversations with Patel and the agreement to stay away from Walgreens and AmerisourceBergen, and Kellum agreed with the plan. Pursuant to that agreement, Sandoz did not contact those two large customers when it entered the market for Tobramycin.

993.    The Sandoz pricing executive and Patel also discussed Sandoz's target market share. The pricing executive informed Patel that Sandoz was seeking a fifty percent share.

994.    No product shortages or other market changes can explain Defendants' elevated pricing. The pricing conduct here is inconsistent with competitive behavior. In a competitive market, as multiple sellers enter the market, prices decline, but that is not what happened here. Instead, because of the overarching anti-competitive agreement among Defendants, Tobramycin prices remained unchanged despite multiple sellers entering the market.

995.    The elevated prices of Tobramycin that resulted from Defendants' anti-competitive conduct has injured Plaintiff, causing Plaintiff to pay more than it would have paid in a free and fair market.

996.    The unlawful agreement between Teva and Sandoz regarding Tobramycin was part of these Defendants' participation in the Price-Fixing Conspiracy.

**Glimepiride**

997.    Glimepiride, also known by the brand name Amaryl®, is a medicine used to treat high blood sugar levels that are caused by Type 2 Diabetes Mellitus.

998.    As part of Defendants' participation in the Price-Fixing Conspiracy, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of Glimepiride.

999.    In July 2014, Dr. Reddy's wanted to implement a price increase on its Glimepiride products. In light of the Price-Fixing Conspiracy, Dr. Reddy's first step was to make sure that Teva would follow such an increase.

1000.    Accordingly, V.B., a senior sales executive at Dr. Reddy's, reached out to Patel at Teva, to coordinate. They spoke for approximately twelve minutes on July 10, 2014, then again for about five minutes on each of July 21, 22, and 24, 2014.

1001.    On August 18, 2014, Dr. Reddy's significantly increased its pricing on Glimepiride, approximately quadrupling the price overnight for all dosage strengths.

1002.    V.B. continued to communicate with Patel, regarding Glimepiride pricing, after Dr. Reddy's price increase, including exchanging at least four text messages on both August 25, 2014 and October 10, 2014.

1003.    Based on the understanding that had been reached between V.B. and Patel during these conversations, Dr. Reddy's anticipated that Teva would follow Dr. Reddy's price increase.  Less than six months later, on January 28, 2015, Teva raised its WAC to exactly match Dr. Reddy's.

1004.    Also, on January 28, 2015, illustrating the applicability of the Price-Fixing Conspiracy to all products made by Defendants, Dr. Reddy's sought and obtained a complete list of Teva's price increases, including drugs not made or sold by Dr. Reddy's.

1005.    No shortages or other market features can explain Defendants' price increases for Glimepiride during the Relevant Period.

1006.    The elevated prices of Glimepiride that resulted from Defendants' anti-competitive conduct has injured Plaintiff, causing Plaintiff to pay more than it would have paid in a free and fair market.

1007.    The unlawful agreement between Teva and Dr. Reddy's on Glimepiride was part of these Defendants' participation in the Price-Fixing Conspiracy.

**Griseofulvin**

1008.    Griseofulvin, also known by the brand name Grifulvin V®, is an oral antifungal medication primarily used to treat ringworm infections that do not respond to topical medications, such as ointments or creams.  Its method of action is to prevent fungal mitosis.

1009.    As part of Defendants' participation in the Price-Fixing Conspiracy, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of Griseofulvin.

1010.    In September 2014, Actavis wanted to implement a price increase on its Griseofulvin products.  Actavis' first step was to make sure that Teva, its fellow seller of Griseofulvin, would follow such a price increase.

1011.    Accordingly, Actavis employees Marc Falkin and Rick Rogerson reached out to their counterparts Patel and Rekenthaler at Teva.  Their first conversations on the subject likely occurred in person at the NACDS 2014 Total Store Expo, held in Boston's Convention Center over August 23-26, 2014, and attended by Falkin, Rogers, Rekenthaler, and Patel, as well as representatives of other Defendants.

1012.    A number of telephone conversations between September 2 and September 8, 2014 between Rekenthaler and Falkin followed.

1013.    The day after that, September 9, 2014, Rogerson called Patel and they spoke for a few minutes.  Actavis then notified its customers it raised the price of Griseofulvin Microsize Oral Suspension, effective October 6, 2014.

1014.    Likewise, Teva immediately added Griseofulvin to its own price increase list. On January 28, 2015, Teva raised the WAC on its Griseofulvin Microsize Oral Suspension to exactly match that of Actavis.

1015.    No shortages or other market features can explain Defendants' price increases for Griseofulvin during the Relevant Period.

1016.    The elevated prices of Griseofulvin that resulted from Defendants' anti-competitive conduct has injured Plaintiff, causing Plaintiff to pay more than it would have paid in a free and fair market.

1017.   The unlawful agreement between Actavis and Teva on Griseofulvin was part of these Defendants' participation in the Price-Fixing Conspiracy.

**Gabapentin**

1018.   Gabapentin, also known by the brand name Neurontin, is part of a class of drugs called anticonvulsants and is used to treat the symptoms of epilepsy and neuropathic pain. Glenmark entered the market for Gabapentin 800mg and 600mg tablets on April 1, 2006.

1019.   As part of Defendants' participation in the Price-Fixing Conspiracy, Defendants conspired to fix, raise, maintain, and/or stabilize the prices of Gabapentin.

1020.   On October 13 and 14, 2014, Patel attended the Annual Meeting of the Pharmaceutical Care Management Association ("PCMA") in Rancho Palos Verdes, California, along with a number of Teva's competitors.  It appears that Patel learned that Glenmark would be increasing its prices for Gabapentin at the PMCA meeting. Although the Glenmark increase had not yet been made public and would not be effective until November 13, 2014, on October 15, 2014, Patel informed her colleagues at Teva that Glenmark would be increasing its Gabapentin price. Patel also informed her colleagues in an e-mail that same day that there would be a WAC increase by Glenmark effective November 13, 2014, and that she had already been able to obtain certain contract price points that Glenmark would be charging to distributors.

1021.   Around the time she sent the e-mail, Patel exchanged two text messages with Brown of Glenmark. Having relatively little market share for Gabapentin, Teva discussed whether it should use the Glenmark price increase as an opportunity to pick up some market share, and over the next several weeks, as alleged herein Teva did pick up market share to be more in line with "fair share" principles.

1022.   No shortages or other market features can explain Defendants' price increases for Gabapentin during the Relevant Period.

1023.   The elevated prices of Gabapentin that resulted from Defendants' anti-competitive conduct has injured Plaintiff, causing Plaintiff to pay more than it would have paid in a free and fair market.

1024.   The unlawful agreement between Teva and Glenmark regarding Gabapentin was part of these Defendants' participation in the Price-Fixing Conspiracy.

**Celecoxib**

1025.   Celecoxib, also known by the brand name Celebrex®, is a Non-Steroidal Anti-Inflammatory (NSAID) drug, and, like Piroxicam, is used in the treatment of pain and inflammation associated with rheumatoid arthritis, juvenile rheumatoid arthritis, and other disorders.

1026.   Teva received approval to market generic Celecoxib in May 2014.

1027.   As part of Defendants' participation in the Price-Fixing Conspiracy, Defendants conspired to fix, raise, maintain, and/or stabilize the price of Celecoxib.

1028.   On November 20, 2014, as Teva was preparing to launch generic Celecoxib, a customer informed Teva that Actavis was bidding on some of that customer's Celecoxib business. The customer said that Actavis was preparing for a launch of its own Celecoxib product and had advocated for the sale by pointing out that Teva had already secured over thirty percent of the market.

1029.   Eleven days later, on December 1, 2014, the issue of which account for Teva to give to Actavis to obtain its "fair share" remained undecided. Another customer, a large retail pharmacy chain, became actively involved in trying to broker an agreement

between Teva and Actavis, and, in accordance with the Price-Fixing Conspiracy, ultimately split its business between Teva and Actavis to accommodate the "rules of the road," as Defendants sometimes referred to their conspiracy.

1030. In addition, in the days leading up to Teva's Celecoxib launch of December 10, 2014, Teva executives had numerous telephone conversations with their counterparts at Actavis. Rekenthaler had a six minute call with Falkin at Actavis on November 25, 2014 and the two spoke twice more a week later, on December 3, 2014. Patel spoke to A.B., a senior sales and marketing executive at Actavis, for approximately eight minutes on December 5, 2014 and for over a quarter hour a few days later, on December 8, 2014. Rekenthaler and Falkin resumed their communications the day before the Teva launch December 9, 2014 with a one-minute telephone call. On the day of the launch, December 10, 2014, Rekenthaler and Falkin spoke three times, the longest of which was for approximately nine minutes.

1031. No shortages or other market features can explain Defendants' elevated pricing for Celecoxib during the Relevant Period.

1032. The elevated prices of Celecoxib that resulted from Defendants' anti-competitive conduct has injured Plaintiff, causing Plaintiff to pay more than it would have paid in a free and fair market.

1033. The unlawful agreement between Defendants Teva and Actavis regarding Celecoxib was part of these Defendants' participation in the Price-Fixing Conspiracy

**Cabergoline**

1034. Cabergoline, a fungal derivative, also known by the brand name Dostinex®, is used in managing certain benign tumors of the pituitary gland, among

other uses. Throughout the Relevant Period, Defendant Teva was the incumbent supplier of Cabergoline.

1035.    As part of Defendants' participation in the Price-Fixing Conspiracy, Defendants conspired to fix, raise, maintain, and/or stabilize the price of Cabergoline.

1036.    In December 2014, Greenstone was preparing to enter the market for Cabergoline. In accordance with the Price-Fixing Conspiracy, Greenstone would be entitled to its "fair share" of Teva customers upon entering the market.  Greenstone wanted to communicate this to Teva, but appears to have wanted to do so discreetly.

1037.    Greenstone passed this message via an intermediary, F.H., a senior executive responsible for generic products at a large joint venture between a retail pharmacy and a large wholesaler, which purchased over $800,000 of Cabergoline annually. As mentioned, because the wholesalers typically had "cost-plus" distribution contracts, they also profited from the Price-Fixing Conspiracy and were therefore incentivized to assist in the Price-Fixing Conspiracy.

1038.    F.H. told Teva that Greenstone was entering the market for Cabergoline and was seeking to target specific customers, specifically requesting that Teva give up a large wholesaler to the new entrant, telling Teva that "Greenstone has promised to play nice[ly] in the sandbox."

1039.    After discussing the matter internally, T.C. of Teva advised F.H. that Teva would give the business with the requested wholesaler to Teva's competitor: "[t]ell Greenstone we are playing nice in the sandbox and we will let them have [the wholesaler]."

1040.    Pursuant to this agreement, Greenstone was able to acquire the wholesaler as a customer for Cabergoline without fear that Teva would compete to retain the business. In exchange, Greenstone agreed to "play nice in the sandbox" by not competing with Teva for other customers, which would drive prices down.

1041.    No shortages or other market features can explain Defendants' elevated pricing for Cabergoline during the Relevant Period.

1042.    The elevated prices of Cabergoline that resulted from Defendants' anti-competitive conduct has injured Plaintiff, causing Plaintiff to pay more than it would have paid in a free and fair market.

1043.    The unlawful agreement between Teva and Greenstone regarding Cabergoline was part of these Defendants' participation in the Price-Fixing Conspiracy.

## THE EFFECT OF THE PRICE-FIXING CONSPIRACY

1044.    The effect of the Price-Fixing Conspiracy was to fix and/or raise the price of generic drugs, and prevent generic drug prices from decreasing or being set at a level that they would be in a competitive market.  In fact, between July 2013 and July 2014, the prices of more than 1,200 generic medications increased an average of 448 percent. A separate analysis conducted by Sandoz showed that during the calendar years 2013 and 2014, there were almost 1,500 examples of generic WAC prices more than doubling in that time, of which 178 increased by more than ten-fold. During the year ending June 30, 2014, more than $500 million of Medicaid drug reimbursements were for generic drugs whose prices had increased by over 100 percent during that time, all of which were due to the Price-Fixing Conspiracy.

## THE PRICE-FIXING CONSPIRACY CONSTITUTES VIOLATIONS OF FEDERAL AND STATE ANTITRUST LAW

1045.   During the Relevant Period, Defendants engaged in the Price-Fixing Conspiracy: a continuing unlawful agreement, understanding and conspiracy in restraint of trade to allocate customers, rig bids and fix, raise, maintain and/or stabilize prices for the Drugs at Issue sold throughout the U.S. and in Suffolk County.

1046.   In formulating and effectuating the Price Fixing Conspiracy, Defendants engaged in, and continue to engage in, anti-competitive activities with the purpose and effect of allocating customers, rigging bids and artificially fixing, raising, maintaining and/or stabilizing the price of the Drugs at Issue sold throughout the U.S. and in Suffolk County.  The Price-Fixing Conspiracy included the following conduct:

    (a)   Defendants participated in meetings and/or conversations (in-person, electronically and telephonically) regarding the prices of Drugs at Issue;

    (b)   Defendants agreed during those meetings and/or conversations to charge certain prices and otherwise to increase and/or maintain prices of the Drugs at Issue sold throughout the U.S.;

    (c)   Defendants agreed during those meetings to allocate market shares and customers amongst themselves in accordance with a "fair share" concept they developed;

    (d)   Defendants agreed to engage in conduct such as rigging bids and placing sham bids so that certain generic drug manufacturers could maintain customers, and colluding on responses to customers who

requested bids from certain of the Defendants and/or their co-conspirators; and

(e)     Defendants issued price quotations and price announcements in accordance with their agreements on the pricing of the generic drugs they manufactured.

1047.    The Price-Fixing Conspiracy constitutes an unreasonable restraint of trade and commerce in violation of Sections One and Three of the Sherman Act, 15 U.S.C. §§ 1, 3, the Donnelly Act, GBL § 340, et seq. and NY Social Services Law § 145-b.

1048.    The Price-Fixing Conspiracy had (and continues to have), *inter alia*, the following effects:

(a)     Artificially restraining price competition in the market for the Drugs at Issue;

(b)     Artificially raising, fixing, maintaining or stabilizing prices for the Drugs at Issue;

(c)     Depriving direct and indirect purchasers for the Drugs at Issue, including Plaintiff, the benefit of free and open competition in the market for the Drugs at Issue;

(d)     Throughout the Relevant Period, Plaintiff directly and indirectly purchased and reimbursed purchases of the Drugs at Issue at prices which were artificially inflated as the direct, and intended, consequence of the Price-Fixing Conspiracy.  This is because the Price-Fixing Conspiracy resulted in prices paid by wholesalers to

generic drug manufacturers for generic drugs which were higher than they would have been in a competitive market, which in turn resulted in (artificially) higher prices being paid by all purchasers in the generic drug supply chain, including end purchasers (such as Plaintiff) and reimbursors of end purchasers (including Plaintiff); and

(e)     As a result of the Price-Fixing Conspiracy, Plaintiff has suffered financial damages in that it has paid more for the Drugs at Issue than it would have paid in a competitive market.

## THE PRICE-FIXING CONSPIRACY AFFECTED AND AFFECTS INTERSTATE AND INTRASTATE TRADE AND COMMERCE

1049.     During the Relevant Period, Defendants sold and distributed generic drugs in a continuous and uninterrupted flow of interstate commerce to consumers throughout the U.S., including consumers in Suffolk County and New York State.

1050.     Defendants' conduct in engaging in the Price-Fixing Conspiracy took place in the U.S., including in New York State and Suffolk County, and has had a direct, significant anti-competitive effect upon interstate commerce within the U.S. and in between New York and other states.  This anti-competitive effect was intended and reasonably foreseeable by Defendants.

1051.     Defendants' conduct in engaging in the Price-Fixing Conspiracy had substantial intrastate effects, including preventing retailers within New York State and Suffolk County from offering generic drugs at a lower price to consumers.  This directly impacted commerce for consumers within Suffolk County, including Plaintiff, which was forced to pay artificially inflated prices for generic drugs.

## FACTS RELATING TO STATUTES OF LIMITATION

### Defendants' Violations Continue to the Present Date

1052.    Because of the ongoing nature of the Price-Fixing Conspiracy, which continues to the present date, Plaintiff continues to incur new damages each time it directly purchases or reimburses the purchase of one of the Drugs at Issue.  As such, applicable statutes of limitation do not bar the claims Plaintiff alleges in this Complaint.

### Plaintiff Had No Knowledge of the Price-Fixing Conspiracy Until at Least May 2019

1053.    Plaintiff did not know about, had no cause to know or suspect, and could not have reasonably discovered the Price-Fixing Conspiracy until at least on or around May 10, 2019, when the Second State Lawsuit Complaint became publicly available, and/or on or around June 21, 2019, when the unredacted version of the Second State Lawsuit Complaint became publicly available.  Prior to that, no information in the public domain or available to Plaintiff revealed or would have put Plaintiff on inquiry of the extensive Price-Fixing Conspiracy in which Defendants were involved.  Plaintiff simply could not have discovered the facts of the Price-Fixing Conspiracy and Defendants' role. By its very nature, the Price-Fixing conspiracy was a secret that could not be discovered by anyone other than those with investigative powers like State Attorneys General and the U.S DOJ.  As such, applicable statutes of limitation do not bar the claims Plaintiff alleges in this Complaint.

### Defendants Concealed their Unlawful Conduct

1054.    Defendants repeatedly and expressly misled the public and Plaintiff, throughout the Relevant Period, by openly and falsely stating, including on their public Websites, that they prohibited the type of collusion alleged in this Complaint.

1055.    In addition, Defendants' Codes of Conduct explicitly stated that they prohibited engagement in collusive behavior, such as the Price-Fixing Conspiracy.  For example:

(a)    Allergan's (predecessor to Actavis) Code of Conduct states: "We support a free and open market, which is why we comply with competition laws everywhere we do business and strive to always compete fairly";

(b)    Apotex's Code of Conduct directs employees: "Do not communicate with competitors about competitive business matters such as prices, costs discounts, customer suppliers, marketing plans, production capacities or any terms or conditions of sale that could create the appearance of improper agreements or understandings.  Do not make agreements or reach understandings with competitors regarding allocation of customers, territories or market share. Do not conspire with other bidders when competing for contracts";

(c)    Dr. Reddy's' Code of Conduct states: "We believe in free and open competition and never engage in improper practices that may hamper fair competition.  We never look to gain competitive advantages through unethical or unlawful business practices. . . . [W]e must never enter into agreements with competitors to engage in any anti- competitive behavior, including colluding or cartelization, fixing prices, dividing up customers, suppliers or markets";

(d)    Glenmark's Code of Conduct states: "We must engage in fair competition and must ensure that our business dealings comply with all applicable

local antitrust and competition laws, such as monopoly, unfair trade, or price discrimination laws. We must not make agreements or engage in concerted actions with a competitor with the intent of improperly dividing markets by allocating territories, customers, goods, or services, or price-fixing or collusion";

(e)     Hikma's (the parent of West-Ward) Code of Conduct provides: "Hikma will engage in free and fair competition and not seek competitive advantage through unlawful means. Hikma will not collude with competitors on prices, bids or market allocations, nor exchange information with third parties in a way that could improperly influence business outcomes";

(f)     Mayne's Business Code of Conduct provides: "Do not agree, even informally, with competitors on price (or any elements of price including discounts or rebates), production, customers or markets without a lawful reason";

(g)     Mylan's Code of Conduct and Business Ethics states: "Mylan is committed  to complying with applicable antitrust and fair competition laws";

(h)     Novartis's (Parent of Sandoz) Code of Conduct states: "We are committed to fair competition and will not breach competition laws and regulations";

(i)     Par's Code of Conduct provides: "It is Company policy to comply with the antitrust and competition laws of each country in which the Company does business";

(j)     Perrigo's Code of Conduct provides: "We will succeed based on the quality and value of our products and not by illegal or otherwise improper business practices. Competition laws, also known as 'antitrust' laws, generally prohibit agreements with competitors, suppliers or customers that could unfairly limit free and open competition;"

(k)     Sun Pharmaceutical Industries, Ltd. (parent of Sun and Taro) has a Global Code of Conduct that provides: "We seek to outperform our competition fairly and honestly. We seek competitive advantages through superior performance, never through unethical or illegal business practices." It goes on to direct its employees that: "Sun Pharma shall compete only in an ethical and legitimate manner and prohibits all actions that are anti-competitive or otherwise contrary to applicable competition or anti-trust laws";

(l)     Taro's Code of Conduct provides: "we do not discuss any of the following topics with our competitors: prices or price-fixing, customer or market allocation, bids or bid-rigging, any topic that seems to be about restricting competition.  If a competitor attempts to engage you in a discussion on any of these topics, make it clear that you do not wish to participate. Leave the conversation immediately, and report the matter to Corporate Compliance";

(m)     Teva's Code of Conduct provides: "We believe that customers and society as a whole benefit from fair, free and open markets. Therefore, we compete on the merits of our products and services and conduct business with integrity. We recognize that the potential harm to Teva's reputation and the penalties for breaching competition laws are severe, and can subject Teva, members of the Board of Directors and employees to severe civil fines and criminal penalties."

1056.   Through their misleading and false statements, Defendants concealed the Price-Fixing Conspiracy. Defendants' misrepresentations were intended to mislead Plaintiff into believing any price increases for generic drugs were the normal result of a competitive generic drug market rather than the result of the Price-Fixing Conspiracy. Plaintiff, as a result of Defendants' misrepresentations, collusion and misconduct, had no reason to question the prices paid for generic drugs and reasonably believed those prices were not artificially inflated. Defendants' conduct in misleading Plaintiff in this way caused Plaintiff economic harm.

1057.   It was reasonable for Plaintiff to believe the false and misleading statements made by Defendants, until the allegations in the Second State Lawsuit Complaint became publicly available on or around May 10, 2019 and/or until the unredacted version of the Second State Lawsuit Complaint became available on or around June 21, 2019. As such, applicable statutes of limitation do not bar the claims Plaintiff alleges in this Complaint.

1058.   In addition, Defendants concealed the Price-Fixing Conspiracy by ensuring much of it occurred through face-to-face meetings and not creating or retaining

written and electronic communications and records of those communications.  Plaintiff therefore could not have discovered the Price-Fixing conspiracy through reasonable diligence until the Second State Lawsuit Complaint became available on May 10, 2019 and/or until the unredacted Second State Lawsuit Complaint became available on or around June 21, 2019.  As such, applicable statutes of limitation do not bar the claims Plaintiff alleges in this Complaint.

## CAUSES OF ACTION AGAINST ALL DEFENDANTS

### FIRST CAUSE OF ACTION
### Violation of Sections 1 and 3 of the Sherman Act

1059.    Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 1058 as if fully set forth herein.

1060.    This count is brought against all Defendants for their participation in the Price-Fixing Conspiracy, which was an overarching conspiracy to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

1061.    This count is also brought against Defendants who participated in each of the drug-specific conspiracies alleged above, each of which were an aspect of the Price-Fixing Conspiracy.

1062.    Throughout the Relevant Period, Defendants and their co-conspirators participated in the Price-Fixing Conspiracy, which involved entering into a continuing agreement, understanding and conspiracy in restraint of trade to artificially allocate customers, rig bids and raise, maintain and fix prices for the Drugs at Issue, thereby creating anti-competitive effects, as described herein.

1063.   The Price-Fixing Conspiracy has caused, and continues to cause, unreasonable restraints in the market for the Drugs at Issue.

1064.   As a result of Defendants' participation in the Price-Fixing Conspiracy, Plaintiff has been harmed by being forced to pay inflated, supracompetitive prices for the Drugs at Issue.

1065.   The Price-Fixing Conspiracy had (and continues to have), *inter alia*, the following effects:

> (a)   Price competition in the market for the Drugs at Issue has been restrained, suppressed, and/or eliminated throughout the U.S., including within Suffolk County; and

> (b)   Prices for the Drugs at Issue manufactured and distributed by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the U.S., including within Suffolk County.

1066.   In addition, Defendants profited from their participation in the Price-Fixing Conspiracy, to the detriment of Plaintiff.

1067.   Throughout the Relevant Period, Plaintiff purchased or reimbursed purchases of the Drugs at Issue by paying the prescription costs of (i) those employees and retirees of Suffolk County, and their dependents, who are not covered by Medicare; (ii) certain former employees of Suffolk County and their dependents, who not covered by Medicare, for a limited period of time under the Consolidated Omnibus Budget Reconciliation Act; (iii) inmates of the Suffolk County operated jail system; (iv) children born to female inmates of the Suffolk County operated jail system, for the period the

child resides within the jail system; (v) Medicaid beneficiaries who reside within Suffolk County and/or for whom Suffolk County has been determined to be the district of fiscal responsibility; and (vi) Medicare beneficiaries, which include certain employees, retirees and former employees of Suffolk County and their dependents.

1068.    As a result of Defendants' participation in the Price-Fixing Conspiracy, Plaintiff has been injured and will continue to be injured by paying more for the Drugs at Issue than it would pay in the absence of the Price-Fixing Conspiracy, and by being deprived of the benefits of paying for generic drugs which are sold in a truly competitive market.

1069.    The Price-Fixing Conspiracy, in which Defendants and their co-conspirators engaged, constituted a contract, combination, or conspiracy in unreasonable restraint of trade which is a violation and/or a per se violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3.

1070.    Plaintiff continues to suffer irreparable injury as a result of Defendants' involvement in the Price-Fixing Conspiracy, which cannot be adequately compensated by remedies available at law.

1071.    It is in the public interest that Defendants are prevented from continuing to engage in the Price-Fixing Conspiracy, which has adversely affected the U.S. healthcare system as a whole, governmental entities and patients specifically, by artificially inflating the prices of generic drugs manufactured by Defendants and their co-conspirators.

1072.    It is not unfairly prejudicial for Defendants to be prevented from continuing to engage in the Price-Fixing Conspiracy, because the Price-Fixing

Conspiracy is an unlawful contract, combination or conspiracy in unreasonable restraint of trade.

1073.    As a result of the allegations set forth in this Complaint, Defendants are jointly, severally and/or in the alternative individually liable to Plaintiff for damages, including treble damages, interest and costs.

1074.    As a further result of the allegations set forth in this Complaint, Plaintiff is entitled to an injunction against all Defendants, preventing and restraining the continuing violations of the Sherman Act alleged herein.

## SECOND CAUSE OF ACTION
### Violation of the Donnelly Act, New York General Business Law § 340, *et seq.*

1075.    Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 1058 as if fully set forth herein.

1076.    This count is brought against all Defendants for their participation in the Price-Fixing Conspiracy, which was an overarching conspiracy to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

1077.    This count is also brought against Defendants who participated in each of the drug- specific conspiracies alleged above, each of which were an aspect of the Price-Fixing Conspiracy.

1078.    Throughout the Relevant Period, Defendants and their co-conspirators participated in the Price-Fixing Conspiracy, which involved entering into a continuing agreement, understanding and conspiracy in restraint of trade to artificially allocate customers, rig bids and raise, maintain and fix prices for the Drugs at Issue, thereby creating anti-competitive effects, as described herein.

1079. The Price-Fixing Conspiracy has caused, and continues to cause, unreasonable restraints in the market for the Drugs at Issue.

1080. Throughout the Relevant Period, Plaintiff purchased or reimbursed purchases of the Drugs at Issue by paying the prescription costs of (i) those employees and retirees of Suffolk County, and their dependents, who are not covered by Medicare; (ii) certain former employees of Suffolk County and their dependents, who not covered by Medicare, for a limited period of time under the Consolidated Omnibus Budget Reconciliation Act; (iii) inmates of the Suffolk County operated jail system; (iv) children born to female inmates of the Suffolk County operated jail system, for the period the child resides within the jail system; (v) Medicaid beneficiaries who reside within Suffolk County and/or for whom Suffolk County has been determined to be the district of fiscal responsibility; and (vi) Medicare beneficiaries, which include certain employees, retirees and former employees of Suffolk County and their dependents.

1081. As a result of Defendants' participation in the Price-Fixing Conspiracy, Plaintiff has been harmed by being forced to pay inflated, supracompetitive prices for the Drugs at Issue.

1082. The Price-Fixing Conspiracy had (and continues to have), inter alia, the following effects:

(a) Price competition in the market for the Drugs at Issue has been restrained, suppressed, and/or eliminated throughout the U.S., including within Suffolk County; and

(b) Prices for the Drugs at Issue manufactured and distributed by Defendants and their co-conspirators have been fixed, raised,

maintained, and stabilized at artificially high, non-competitive levels throughout the U.S., including within Suffolk County.

1083. In addition, Defendants profited from their participation in the Price-Fixing Conspiracy, to the detriment of Plaintiff.

1084. Plaintiff purchased or reimbursed purchases of the Drugs at Issue throughout the Relevant Period, as described above in this Cause of Action. As a result of Defendants' participation in the Price-Fixing Conspiracy, Plaintiff has been injured and will continue to be injured by paying more for the Drugs at Issue than it would pay in the absence of the Price-Fixing Conspiracy, and by being deprived of the benefits of paying for generic drugs which are sold in a truly competitive market.

1085. The Price-Fixing Conspiracy, in which Defendants and their co-conspirators engaged, constituted a contract, combination, or conspiracy in unreasonable restraint of trade which is a violation and/or a per se violation of the Donnelly Act, New York General Business Law § 340, et seq.

1086. As a result of the allegations set forth in this Complaint, Defendants are jointly, severally and/or in the alternative individually liable to Plaintiff for damages, including treble damages, interest and costs.

### THIRD CAUSE OF ACTION
### Unjust Enrichment

1087. Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 1058 as if fully set forth herein.

1088.    This count is brought against all Defendants for their participation in the Price-Fixing Conspiracy, which was an overarching conspiracy to fix, raise, maintain, and/or stabilize the prices the Drugs at Issue.

1089.    This count is also brought against Defendants who participated in each of the drug- specific conspiracies alleged above, each of which were an aspect of the Price-Fixing Conspiracy.

1090.    Throughout the Relevant Period, Defendants inequitably benefited from their participation in the Price-Fixing Conspiracy, in violation of federal and state law. Plaintiff paid artificially inflated prices for the Drugs at Issue, which was the direct consequence of the Price-Fixing Conspiracy, and Defendants directly received financial benefits as a result of Plaintiff's overpayments for the Drugs at Issue.

1091.    Plaintiff conferred upon Defendants an economic benefit, in the nature of profits made by Defendants resulting from unlawful overcharges for the Drugs at Issue, to the economic detriment of Plaintiff.

1092.    Defendants have been enriched by revenue resulting from unlawful overcharges for the Drugs at Issue while Plaintiff had been impoverished by the overcharges it paid for the Drugs at Issue (which were due to Defendants' participation in the Price-Fixing Conspiracy).    Defendants' enrichment and Plaintiff's impoverishment are connected.

1093.    There is no justification for Defendants' enrichment and retention of the financial benefits they received from Plaintiff as a result of their participation in the Price-Fixing Conspiracy.

1094.     Plaintiff did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

1095.     The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of the Drugs at Issue.

1096.     The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to their unlawful overcharges of the Drugs at Issue are ascertainable by review of sales records.

1097.     It would be futile for Plaintiff to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it indirectly purchased the Drugs at Issue, as the intermediaries cannot reasonably be expected to compensate Plaintiff for Defendants' unlawful conduct.

1098.     The economic benefit of overcharges and monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for the Drugs at Issue is a direct and proximate result of Defendants' unlawful practices.

1099.     The financial benefits derived by Defendants rightfully belong to Plaintiff because Plaintiff paid supracompetitive prices, inuring to the benefit of Defendants.

1100.     It would be inequitable under unjust enrichment principles under the law of New York State for Defendants to be permitted to retain any of the overcharges for the Drugs at Issue derived from the unlawful Price-Fixing Conspiracy.

1101.     Defendants are aware of the benefits bestowed upon them by Plaintiff. Defendants consciously accepted the benefits and continue to do so as at the present date.

1102.    Defendants should be compelled to disgorge to Plaintiff all unlawful or inequitable proceeds they received from their sales of the Drugs at Issue.

1103.    Plaintiff has no adequate remedy at law.

1104.    By engaging in the foregoing unlawful or inequitable conduct depriving Plaintiff of the opportunity to purchase the Drugs at Issue at a competitive price and forcing it to pay artificially high prices for the Drugs at Issue, Defendants have been unjustly enriched in violation of the common law of New York.

1105.    Defendants unlawfully overcharged Plaintiff, who made purchases of, or reimbursements for the Drugs at Issue in and for Suffolk County at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Drugs at Issue, which revenue resulted from anti-competitive prices paid and reimbursed by Plaintiff, which inured to Defendants' benefit.  Defendants' enrichment has occurred at the expense of Plaintiff. It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

1106.    As a result, each Defendant is liable to Plaintiff for the amount of revenue it obtained as a result of artificially inflated prices paid by Plaintiff for generic drugs manufactured by Defendants.

**FOURTH CAUSE OF ACTION**
**Violation of New York Social Services Law § 145-b**

1107.    Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 1058 as if fully set forth herein.

1108.    This count is brought against all Defendants for their participation in the Price-Fixing Conspiracy, which was an overarching conspiracy to fix, raise, maintain, and/or stabilize the prices of the Drugs at Issue.

1109.    This count is also brought against Defendants who participated in each of the drug- specific conspiracies alleged above, each of which were an aspect of the Price-Fixing Conspiracy.

1110.    NY Social Services Law § 145-b provides, in part:

> 1.(a) It shall be unlawful for any person, firm or corporation knowingly by means of a false statement or representation, or by deliberate concealment of any material fact, or other fraudulent scheme or device, on behalf of himself or others, to attempt to obtain or to obtain payment from public funds for services or supplies furnished or purportedly furnished pursuant to this chapter.

> (b) For purposes of this section, "statement or representation" includes, but is not limited to: a claim for payment made to the state, a political subdivision of the state, or an entity performing services under contract to the state or a political subdivision of the state; an acknowledgment, certification, claim, ratification or report of data which serves as the basis for a claim or a rate of payment, financial information whether in a cost report or otherwise, health care services available or rendered, and the qualifications of a person that is or has rendered health care services.

> (c) For purposes of this section, a person, firm or corporation has attempted to obtain or has obtained public funds when any portion of the funds from which payment was attempted or obtained are public funds, or any public funds are used to reimburse or make prospective payment to an entity from which payment was attempted or obtained.

1111.    Defendants' participation in the Price-Fixing Conspiracy resulted in the Drugs at Issue being sold at artificially inflated prices.  This includes those generic drugs which were reimbursed by Medicaid.

1112.    Defendants' conduct in selling generic drugs at artificially inflated prices, which were reimbursed by Medicaid, constitutes attempting to obtain and obtaining

payment from Medicaid by: (a) knowingly making a false statement or representation as to the true cost of the relevant generic drugs; (b) deliberately concealing the fact the relevant generic drugs' prices were artificially inflated by the Price-Fixing Conspiracy; and/or (c) engaging in a fraudulent scheme (the Price-Fixing Conspiracy).

1113.    Defendants' conduct violated New York Social Services Law **§** 145-b.

1114.    As a proximate result of Defendants' conduct, Plaintiff has suffered overpayments of Medicaid reimbursements.

1115.    As a result of the allegations set forth in this Complaint, Defendants are jointly, severally and/or in the alternative individually liable to Plaintiff for damages, including interest and costs.

## **PRAYER FOR RELIEF**

WHEREFORE Plaintiff demands judgment against the Defendants on each cause of action as follows:

(a)    The unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed: (a) an unreasonable restraint of trade or commerce in violation of Sections 1 and 3 of the Sherman Act; (b) a violation of the Donnelly Act, General Business Law § 340, *et seq*.; (c) a violation of New York Social Services Law § 145-b; and/or (d) acts of unjust enrichment by Defendants as set forth herein;

(b)    Awarding damages to the maximum extent allowed under such law and that a judgment in favor of Plaintiff be entered against Defendants jointly and severally in an amount to be trebled to the extent the law permits;

(c)     Awarding damages, to the maximum extent allowed by law, in the form of restitution and/or disgorgement of profits unlawfully obtained;

(d)     Awarding restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment;

(e)     Permanently enjoining and restraining Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, from, in any manner, continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

(f)     Awarding prejudgment interest to the extent permitted by law at the highest legal rate;

(g)     Awarding the costs of this suit, including reasonable attorney's fees; and

(h)     Awarding such other and further relief as this Court may seem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff demands a trial by jury on all issues so triable.

Dated: New York, New York
     August 27, 2020

                       Respectfully submitted,

**CALCATERRA POLLACK LLP**

_____

REGINA M. CALCATERRA
rcalcaterra@calcaterrapollack.com
JANINE POLLACK
jpollack@calcaterrapollack.com
MICHAEL LISKOW
mliskow@calcaterrapollack.com
1140 Avenue of the Americas
9th Floor
New York, New York 10036
(212) 899-1760
*Attorneys for Plaintiff*